Nos. 2015-1346, -1347

# United States Court of Appeals
# for the Federal Circuit

SAS INSTITUTE, INC.,

*Appellant,*

v.

COMPLEMENTSOFT, LLC,

*Cross-Appellant.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2013-00226.

## OPENING BRIEF OF APPELLANT SAS INSTITUTE, INC.

JOHN A. MARLOTT
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
(312) 782-3939

DAVID B. COCHRAN
JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939

GREGORY A. CASTANIAS
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939

MATTHEW W. JOHNSON
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939

*Counsel for Appellant SAS Institute, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Appellant SAS Institute, Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

SAS Institute, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

JONES DAY:  John A. Marlott, David B. Cochran, John V. Biernacki, Joshua R. Nightingale, Gregory A. Castanias, Matthew W. Johnson


Dated: April 21, 2015              /s/ John A. Marlott
                                   JOHN A. MARLOTT
                                   JONES DAY
                                   77 West Wacker Drive
                                   Chicago, IL 60601
                                   Telephone:  (312) 782-3939

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................................i

TABLE OF AUTHORITIES ...........................................................................vi

TABLE OF ABBREVIATIONS .......................................................................ix

STATEMENT OF RELATED CASES .............................................................xi

I.     RELATED PROCEEDINGS REGARDING THE '936 PATENT .............xi

II.    OTHER PROCEEDINGS INVOLVING RELATED ISSUES ...................xi

STATEMENT OF JURISDICTION..................................................................1

STATEMENT OF THE ISSUES.......................................................................1

STATEMENT OF THE CASE..........................................................................2

I.     INTRODUCTION .................................................................................2

II.    THE '936 PATENT ...............................................................................3

    A.     The Alleged Invention Of The '936 Patent.........................................3

        1.     Background of the Invention .....................................................3

        2.     The Four Key Modules Disclosed And Claimed In The
        '936 Patent ................................................................................4

    B.     The '936 Patent Claims ......................................................................10

        1.     Claims 1, 3 and 5-10 ................................................................10

        2.     Dependent Claim 4 (Addressed In The Board's Final
        Written Decision) Recites "Data Flows." ...............................11

        3.     Dependent Claim 2 (*Not* Addressed In The Board's Final
        Written Decision) Also *More Broadly* Recites "Data
        Flows." ......................................................................................11

III.   THE PRIMARY PRIOR ART PERTINENT TO SAS'S APPEAL ............12

    A.     Coad.....................................................................................................12

    B.     Antis ....................................................................................................15

    C.     Burkwald .............................................................................................18

IV.    *INTER PARTES* REVIEW OF THE '936 PATENT ....................................18

    A.     SAS's Petition & ComplementSoft's Preliminary Response ............18

    B.     The Board's Institution Decision .......................................................19

# TABLE OF CONTENTS
## (continued)

Page

C.  August 12, 2013 Scheduling Order .....................................20

D.  ComplementSoft's Response & SAS's Reply ................20

E.  ComplementSoft's Motion To Amend & SAS's Opposition ...........21

F.  The Oral Hearing & Final Written Decision................22

G.  SAS's Request For Rehearing................................24

SUMMARY OF THE ARGUMENT .......................................25

ARGUMENT ....................................................27

I.  STANDARDS OF REVIEW.....................................27

II. THE BOARD'S NEWLY-ADOPTED CONSTRUCTION FOR "DATA FLOWS" IS NOT THE "BROADEST REASONABLE CONSTRUCTION" IN VIEW OF THE SPECIFICATION, AND THAT INCORRECT CLAIM CONSTRUCTION CAUSED THE BOARD TO ERR REGARDING CLAIM 4.............................28

A.  The Board Adopted An Entirely New And Narrower Claim Construction For "Data Flows" In The Final Written Decision And Reaffirmed That Narrow Construction In The Rehearing Decision.................................28

B.  The Board's New Claim Construction For "Data Flows" Is Not The "Broadest Reasonable Construction In Light Of The Specification." ..................................30

1.  The Board Improperly Equated "Data Flows" (As Recited In Claim 4) With "Data Flow Diagrams" (A Different Term *Not* Recited In Claim 4)..................31

2.  The Board's Construction Is Not The Broadest Reasonable Construction Because The '936 Patent Specification Does *Not* Limit The Display Of "Data Flows" To "Data Flow Diagrams." .........................32

3.  The '936 Patent Specification Uses The Terms "Data Flows" And "Data Flow Diagrams" Differently. ...................33

4.  The Board's New Claim Construction Is Based On A Misreading Of The Specification............................34

# TABLE OF CONTENTS
### (continued)

Page

5.  The Board's New Claim Construction Improperly Reads Into The Claims A Specific, Non-Limiting Embodiment Described In The Specification ................................................. 35

C.  Because The Board Adopted An Entirely New Claim Construction In The Final Written Decision, SAS Was Prevented From Presenting Evidence Tailored To That New Claim Construction During The IPR ................................................. 38

D.  Applying The Broadest Reasonable Construction, As The Board Should Have Done, SAS Demonstrated By A Preponderance Of The Evidence That Claim 4 Is Unpatentable ....... 40

1.  Coad Discloses Data Flows ..................................................... 42

2.  As Properly Construed, Claim 4 Is Unpatentable In View Of The Prior Art ................................................................ 44

III.  THE BOARD ERRED AS A MATTER OF LAW BY FAILING TO ISSUE A FINAL WRITTEN DECISION ON ALL PATENT CLAIMS CHALLENGED BY SAS ...................................................... 45

A.  As Required By Statute, The Board Should Have Issued A Final Written Decision On All Patent Claims Challenged In SAS's IPR Petition, Including Claims 2 and 11-16 .......................... 45

B.  By Its Literal Terms, 35 U.S.C. § 318(a) Requires That The Board "*Shall* Issue A Final Written Decision With Respect To The Patentability Of *Any Patent Claim Challenged By The Petitioner.*" ....................................................................... 47

C.  Had It Complied With Section 318(a), The Board Could Have Avoided The Need To Craft A New And Overly Narrow Claim Construction For "Data Flows" In The Final Written Decision In This Case ................................................................... 51

D.  The PTO's Partial Institution Practice Frustrates Congress's Goal For The *Inter Partes* Review Process, And The Board's Disregard For The Requirements Of Section 318(a) Will Increase The Burdens On The District Courts And This Court ........ 53

E.  The PTO's Partial Institution Practice Has Affected And Will Continue To Affect A Substantial Percentage Of Board Trials ........ 57

# TABLE OF CONTENTS
(continued)

**Page**

CONCLUSION ...................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318 (Fed. Cir. 2011) ...............................................................................................45

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) .........................48

*Barsebäck Kraft AB v. United States*, 121 F.3d 1475 (Fed. Cir. 1997)...................48

*Computer Docking Station Corp. v. Dell, Inc.*, 519 F. 3d 1366 (Fed. Cir. 2008) ...............................................................................................38

*In re Baxter Int'l, Inc.*, 678 F.3d 1357 (Fed. Cir. 2012) .........................................27

*In re Bigio*, 381 F.3d 1320 (Fed. Cir. 2004) ...........................................................34

*In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271 (Fed. Cir. 2015)..............27, 30, 47

*In re Morris*, 127 F.3d 1048 (Fed. Cir. 1997)..........................................................30

*In re Rambus*, 694 F.3d 42 (Fed. Cir. 2012)............................................................35

*In re Sullivan*, 362 F.3d 1324 (Fed. Cir. 2004)..................................................28, 47

*Intellectual Ventures II, LLC v. JPMorgan Chase & Co.*, No. 14-1724 (Fed. Cir. Apr. 1, 2015) ...............................................................................46, 48

*Kara Technology, Inc. v. Stamps.com, Inc.*, 582 F.3d 1341 (Fed. Cir. 2009) ........................................................................................... 31-32

*Miller v. French*, 530 U.S. 327 (2000) ....................................................................48

*Micron Tech., Inc. v. United States*, 243 F.3d 1301 (Fed. Cir. 2001) ....................49

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)................................................................................................48

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................38

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ...................................48

*Sharp Elecs. Corp. v. McHugh*, 707 F.3d 1367 (Fed. Cir. 2013) ...........................48

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ...........................49

*Softview LLC v. Apple, Inc.*, Nos. 12-989 & 10-389-LPS, 2013 WL
    4757831 (D. Del. Sep. 4, 2013) ...................................... 54-55

*Specialty Composites v. Cabot Corp.*, 845 F.2d 981 (Fed. Cir.1988) ....................35

*Sullivan v. Stroop*, 496 U.S. 478 (1990) ...................................49

*St. Jude Medical v. Volcano Corp.*, 749 F.3d 1373 (Fed. Cir. 2014) ......................50

*Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831
    (2015) ....................................................................27

*United States v. Gonzales*, 520 U.S. 1 (1997) ................................. 48-49

*United States v. Rosenwasser*, 323 U.S. 360 (1945) ...............................49

*U.S. Steel Group v. United States*, 225 F.3d 1284 (Fed. Cir. 2000) ......................27

## STATUTES

5 U.S.C. § 706(2)(A) ..........................................................28, 47

28 U.S.C. § 1295(a)(4)(A) ......................................................1

35 U.S.C. § 2(b)(2) ...........................................................47

35 U.S.C. § 102 .............................................................11, 54

35 U.S.C. § 103 ..........................................................11, 27, 54

35 U.S.C. § 112 .............................................................11, 53

35 U.S.C. § 141(c) ........................................................1, 47, 50

35 U.S.C. § 142 ................................................................................1

35 U.S.C. § 311(a) ..........................................................................45

35 U.S.C. § 311(b) ....................................................................11, 54

35 U.S.C. § 312(a)(3) ......................................................................50

35 U.S.C. § 314(a) ..............................................................45, 46, 50

35 U.S.C. § 315(e)(2) ................................................................53, 54

35 U.S.C. § 318(a) ...................................................................*passim*

35 U.S.C. § 319 ....................................................................1, 47, 50

35 U.S.C. § 325(d) ..........................................................................20

35 U.S.C. § 704 ................................................................................1

**OTHER AUTHORITIES**

37 C.F.R. § 42.100(b) ................................................................30, 38

37 C.F.R. § 42.108(a).......................................................................46

37 C.F.R. § 42.120 ..........................................................................20

37 C.F.R. § 90.3 ................................................................................1

## TABLE OF ABBREVIATIONS

*Parties*

| | |
|---|---|
| SAS | SAS Institute, Inc. |
| ComplementSoft | ComplementSoft, LLC |

*Cites*

| | |
|---|---|
| A__ | Joint Appendix at page(s) __ |

*Terms*

| | |
|---|---|
| AIA | America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) |
| PTO | U.S. Patent & Trademark Office |
| Board | Patent Trial & Appeal Board |
| IPR | *Inter Partes* Review |
| CBM | Covered Business Method Review |
| the '936 patent | U.S. Patent No. 7,110,936, SAS Exhibit 1001, A449-502 |
| Petition | SAS's Petition for *Inter Partes* Review in IPR2013-00226, Paper 1, A54-121 |
| Institution Decision | Decision-Institution of *Inter Partes* Review in IPR2013-00226, Paper 9, A166-188 |
| Final Written Decision | Final Written Decision in IPR2013-00226, Paper 38, A1-43 |
| Rehearing Decision | Decision on Rehearing Request in IPR2013-00226, Paper 40, A44-49 |
| Hearing Transcript | Record of Oral Hearing held May 7, 2014 in IPR2013-00226 (entered June 4, 2014), Paper 36, A361-430 |

| | |
|---|---|
| Antis | U.S. Patent No. 5,572,650 ("Antis"), SAS Exhibit 1005, A530-548 |
| Coad | U.S. Patent No. 6,851,107 ("Coad"), SAS Exhibit 1006, A549-582 |
| Burkwald | U.S. Patent No. 6,356,285 ("Burkwald"), SAS Exhibit 1007, A583-624 |
| Eick | U.S. Patent No. 5,937,064 ("Eick"), SAS Exhibit 1008, A625-633 |
| Oracle Primer | Oracle Programming – A Primer ("Oracle Primer"), SAS Exhibit 1012, A673-773 |
| Oracle8 Primer | Oracle8 Programming: A Primer ("Oracle8 Primer"), SAS Exhibit 1013, A774-922 |
| Building Applications | "Building Applications with Microsoft Access 97," SAS Exhibit 1011, A667-672 |
| Roussopoulos Declaration | Declaration of Dr. Nick Roussopoulos Under 37 C.F.R. § 1.68 in Support of Petition for *Inter Partes* Review of U.S. Patent No. 7,110,936, SAS Exhibit 1015, A923-1017 |
| Booch UML Manual | The Unified Modeling Language Reference Manual by Grady Booch et al, SAS Exhibit 1043, A1639-1686 |

# STATEMENT OF RELATED CASES

## I.    RELATED PROCEEDINGS REGARDING THE '936 PATENT.

ComplementSoft has asserted the '936 patent against SAS in *ComplementSoft, LLC v. SAS Institute, Inc.*, No. 1:12-cv-07372 (N.D. Ill.).  That case is currently stayed.

The '936 patent was the subject of a second IPR petition filed by SAS on September 12, 2013, designated IPR2013-00581.  The PTAB denied the petition in IPR2013-00581 on December 30, 2013.

United States Patent Application Serial No. 11/265,485 is a continuation of the application that led to the issuance of the '936 patent and is currently pending before the PTO.

## II.    OTHER PROCEEDINGS INVOLVING RELATED ISSUES.

Two other cases pending before this Court may directly affect, or be directly affected by, the Court's decision regarding one of the issues raised in SAS's appeal.

(1) In *Synopsys, Inc. v. Mentor Graphics Corporation*, Appeal Nos. 14-1516, -1530 (Fed. Cir.), one of the issues as stated by Synopsys is:  "Did the Board err by instituting review but failing to issue a final written decision with respect to the patentability of each claim challenged by Synopsys?"  *See* Opening Brief & Addendum of Appellant Synopsys, Inc., ECF No. 34, filed October 3, 2014, at pp. 3-4.  SAS filed an amicus brief in this Court in that appeal on October 24, 2014.

xi

(2) In *Synopsys, Inc. v. Lee*, Appeal No. 15-1183 (Fed. Cir.), Synopsys has challenged the Board's partial institution rule, 37 C.F.R. § 42.108, under the Administrative Procedure Act.  Synopsys "asserts that § 42.108 violates 35 U.S.C. § 318(a) by allowing the [Board] to both grant *inter partes* review petitions in part and to issue final written decisions that address fewer than all of the challenged claims in a granted petition."  *See* Opening Brief & Addendum of Appellant Synopsys, Inc., ECF No. 22, filed March 6, 2015, at p. ix.  SAS filed an amicus brief in the district court in that case on September 4, 2014.

## STATEMENT OF JURISDICTION

SAS appeals from the Board's Final Written Decision in IPR2013-00226 entered on August 6, 2014 (A1-43), and the Board's Decision entered on November 10, 2014 denying SAS's Request For Rehearing (A44-49). 35 U.S.C. §§ 141(c) & 319; *see also* 5 U.S.C. § 704 (all rulings not previously appealable are reviewable after final agency action). SAS appealed within the time set by statute and rule. 35 U.S.C. § 142; 37 C.F.R. § 90.3. This Court has exclusive jurisdiction over an appeal from a Board decision in an IPR. 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

(1) Whether the Board erred by not applying the broadest reasonable construction of the claim term "data flows" and instead adopting in the Final Written Decision a new and overly narrow construction of that term based on a single sentence in the '936 patent specification describing a different, unclaimed term ("data flow diagrams"), and whether, under the correct construction of "data flows," claim 4 of the '936 patent is unpatentable over the prior art.

(2) Whether the Board erred by misinterpreting 35 U.S.C. § 318(a), which provides that the Board "shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner," and by issuing a Final Written Decision with respect to the patentability of only some of the '936

patent claims challenged in SAS's IPR Petition, but not with respect to the patentability of challenged claims 2 and 11-16.

## STATEMENT OF THE CASE

## I.    INTRODUCTION

In the AIA, Congress created new post-grant review proceedings to combat the "growing sense that questionable patents are too easily obtained and are too difficult to challenge."  H.R. Rep. No. 112-98, pt. 1, at 39 (2011).  Appellee ComplementSoft owns one such questionable patent, the '936 patent, which it has wielded in litigation against SAS.  SAS availed itself of the new *inter partes* review procedure to challenge all 16 claims of the '936 patent.  The Board instituted an IPR because it found "a reasonable likelihood that … at least 1 of the claims" of the '936 patent was invalid.  Ultimately, the Board properly cancelled the lone independent claim (claim 1) and seven dependent claims (claims 3 and 5-10) of the '936 patent.

In two ways, however, the Board failed to go far enough.  One additional dependent claim (claim 4) reviewed in the IPR also is unpatentable as obvious in view of the prior art.  The Board determined that a prior art combination on which the IPR was instituted discloses every limitation of dependent claim 4 except one: "data flows."  But, as to that purportedly missing "data flows" limitation, the Board applied a new and overly narrow claim construction in the Final Written

2

Decision that incorrectly equated "data flows" with "data flow diagrams," a different, unclaimed term used only in the '936 patent specification. The Board's new construction impermissibly reads into "data flows" a requirement for "icons depicting data processing steps" and that construction is contrary to the governing broadest reasonable construction standard in an IPR. Applying the proper, broadest reasonable construction of "data flows," claim 4 is unpatentable, and the Board's decision regarding the patentability of claim 4 should be reversed.

Additionally, the Board erred as a matter of law when it issued a final written decision that failed to address all of the claims challenged in SAS's IPR Petition, including dependent claims 2 and 11-16. This practice contravenes the plain text of 35 U.S.C. § 318(a). This portion of the Board's decision should be vacated and remanded with instructions to the Board to issue a final written decision that complies with the clear statutory requirement.

## II.    THE '936 PATENT

### A.    The Alleged Invention Of The '936 Patent.

#### 1.    Background of the Invention.

The '936 patent is generally directed to "an extensible, language independent software development tool having a graphical user interface, i.e., a GUI Integrated Development Environment." A493 (col. 1:15-19). The '936 patent acknowledges that Integrated Development Environments ("IDEs") for customizing software were known in the prior art and were not new. A493 (col.

1:32-38).  As was generally known in the art, "these software development tools assist users and programmers in editing, debugging and developing software for specific programming languages."  A493 (col. 1:38-41).

The '936 patent asserts, however, that software providers had previously "failed to provide a single comprehensive software development tool capable of assisting users in the editing, visualizing, debugging and development" in certain kinds of programming languages:  "data manipulation languages or systems." A493 (col. 1:41-45).  According to the '936 patent, "the creation of graphical development tools for particular programming languages, such as, SAS®, has been inhibited by the intricacies of the programming language itself."  A493 (col. 1:45-48).  The '936 patent alleges that there had been a need "for an Integrated Development Environment for generating and maintaining software code, in particular, for data manipulation centric languages," and "[m]ore specifically, a need exist[ed] for a system and method for exchanging, editing, debugging, visualizing and developing SAS®, SPSS®, SQL®, DB2 UDB®, Oracle® RDBMS and other relational database management system software."  A493 (col. 1:64 - col. 2:3).

## 2.    The Four Key Modules Disclosed And Claimed In The '936 Patent.

The integrated development environment of the '936 patent is described in the context of a network 20 that connects one or more remote computers 22a and

4

local computers 22b.  A494-495 (col. 4:46 - col. 6:21); A451 (FIG. 1).  Pertinent here, the integrated development environment 30 includes four primary cooperating modules:  (i) a document manager, (ii) an editor, (iii) a parser layer, and (iv) a visualizer.  A494 (col. 4:40-46); A495 (col. 5:4-25).

**(i) Document Manager.**  The document manager is described as a file management program used to retrieve source code files for editing.  A495 (col. 6:22-42).  The document manager 60 "performs many enhanced file management functions, such as recognizing related files, (e.g., execution log files, output files, include files, etc.) and managing related files as a unit, regardless of the location of such files."  A495 (col. 6:23-28).

**(ii) Editor.**  The editor 80 is used to display and edit the source code.  The editor 80 "allows the user to perform standard text editing functions, including, mouse placement of the cursor, click-and-drag text selection and standard Windows® key combinations for cutting, copying and pasting data."  A496 (col. 7:4-7).  The editor generally provides the functionality for a user to edit, modify and debug the code.  *See* A496 (col. 7:3 - col. 8:7); A498-499 (col. 12:35 - col. 14:51).

**(iii) Parser Layer.**  A parser layer 140 is provided for parsing the code.  A497 (col. 9:38-53).  The parser layer 140 is "language aware," such that a user of the integrated software development environment of the '936 patent is able to write,

edit and debug code written in multiple different programming languages. *Id.*; A501 (col. 17:17-45). In operation, the document manager 60 first determines the file type for a user-selected file (e.g., a file written in "SAS®, SPSS®, SQL®, DB2 UDB®, [or] Oracle® RDBMS"). A501 (col. 17:17-19). Then "the parser layer 140 deploys the corresponding file parser 142, e.g., a file parser 142 that corresponds to, in this case, one of a variety of data manipulation and/or data management programming languages." A501 (col. 17:19-24). "By deploying the appropriate file parser 142, the parser layer 140 also activates the respective rules and logic that correspond to the detected programming language." A501 (col. 17:24-27). Through the parser layer 140, therefore, "users are capable of developing, editing and maintaining code that can be executed by more than one data manipulation and/or data management program." A501 (col. 17:27-29).

**(iv) Visualizer.** The '936 patent also utilizes a visualizer 120 for displaying graphical representations of flows within the source code, including "program flows" (FIG. 9) and "data flows" (FIG. 17). "For viewing the program flow and data flow of a selected program," for example, "the visualizer 120, in connection with a parser layer 140, reads, parses and displays the code for the selected program, representing each program and data block with a program flow icon 126." A496 (col. 8:8-12).

The '936 patent recognizes that graphically displaying "program flows" and "data flows" was not new. In the Background of the Invention section of the specification, for example, the '936 patent explains that "there are software packages that one can use to manually diagram program flow and data flow." A493 (col. 1:52-55). The '936 patent further explains that "[a]s is generally known in the art," the file parser 142 breaks a source code document 146 into individual words/tokens 144, and "[b]y tagging the tokens 144, the parser layer 140 enables the document view engine 200 to recognize and display the program flow 122." A501 (col. 17:46-56).

**Program Flow.** "As shown in FIG. 9, the program flow 122 is displayed as a default and displays program flow icons 126, which are graphical representations of code sections, in the order that they occur in the code." A500 (col. 15:56-59).



A469 (FIG. 9).

**Data Flow.**  The '936 patent discloses that "data flows" can also be displayed in a "program flow" diagram like FIG. 9:  "FIG. 9 is an exemplary screen shot depicting a program flow for a selected file, along with arrows that indicate the flow of data within the program flow."  A494 (col. 3:49-51).  As shown in FIG. 9, arrows connect the program flow icons 126 "to generally illustrate the flow of data."  A496 (col. 8:12-14).

Alternatively, as shown in FIG. 17, a "data flow display 124a" can be used to "show the data flow 124 of the subject code."  A500 (col. 16:6-7).



**FIG. 17**

A481 (FIG. 17).  In this embodiment, "[t]he data flow 124 is generated by parsing the code, tracing the flow of the data through the code and displaying individual processes and data blocks in separate columns with arrows that connect the program flow icons 126 and indicate the direction of the data flow."  A500 (col.

16:7-12).  As shown in FIG. 17, for example, the "data flow" provides a visual

representation of what data (*e.g.*, relations smpl.smpl_1, smpl.smpl_2) are accessed

by which modules of source code (*e.g.*, source code used to perform a sort).

    **Two-Way Editing.**  The '936 patent further discloses that the visualizer 120

is dynamically linked with the editor 80, such that edits made to the source code

using the editor 80 are automatically reflected in the graphical representations of

flows displayed by the visualizer 120, and edits made to the graphical

representations of flows in the visualizer 120 are automatically reflected in the

source code displayed by the editor 80.

> [T]he integrated software application 30 allows changes to the code to be
> made textually or visually, i.e., by using the editor 80 or the visualizer 120,
> respectively.  Editing, creating or developing new code visually using the
> visualizer is achieved by reverse engineering the exi[s]ting code or code
> templates, i.e., SAS®, SQL® SPSS®, DB2 UDB®, Oracle® RDBMS and
> UNIX® Scripts, and displaying the code visually using icons.  As the user
> manipulate[s] these icons visually, code will be generated.  Any changes to
> the code via the visual interface can be forward engineered to assume a
> textual format capable of being executed on the respective Data
> Development and Data Management System.  Therefore, the integrated
> software application 30 is capable of producing a textual file that is derived
> from a visual model and executing the derived textual file.

A500 (col. 16:31-46); *see also* A500 (col. 15:4-10:  "Moreover, for assisting users

in developing and maintaining software, the editor 80 and the visualizer 120 have

an integrated relationship. For example, each of the active elements 92 displayed in

the tree view 90 may also be represented in the visualizer 120 and any changes

made in the editor 80 can be simultaneously reflected in the visualizer 120.")

### B.     The '936 Patent Claims.

The '936 patent issued with 16 total claims.  Claim 1 is the lone independent

claim, and generally recites an "integrated development environment" comprising

the four key modules described above:

1. An integrated development environment, comprising:

> a **document manager** for retrieving source code programmed using one of a plurality of types of data manipulation languages;

> an **editor** for displaying the retrieved source code and providing a means for a user to edit the retrieved source code;

> a **parser layer** which detects the one of the plurality of types of data manipulation languages in which the retrieved source code is programmed and which activates rules and logic applicable to the detected one of the plurality of types of data manipulation languages; and

> a **visualizer** dynamically linked to the editor for displaying graphical representations of flows within the retrieved source code using the rules and logic applicable to the detected one of the plurality of types of data manipulation languages and activated by the parser,

> wherein the editor, parser layer and visualizer cooperate such that edits made to the source code using the editor are automatically reflected in the graphical representations of flows displayed by the visualizer and edits made to the graphical representations of flows in the visualizer are automatically reflected in the source code displayed by the editor.

### 1.     Claims 1, 3 and 5-10.

In the Final Written Decision, the Board correctly determined that

independent claim 1 and dependent claims 3 and 5-10 of the '936 patent are

unpatentable in view of prior art.

## 2. Dependent Claim 4 (Addressed In The Board's Final Written Decision) Recites "Data Flows."

At issue in SAS's appeal is the patentability of dependent claim 4. Whereas independent claim 1 refers to "graphical representations of flows," dependent claim 4 recites a more specific type of flows – "data flows":

> 4. The integrated development environment as recited in claim 1, wherein the graphical representations of **data flows** are expandable and collapsible.[1]

The key issue for purposes of SAS's appeal is the correct construction of "data flows."

## 3. Dependent Claim 2 (*Not* Addressed In The Board's Final Written Decision) Also *More Broadly* Recites "Data Flows."

The same key claim language – "data flows" – also is recited in dependent claim 2:

> 2. The integrated development environment as recited in claim 1, wherein the graphical representations of flows depict **data flows**.

Claim 2 is broader on its face than claim 4 because it does not require that the claimed "graphical representations of flows depict[ing] data flows" are "expandable and collapsible." If narrower claim 4 were found unpatentable in the IPR, that conclusion would logically imply the unpatentability of broader claim 2. Yet the Board's Institution Decision inexplicably included narrower claim 4 in the

---

[1] SAS does not concede that there is proper antecedent basis under 35 U.S.C. § 112 for "the graphical representations of data flows" as recited in dependent claim 4, but this issue was not before the Board in the IPR, which by statute is limited to considering patentability under sections 102 or 103. *See* 35 U.S.C. § 311(b).

IPR while excluding broader claim 2. And contrary to statute, the Board's Final Written Decision failed to address the patentability of broader claim 2.

## III.    THE PRIMARY PRIOR ART PERTINENT TO SAS'S APPEAL.

### A.    Coad.

Like the '936 patent, Coad is directed to "an improved software development tool which allows a developer to simultaneously view a graphical and a textual display of source code." A549, Abstract and Title ("Software Development Tool With Instant Updating And Simultaneous View Of Graphical And A Textual Display Of Source Code."). As Coad explains:

> Computer instructions are written in source code. Although a skilled programmer can understand source code to determine what the code is designed to accomplish, with highly complex software systems, a graphical representation or model of the source code is helpful to organize and visualize the structure and components of the system. Using models, the complex systems are easily identified, and the structural and behavioral patterns can be visualized and documented.

A570 (col. 1:38-46).

Coad's improved software development tool is used "for developing source code in a project," and is specifically "designed for use with more than one programming language." A570 (col. 2:51-55). In an exemplary embodiment, Coad discloses C++ and Java as potential programming languages. A577 (col. 16:1-4).

In Coad, a development "project comprises a plurality of files, and the source code of a chosen one of the files is written in a language." A570 (col. 2:55-

12

57).  The Coad software development method "comprises the steps of determining

the language of the source code of the chosen file, displaying the source code of

the chosen file in the language, and displaying a graphical representation of at least

a portion of the project."  A570 (col. 2:57-61); *see also* A577 (col. 15:17-40).

Coad's software tool "creates a graphical representation of source code regardless

of the programming language in which the code is written."  A571 (col. 4:38-41).

"The source code and the graphical representation are displayed

simultaneously."  A577 (col. 15:28-29).  In this way, the software development

tool disclosed in Coad "allows a developer to simultaneously view a graphical and

a textual display of source code."  A570 (col. 2:46-48).  As one example, "[a]s

depicted in FIG. 2 (A551), source code 202 is being displayed in both a graphical

form 204 and a textual form 206" (A571, col. 4:46-47):



In addition to being viewable simultaneously, "[t]he graphical and textual

views are synchronized so that a modification in one view is automatically

reflected in the other view." A570 (col. 2:48-49). In other words, "the software development tool simultaneously reflects any modifications to the source code to both the display of the graphical representation as well as the textual display of the source code." A571 (col. 4:42-45). In Coad, as in the '936 patent, edits made to the textual form of the source code are automatically reflected in the graphical representation of the code, and edits made to the graphical representation of the source code are automatically reflected in the textual representation of the code:

> The improved software development tool provides simultaneous round-trip engineering, i.e., the graphical representation 204 is synchronized with the textual representation 206. Thus, if a change is made to the source code 202 via the graphical representation 204, the textual representation 206 is updated automatically. Similarly, if a change is made to the source code 202 via the textual representation 206, the graphical representation 204 is updated to remain synchronized.

A571-572 (col. 4:61 - col. 5:2); *see also* A577 (col. 15:41-50).

For viewing graphical representations of the source code, Coad describes an exemplary embodiment using the "well-known Unified Modeling Language (UML)":

> The well-known Unified Modeling Language (UML) is a general-purpose notational language for visualizing, specifying, constructing, and documenting complex software systems. UML is used to model systems ranging from business information systems to Web-based distributed systems, to real-time embedded systems. UML formalizes the notion that real-world objects are best modeled as self-contained entities that contain both data and functionality.

A570 (col. 1:46-65).  Coad discloses that "UML is more clearly described" in a

handful of published UML books, which are expressly incorporated by reference.

A570 (col. 1:55-65).  Coad further explains that "conventional software

development tools 100 allow a programmer to view UML 102 while viewing

source code."  A570 (col. 1:66 - col. 2:1).[2]

Coad teaches that "[t]he software development tool is collectively broken

into three views of the application: the static view, the dynamic view, and the

functional view."  A577 (col. 16:58-60).  Various examples of potential UML

graphical views showing flows within source code are illustrated in FIGS. 12-17.

A562-567; A571 (col. 4:8-27); A577-578 (col. 16:60 - col. 17:47).

### B.    Antis.

Antis is directed to a system that provides "graphical displays for visualizing

useful characteristics of large databases, in general, and graphical displays for

visualizing structures and relationships within large databases, in particular."  A543 (col.

1:15-18).  Antis describes "a long felt need in the art for a method and apparatus for

displaying characteristics of a database without semantic information such that explicit

and implicit data structures can be readily observed to facilitate use, development and

---

[2] Coad explicitly describes the UML embodiment as exemplary and non-limiting:
"The graphical representation of the project may be in Unified Modeling Language;
however, one skilled in the art will recognize that other graphical representations
of the source code may be displayed. Further, although the present invention is
described and shown using the various views of the UML, one of ordinary skill in
the art will recognize that other views may be displayed."  A577 (col. 15:50-57).

maintenance of large databases." A543 (col. 2:25-29). Antis claims to solve this problem and improve over known techniques "by providing a method and apparatus for displaying statistics and characteristics of an entire relational database in one overall view without any semantic information to clutter the display and confuse the viewer. The semantic information, which is purposefully omitted from the overall view, is provided in additional views that are interactively linked to the overall view and to each other." A543 (col. 2:30-40).

To provide the visualizations, the relational database analysis system of Antis includes a number of linked "views." A543 (col. 2:36-39); *see also* A532-542 (FIGS. 2-12). A highest level view of a relational database is presented in an "over view," as illustrated in FIG. 2 (A532) of Antis. The "over view" displays high-level statistics and characteristics of the relational database including a listing of all relations of the database. A544 (col. 4:1-19). Further information on the relational database is provided in additional views that are interactively linked to the "over view" and to each other. A543 (col. 2:36-39); *see also* A532-542 (FIGS. 2-12). In particular, Antis discloses: a "specification view" (A545, col. 5:4-8); an "associations view" (A545, col. 5:32-36); a "path view" (A545, col. 6:43-47); a "code view" (A546, col. 7:31 - col. 8:4); a "layout view" (A546, col. 8:5-9); and a "domain view" (A546, col. 8:22-25).

The linking of the various views "makes them interactive with each other such that changes to one view cause[] corresponding changes in the other actively linked

views." A547 (col. 9:23-25). For example, FIG. 12 (A542) "shows an over view, a

relations view, a path view and an expanded code view all displayed in partially

overlapping windows on a display screen" A546 (col. 8:63-66).:



FIG. 12

"Those views that are displayed together are linked such that cursor motion and

selection in one view will have coordinated interactive results in the other open

views." A546 (col. 8:66 – col. 9:1).

Like the '936 patent, Antis discloses graphically displaying the source code of a

relational database management system (RDBMS). In the "code view" in FIG. 8

(A538), for example, Antis shows RDBMS source code: "The code view displays the

application source code of the RDBMS that uses the currently selected relation, in this

case relation RLls_lnk." A546-547 (col. 7:32-35).

### C.    Burkwald.

Burkwald is directed to a "software visualization technique [that] allows a software application . . . to be visually analyzed."  A583 (Abstract).  The visualization technique of Burkwald allows a user to expand or collapse a displayed graphical representation.  A611-612 (col. 14:43 - col. 15:15).

## IV.    *INTER PARTES* REVIEW OF THE '936 PATENT.

### A.    SAS's Petition & ComplementSoft's Preliminary Response.

SAS filed a Petition For *Inter Partes* Review of the '936 patent on March 29, 2013.  A54-121.  SAS's IPR Petition challenged all claims of the '936 patent, claims 1-16.  A66.

Supporting its Petition, SAS submitted a declaration from Dr. Nick Roussopoulos, a technical expert with 40 years of experience in the field of software development, computer programming languages, and database management.  A923-1017.  Dr. Roussopoulos is a Professor in the Computer Science Department and a senior faculty member of the Institute of Advanced Computer Studies at the University of Maryland.  *See* A924-925 (¶¶ 4-7).

ComplementSoft filed a Preliminary Response to SAS's Petition on June 28, 2013.  A122-165.  ComplementSoft urged the Board not to institute a trial because, it alleged, "none of the references relied on in the Petition, either alone or in combination, gives rise to 'a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.'"  A125.

### B.    The Board's Institution Decision.

The Board issued its Institution Decision on August 12, 2013.  A166-188.

**Claims 1 and 3-10.**  In its Institution Decision, the Board concluded that SAS had demonstrated a reasonable likelihood of showing that each of claims 1 and 3-10 were unpatentable based on the following grounds:

- claim 1:  obvious over Coad combined with Oracle Primer and Oracle8 Primer;

- claims 1, 3, 5, 6, 8, and 10:  obvious over Antis combined with Coad;

- claim 4:  obvious over Antis combined with Coad and Burkwald;

- claim 7:  obvious over Antis combined with Coad and Eick; and

- claim 9:  obvious over Antis combined with Coad and Building Applications.

*Id.*  The Board instituted a partial *inter partes* review, however, limited to claims 1 and 3-10 of the '936 patent.  A168-169, A178-180, A183-187.

**Claims 2 and 11-16.**  The Board declined to institute an *inter partes* review of the other claims challenged in SAS's petition, *i.e.*, dependent claims 2 and 11-16 of the '936 patent.  A168-169, A176, A184, A186-187.

With respect to claim 2, while the Board agreed with SAS that Coad shows "flows" (as recited in claim 1) and  "program flows" (as recited in claim 3), the Board concluded that SAS had failed to sufficiently identify in Coad "data flows" (as recited in claim 2).  A184.  According to the Board, "[i]t is unclear exactly which view [of Coad] SAS equates to the claimed 'graphical representation' of a 'data flow.'"  *Id.*

19

Regarding dependent claims 11-16, the Board concluded that SAS had not met

its burden by providing a specific construction for a means-plus-function limitation

recited in claim 11 (and claims 12-16, which further depend from claim 11). A175-176

("SAS does not identify what structure in the Specification it believes corresponds

to the means-plus-function limitation of claim 11.).[3]

### C.    August 12, 2013 Scheduling Order.

The Board entered an Order on August 12, 2013, setting the trial schedule

including the due date for ComplementSoft's response to the Petition under 37 C.F.R.

§ 42.120.  A189-194.  In that Order, the Board stated: "The patent owner is cautioned

that any arguments for patentability not raised in the response will be deemed waived."

A190.

### D.    ComplementSoft's Response & SAS's Reply.

ComplementSoft filed its patent owner Response on November 12, 2013.

A210-261.  ComplementSoft argued that the Board "should confirm the

---

[3] Shortly after the Board instituted IPR2013-00226 on less than all the challenged
claims, SAS filed a second IPR petition (IPR2013-00581) challenging claims 1-16
of the '936 patent.  A2341-2409 (Supplemental Petition in IPR2013-00581, filed
September 27, 2013).  SAS simultaneously moved for joinder of the two IPR
proceedings.  A2325-2332.  The Board denied the petition in IPR2013-00581 on
December 30, 2013.  A2476-2499.  The Board declined to institute IPR2013-
00581 on certain grounds finding that SAS had not shown a reasonable likelihood
that it would prevail on those grounds.  A2478-2479.  As to the remaining grounds
in IPR2013-00581, the Board stated that it was "exercising [the Board's] discretion
under 35 U.S.C. § 325(d)" and was denying the petition "because these grounds
are based upon substantially the same prior art and arguments as set forth in
IPR2013-00226."  A2479.

patentability of claims 1 and 3 through 10 because the cited prior art fails to disclose the non-obvious claim limitation of graphical visualizations of the program flows or data flows occurring *within* data manipulation languages." A212 (emphasis by ComplementSoft). ComplementSoft also argued that the Board erred in the Institution Decision in construing the claim term "data manipulation language." A221-222; A240. ComplementSoft further argued that Coad does not disclose "graphical representations of flows" as claimed. A241-244. Antis, ComplementSoft argued, discloses a "data definition language" and not a "data manipulation language" as recited in the '936 patent claims, and "even if data definition languages could somehow be extended to the disclosure of data manipulation languages, Antis does not disclose creating graphical representation of flows within such data manipulation languages." A253-256.

SAS filed a Reply to ComplementSoft's Response on February 12, 2014. A283-306.

### E.    ComplementSoft's Motion To Amend & SAS's Opposition.

In addition to arguing the patentability of the original '936 patent claims, ComplementSoft also pursued a contingent motion to amend the claims during the IPR. ComplementSoft's initial motion to amend violated the Board's page-limit rule and was expunged. *See* A262-264. ComplementSoft then filed a substitute motion to amend on December 20, 2013 (A265-282), and a reply in support of the

proposed claim amendments on March 12, 2014 (A331-338).  ComplementSoft

thereafter requested Board permission to revise the proposed claims yet again.  *See*

A339-343.  The Board granted ComplementSoft's request (*id.)*, and

ComplementSoft filed a second contingent motion to amend on March 24, 2014.

A344-350.

SAS filed a single paper on February 12, 2014 opposing ComplementSoft's

motion to amend the '936 patent claims.  A307-330.

### F.    The Oral Hearing & Final Written Decision.

The Board conducted an Oral Hearing on May 7, 2014 (A361-430), and

issued its Final Written Decision (A1-43) on August 6, 2014.

**Claims 1, 3 and 5-10.**  In the Final Written Decision, the Board correctly

concluded that SAS had shown, by a preponderance of the evidence, that claims 1,

3 and 5-10 were unpatentable in view of the prior art.  A24-28; A31-32; A41.

**Claim 4.**  Reversing course from the Institution Decision, however, the

Board determined that SAS had not shown that dependent claim 4 was

unpatentable in view of the prior art.  A28-31; A41.  Specifically, the Board

concluded that SAS had not shown that the prior art disclosed "data flows" as

recited in claim 4.  A18-19, A28-31.

The Board's finding regarding claim 4 was premised entirely on a new claim

construction for "data flows" adopted for the first time in the Final Written

Decision. *Id*. The Board newly construed the claim term "data flows" to require

"a graphical representation comprised of icons depicting data processing steps and

arrows to depict the movement of data through source code." *Id*. Simultaneous

with revealing its new claim construction in the Final Written Decision, the Board

faulted SAS for not sufficiently explaining how the prior art met this new claim

construction. In particular, the Board asserted that SAS had not explained how the

prior art satisfied the newly-added "icons depicting data processing steps"

requirement included in the Board's new claim construction. A29-31.

The Board's Final Written Decision regarding claims 1 and 3-10 can be

summarized as follows:

| Claim(s) | Grounds Of Unpatentability | Institution Decision | Final Written Decision |
|---|---|---|---|
| 1 | Obvious over Coad + Oracle Primer / Oracle8 Primer | X | X |
| 1, 3, 5, 6, 8, 10 | Obvious over Antis + Coad | X | X |
| 4 | Obvious over Antis + Coad + Burkwald | X | |
| 7 | Obvious over Antis + Coad + Eick | X | X |
| 9 | Obvious over Antis + Coad + Building Applications | X | X |

**Claims 2 and 11-16.** The Final Written Decision does not address the

patentability of the other claims challenged in SAS's Petition – claims 2 and 11-16.

The Final Written Decision instead states that "Claims 2 and 11-16 are not at issue

in this trial."[4]  A41.  In a footnote, the Final Written Decision further states:  "In the Decision to Institute, we declined to institute an *inter partes* review of claims 2 and 11-16 because we were not persuaded that Petitioner had shown that there was a reasonable likelihood of prevailing on its challenges to these claims."  *Id.*

**Denial Of ComplementSoft's Motion To Amend.**  The Board's Final Written Decision also denied ComplementSoft's motion to amend.  A32-41.  The Board rightly concluded that "Patent Owner has not shown that its proposed substitute claims 17, 18, and 20-25 are patentable over the prior art."  A41.

### G.    SAS's Request For Rehearing.

SAS requested that the Board grant rehearing on essentially the same two issues now raised in this appeal: (1) the Board's adoption of a new and overly narrow construction in the Final Written Decision for the claim term "data flows" and the Board's consequent error in determining that SAS had not shown claim 4 to be unpatentable; and (2) the Board's failure to issue a Final Written Decision with respect to all the patent claims challenged in SAS's Petition.  A431-448.  The Board denied SAS's rehearing request on November 10, 2014.  A44-49.

---

[4] SAS raised the Board's error in granting partial institution on multiple occasions during the IPR.  For example, SAS argued in its Reply filed on February 12, 2014, that the Board erred in not instituting *inter partes* review of claims 2 and 11-16 of the '936 patent.  A299.  SAS also raised the partial institution issue during the oral argument.  A384-385.  Finally, SAS raised this issue in its Request For Rehearing.  A433, 435-437.

## SUMMARY OF THE ARGUMENT

SAS appeals: (1) the Board's decision on the merits regarding the patentability of claim 4 and its denial of SAS's rehearing request, and (2) the Board's issuance of a Final Written Decision that failed to address the patentability of all the claims challenged in SAS's Petition, including claims 2 and 11-16, in violation of 35 U.S.C. § 318(a).

**(1) Claim 4 Is Unpatentable Under The Proper Construction Of "Data Flows."** SAS appeals the Board's construction of a single claim term ("data flows") and the Board's decision on the merits regarding the patentability of a single claim (claim 4) reciting that term. The Board erred by applying an overly narrow construction for "data flows" and by concluding that SAS had not met its burden of demonstrating that claim 4 is unpatentable.

In the Final Written Decision, the Board adopted an entirely new construction for the term "data flows" that is contrary to the governing broadest reasonable interpretation standard applied during an IPR. The Board erred by equating the term "data flows" (as recited in claim 4) with an entirely different term, "data flow diagrams" (**not** recited in claim 4). The Board's new construction is inconsistent with the broad description of "data flows" in the '936 patent specification, and impermissibly reads into claim 4 a requirement for "icons depicting data processing steps"; that overly restrictive language appears only once

in the entire '936 patent specification, and is used to describe one embodiment of "data flow diagrams," not the "data flows" recited in claim 4. Based on its flawed construction of the term "data flows," the Board wrongly concluded that SAS had not shown claim 4 to be unpatentable in view of the prior art. Compounding its error, the Board never gave SAS any opportunity to demonstrate why claim 4 is unpatentable even under the new "data flows" construction adopted in the Final Written Decision. Under the correct, broadest reasonable construction for "data flows," claim 4 is unpatentable in view of the combination of Antis, Coad and Burkwald.

**(2)  The Final Written Decision Failed To Comply With 35 U.S.C. § 318(a).**  35 U.S.C. § 318(a) mandates that the Board "shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner." This statutory language is clear and unambiguous. The well-understood meaning of "shall" is "must," and "any" means "all"—the Board therefore **must** issue a final written decision regarding **all** the claims challenged in an IPR petition. The Board's Final Written Decision in this case violated Section 318(a) because it failed to address the patentability of claims 2 and 11-16 challenged in SAS's Petition. This Court should remand with instructions to the Board to issue a Final Written Decision in compliance with Section 318(a).

# ARGUMENT

## I.    STANDARDS OF REVIEW

**Claim Construction.**  This Court reviews "the Board's claim construction according to the Supreme Court's decision in *Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015)." *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1282 (Fed. Cir. 2015).  Specifically, the Court reviews "underlying factual determinations concerning extrinsic evidence for substantial evidence and the ultimate construction of the claim *de novo*." *Id.* at 1282-83.  Here, because the Board did not refer to or rely upon extrinsic evidence in construing the claim term "data flows," this Court reviews *de novo* the Board's construction of "data flows."

**Obviousness.**  This Court reviews "the Board's factual findings for substantial evidence and review[s] the Board's legal conclusions *de novo*." *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012).  "The ultimate determination of obviousness under § 103 is a question of law based on underlying factual findings." *In re Cuozzo,* 778 F.3d at 1283.  What a prior art reference teaches and the differences between the claimed invention and the prior art are questions of fact which this Court reviews for substantial evidence.  *Id.*

**PTO Compliance With 35 U.S.C. § 318(a).**  This Court reviews questions of statutory interpretation without deference. *U.S. Steel Group v. United States*, 225 F.3d 1284, 1286 (Fed. Cir. 2000).  Consistent with the Administrative

Procedure Act, this Court sets aside "actions of the Board that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *In re Sullivan*, 362 F.3d 1324, 1326 (Fed. Cir. 2004); 5 U.S.C. § 706(2)(A).

## II.    THE BOARD'S NEWLY-ADOPTED CONSTRUCTION FOR "DATA FLOWS" IS NOT THE "BROADEST REASONABLE CONSTRUCTION" IN VIEW OF THE SPECIFICATION, AND THAT INCORRECT CLAIM CONSTRUCTION CAUSED THE BOARD TO ERR REGARDING CLAIM 4.

In its Institution Decision, the Board found it reasonably likely that SAS would prevail in its challenge that dependent claim 4 is obvious.  A184-185.  In the Final Written Decision, however, the Board adopted an entirely new construction for "data flows," and based on that new construction requiring "icons depicting data processing steps," concluded that SAS had not shown by a preponderance of the evidence that claim 4 would have been obvious.  A28-31.  The Board's claim construction, reviewed *de novo* by this Court, was in error, and the Board's patentability finding regarding claim 4 should be reversed.

### A.    The Board Adopted An Entirely New And Narrower Claim Construction For "Data Flows" In The Final Written Decision, And Reaffirmed That Narrow Construction In The Rehearing Decision.

Independent claim 1 refers generally to "graphical representations of flows."

Claim 4 depends from claim 1 and recites a specific type of flows – "data flows":

> 4. The integrated development environment as recited in claim 1, wherein the graphical representations of **data flows** are expandable and collapsible.

In discussing the prior art in its Institution Decision, the Board generally interpreted "data flow" to mean "a depiction of a map of the path of data through the executing source code."  A174, A184.  But in the Final Written Decision the Board adopted an entirely new – and considerably narrower – construction for "data flows":

> a graphical representation comprised of icons depicting data processing steps and arrows to depict the movement of data through source code.

A18-19.

SAS requested rehearing regarding this new construction of "data flows" in the Final Written Decision.  In response to SAS's request, without expressly modifying its claim construction, the Board stated that the Final Written Decision "could have" equated "data flow diagrams" with the lengthier claim 4 term "graphical representations of data flows" (rather than the shorter claim 4 term "data flows"):  "We agree that the Final Decision could have further defined 'data flow diagram' and 'graphical representations of data flows' to be equivalent." A46-47.  The Board's Rehearing Decision then appeared to reaffirm a somewhat-shortened construction of "data flows" that eliminated the language "a graphical representation comprised of":  "Thus, we are not persuaded that our interpretation requiring the visualization of 'data flows' to include 'icons depicting data processing steps and arrows to depict the movement of data through source code'

was erroneous." A48. The Board's shortened construction for "data flows" in the Rehearing Decision appears to be:

> icons depicting data processing steps and arrows to depict the movement of data through source code.

*Id.*

Regardless of whether or not the introductory language "a graphical representation comprised of" is considered part of the Board's "data flows" construction, the Board's new and overly narrow construction for the "data flows" claim term was in error for multiple reasons.

## B. The Board's New Claim Construction For "Data Flows" Is Not The "Broadest Reasonable Construction In Light Of The Specification."

The Board's new claim construction for "data flows" is contrary to the controlling "broadest reasonable construction" standard during an IPR. *See* 37 C.F.R. § 42.100(b) ("A claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears."); *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1281-82 (Fed. Cir. 2015). The broadest reasonable interpretation is "the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the [patent] specification." *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997).

### 1. The Board Improperly Equated "Data Flows" (As Recited In Claim 4) With "Data Flow Diagrams" (A Different Term *Not* Recited In Claim 4).

The Board recognized that "the '936 patent does not explicitly define 'data flows'" (A18; A47) or "graphical representations of data flows" (A47). The Board's new construction for "data flows" was instead based on a single sentence in the '936 patent specification describing "data flow diagrams." A18 (citing A493 col. 2:40-42: "Data flow diagrams are comprised of icons depicting data processing steps and arrows to depict the flow of the data through the program.").

Claim 4, however, does not literally recite or require "data flow diagrams." Rather, the literal language of claim 4 recites "graphical representations of data flows" (not "data flow diagrams" and not "graphical representations of data flow diagrams"). The '936 patent drafter used the term "data flow diagrams" a handful of times in the specification (A449: Abstract; A493: col. 1:55-32, col. 2:40-42; A494: col. 3:3-8) and could have chosen to recite "data flow diagrams" in claim 4, but deliberately chose not to do so. The '936 patent drafter instead used a different, more general term "graphical representations of data flows" in claim 4. The Board here improperly shoehorned a construction for "data flow diagrams" (an unclaimed term used in the specification only) into a claim that literally recites "graphical representations of data flows." *Kara Technology, Inc. v. Stamps.com, Inc.*, 582

F.3d 1341, 1348 (Fed. Cir. 2009) ("The claims, not specification embodiments,

define the scope of patent protection.").

> **2.      The Board's Construction Is Not The Broadest Reasonable Construction Because The '936 Patent Specification Does *Not* Limit The Display Of "Data Flows" To "Data Flow Diagrams."**

The Board's construction of "data flows" as equivalent to "data flow

diagrams" is further in error because, as described in the '936 patent specification,

"data flows" are not exclusively displayed in "data flow diagrams."  The

specification instead expressly discloses that "data flows" can be graphically

displayed **not only** in "data flow diagrams" (like FIG. 17), but that "the flow of

data" can also be displayed in "**program** flow" diagrams (like FIG. 9):  "FIG. 9 is

an exemplary screen shot depicting a **program flow** for a selected file, along with

arrows that indicate **the flow of data within the program flow**"  A494 (col. 3:49-

51) (emphasis added); "As illustrated in FIG. 9, arrows connect these program

flow icons 126 to generally illustrate **the flow of data**" A496 (col. 8:12-14)

(emphasis added).  Because the '936 specification discloses that "data flows" or

"graphical representations of data flows" can be illustrated as part of the "program

flow" in "program flow" diagrams, the Board erred by construing "data flows" to

be necessarily, and in all cases, coextensive with "data flow diagrams."

In its Rehearing Decision, the Board defended its new construction for "data

flows" by asserting that "the '936 patent consistently differentiates the

visualization of program flows and data flows." A48. The exemplary citations above to the '936 specification directly contradict this assertion; rather than "consistently differentiat[ing]" the visualization of program flows and data flows, the '936 patent specification on multiple occasions discloses that the "the flow of data" can be depicted "within the program flow" (A494, col. 3:49-51), and that program flow diagrams can be used to "illustrate the flow of data" (A496, col. 8:12-14).

### 3.    The '936 Patent Specification Uses The Terms "Data Flows" And "Data Flow Diagrams" Differently.

Even the isolated sentence from the '936 patent specification relied upon by the Board in the Final Written Decision recognizes the difference between the "the flow of the data" itself and "[d]ata flow diagrams" that can be used to depict that data flow. *See* A493 (col. 2:40-42). The '936 patent includes other examples where "diagrams" or "graphical representations" of "data flow" are distinguished from the "data flow" itself, such as: "A visualizer, i.e., a software tools [sic] that reads the code and generates diagrams and graphical representation of the program flow, data flow or the logic of the code…." A493 (col. 2:33-38).

These disclosures demonstrate that the broadest reasonable construction of the actual claim term "data flows" in view of the '936 specification is not a construction that equates "data flows" or "graphical representations of data flows" with "data flow diagrams." To the contrary, as described in the '936 specification,

a "data flow diagram" (or in some cases a "program flow diagram") is what is used

to depict the "data flow" or "the flow of the data" – a "data flow diagram" is **not**

the "data flow" itself.

### 4. The Board's New Claim Construction Is Based On A Misreading Of The Specification.

The entire premise for the Board's new claim construction is that the '936

specification purportedly uses the terms "data flows" and "data flow diagrams"

interchangeably. A18-19. But that premise is factually flawed. The Board's two

exemplary citations to the '936 specification do not support, either explicitly or

implicitly, the conclusion that the terms "data flows" and "data flow diagrams" are

used interchangeably. A18-19 (citing A494 col. 4:12-13 & A500 col. 16:3-5).

Indeed, neither of the Board's two citations uses the term "data flow diagram." *Id.*

The term "data flow diagram" appears only five times in the entire '936

specification. A449 (Abstract); A493 (col. 1:55-32, col. 2:40-42); A494 (col. 3:3-

8). The term "data flow diagram" does not appear anywhere in the DETAILED

DESCRIPTION portion of the specification, even though the term "data flow" is

used extensively in that part of the specification (*e.g.*, A496 col. 8:8-14; A500 col.

16:6-30, 16:47-59), thus undermining the Board's conclusion that the specification

uses these terms "interchangeably." *See In re Bigio*, 381 F.3d 1320, 1325-26 (Fed.

Cir. 2004) ("[T]his court counsels the PTO to avoid the temptation to limit broad

claim terms solely on the basis of specification passages.").

### 5. The Board's New Claim Construction Improperly Reads Into The Claims A Specific, Non-Limiting Embodiment Described In The Specification.

The Board's new construction for "data flows" is further in error to the extent it requires "icons depicting data processing steps." The Board relies on a single sentence in the specification for this aspect of its newly-adopted construction. A493 (col. 2:40-42). The lone sentence relied upon by the Board does not reflect the broadest reasonable construction of "data flows," however, because the entirety of the specification does not require that "data flows" must necessarily include "icons depicting data processing steps." *See Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) ("Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims.") (emphasis in original); *In re Rambus*, 694 F.3d 42, 47 (Fed. Cir. 2012) (affirming PTO construction that claim term was not limited to a particular embodiment where nothing in the specification restricted claimed invention to that specific embodiment).

Contrary to the Board's overly-narrow construction, parts of the '936 specification broadly describe "data flows" being illustrated with more general "program flow icons" (not necessarily "icons depicting data processing steps") and arrows:

> For viewing the program flow and data flow of a selected program, as will be further described below, the visualizer 120, in connection with a parser

35

> layer 140, reads, parses and displays the code for the selected program,
> representing each program and data block with a program flow icon 126.  As
> illustrated in FIG. 9, **arrows connect these program flow icons 126 to
> generally illustrate the flow of data**.

A496 (col. 8:8-14) (emphasis added).  As the Board itself recognized in the Final

Written Decision, this portion of the '936 specification discloses that "[p]rogram

flow icons … are connected by arrows that illustrate the flow of data."  A4 (citing

A496, col. 8:8-14).  The '936 specification also discloses that "arrows that connect

the program flow icons 126" are used to "indicate the direction of the data flow."

A500 (col. 16:7-12).

Even more specific to the recitation in claim 4 that the "graphical

representations of data flows are expandable and collapsible," the '936

specification explains that the "expandable" and "collapsible" data flows are

comprised of more general "program flow icons" (not "icons depicting data

processing steps"):

> As the user clicks the Step-wise button 121a located on the visualizer
> window 121, shown in FIG. 17, the visualizer 120 and the document view
> engine 200 may re-generate the data flow 124a on the visualizer window
> 121 and **collapse the number of program flow icons 126 that comprise
> the data flow 124**, ultimately showing the entire lineage of the data (i.e.,
> where the data came from, how the data has been processed and where the
> data was stored).  * * *  It should also be appreciated that the user may take
> a single data flow 124 and reverse the step-wise function, thereby
> **expanding the number of program flow icons 126 that comprise the
> data flow 124** and showing the data flow 124 for individual sections or
> blocks of code.

A500 (col. 16:15-30) (emphasis added).  In these two excerpts, it is "program flow icons 126" (not "icons depicting data processing steps") that comprise "the data flow 124" that is "expandable and collapsible" as recited in claim 4.

There are thus other, broader descriptions of "data flows" in the '936 patent specification that are merely comprised of "program flow icons," and those more general "program flow icons" are not necessarily limited to "icons depicting data processing steps."  Given these other disclosures, the isolated sentence relied upon by the Board describing "icons depicting data processing steps" is, at most, a description of a single potential embodiment.  And the '936 patent specification explains that the disclosed embodiments should be considered exemplary, illustrative, and non-limiting.[5]

---

[5] A501 (col. 18:13-17: "Accordingly, the particular arrangement disclosed is meant to be illustrative only and not limiting as to the scope of the invention which is to be given the full breadth of the appended claims and any equivalents thereof."); A501 (col. 17:62-66: "While specific embodiments of the present invention have been described in detail, it will be appreciated by those skilled in the art that various modifications and alternatives to those details could be developed in light of the overall teachings of the disclosure."); A494 (col. 3:15-20: "A better understanding of these and other objects, advantages, features, properties and relationships of the invention will be obtained from the following detailed description and accompanying drawings which set forth an illustrative embodiment and which are indicative of the various ways in which the principles of the invention may be employed."; col. 3:24-26: "For a better understanding of the invention, reference may be had to a preferred embodiment shown in the following drawings.").

Because the '936 specification explicitly describes "data flows" that are

depicted with more general "program flow icons" (and not solely "icons depicting

data processing steps"), the Board's new construction cannot be the "broadest

reasonable construction in view of the specification" as required under 37 C.F.R.

§42.100(b).  The Board erred by reading into the claim term "data flows" the

details of one specific, non-limiting embodiment described in the specification.

*See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir.

2008) ("[T]his court will not countenance the importation of claim limitations from

a few specification statements or figures into the claims, particularly if those

specification extracts describe only embodiments of a broader claimed invention.")

(citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc)

(warning against importing limitations from specification and noting that "although

the specification often describes very specific embodiments of the invention, we

have repeatedly warned against confining the claims to those embodiments")).

### C.    Because The Board Adopted An Entirely New Claim Construction In The Final Written Decision, SAS Was Prevented From Presenting Evidence Tailored To That New Claim Construction During The IPR.

In the Final Written Decision, the Board faulted SAS and Dr. Roussopoulos

for not addressing the "icons depicting data processing steps" portion of its new

construction for "data flows" in claim 4.  *See* A29-31.  Indeed, the only thing the

Board identified as missing in SAS's unpatentability arguments was prior art

38

evidence corresponding to the new requirement for "icons depicting data processing steps."[6] That portion of the new construction, as explained above, is flawed and is not the broadest reasonable construction of the term "data flows" in claim 4.

And even if the Board's new claim construction were correct (which it is not), SAS and Dr. Roussopoulos should not, as a matter of basic fairness, have been faulted for not previously addressing a claim construction that the Board first adopted in the Final Written Decision. The Board readily acknowledged in the Final Written Decision that it adopted a new construction for "data flows," even though the construction of that term was "not addressed explicitly by either party." A6-7. SAS had no prior opportunity to address the Board's new claim construction for "data flows," and therefore no prior opportunity or reason to

---

[6] *See* A30-31 ("Figure 14 [of Coad] appears to show 'various functions' using arrows and objects using icons, but it is unclear that any **icons represent 'data processing steps' as required."**; "Dr. Roussopoulos does not explain how [Coad FIG. 16] shows **'icons depicting data processing steps.'** Dr. Roussopoulos's testimony that Figure 17, an activity diagram, depicts data flows suffers from the same problem."; "The figures depicted in the UML Manual, however, suffer from the same problem as we have identified for Figures 14, 16, and 17 of Coad—they do not appear to show **'icons representing data processing steps.'"**) (emphasis added).

specifically identify or present expert testimony or other evidence of, *inter alia*, "icons representing data processing steps" in the prior art references.[7]

Because the Board adopted an entirely new claim construction for "data flows" in the Final Written Decision, SAS should have been afforded an opportunity to address it. The Board, however, improperly denied SAS's rehearing request seeking that opportunity. A46-48. Should this Court affirm the Board's construction of "data flows" as newly-adopted in the Final Written Decision, SAS requests that the Court remand to the Board so that SAS is given a proper opportunity to present evidence of the unpatentability of claim 4 under this new claim construction.

### D. Applying The Broadest Reasonable Construction, As The Board Should Have Done, SAS Demonstrated By A Preponderance Of The Evidence That Claim 4 Is Unpatentable.

This Court's review of the proper construction of "data flows" is *de novo*. The broadest reasonable construction of "data flow" in view of the '936 specification is just the final portion of the Board's construction: **"the movement**

---

[7] Throughout the IPR, SAS did address the unpatentability of claim 4 and the disclosure of "data flows" in the prior art references. *See, e.g.*, A99-100, A108-109 (Petition); A288-291, A298 (Reply); A382-385 (Record of Oral Hearing); A961-970, A991-992, A1007-1008 (Roussopoulos Declaration); A1793, A1800-1803 (SAS-20, 27-30). SAS could not have addressed the Board's overly narrow (and flawed) interpretation of "data flows" until after the Final Written Decision, because the Board had never before disclosed or applied that new construction.

**of data through source code."**[8]  As described in the specification, "data flows" are generally used to illustrate the movement (the flow and the direction) of the data through the source code.  A500 (col. 16:7-12: "The data flow 124 is generated by parsing the code, tracing the flow of the data through the code and displaying individual processes and data blocks in separate columns with arrows that connect the program flow icons 126 and indicate the direction of the data flow.").

The remainder of the Board's construction, requiring "a graphical representation comprised of icons depicting data processing steps and arrows to depict" is overly narrow and inconsistent with the broadest reasonable construction standard and the language of claim 4 itself.  Claim 4 already literally recites "graphical representations of data flows," so to the extent the Board's construction requires the "data flows" to include "a graphical representation," it is repetitive and redundant.  And the Board's additional requirement that the "graphical representation" be "comprised of icons depicting data processing steps and arrows to depict" is further redundant and not the broadest reasonable construction in view of the specification for all of the reasons explained above.

---

[8] For purposes of its rehearing request, SAS argued that the Board should apply its construction of "data flows" from the Institution Decision, since that construction was generally consistent with the broadest reasonable construction standard and did not impermissibly require, *inter alia*, "icons depicting data processing steps." A444-445.  The Board declined to do so.  A46-48.  Upon *de novo* review by this Court, SAS maintains that the proper construction of "data flows" in view of the '936 patent specification is "the movement of data through source code."

### 1. Coad Discloses "Data Flows."

SAS presented evidence in the IPR that UML diagrams like those disclosed in Coad are used to show various flows, including "data flows." *See, e.g.*, A961-970 (Roussopoulos Declaration). The Final Written Decision (A28-31) discussed SAS's arguments based on the "data flows" disclosed in Coad FIGS. 14, 16 and 17, but failed to give proper consideration to SAS's arguments and evidence regarding Coad FIG. 15. *See* A288-291; A1800-1802 (SAS-27-29). In this regard, Coad's FIG. 15 shows a UML collaboration diagram 1500:



A565 (FIG. 15). Coad describes the UML collaboration diagram 1500 as "an interaction with messages 1502 exchanged among objects 1504." A578 (col. 17:8-11).

In addition to Coad, SAS provided the Board with a well-known UML reference manual (the "Booch UML Manual") as evidence that many types of

flows – including "data flows" – can be visually depicted in UML diagrams.

A1639-1685.  The Booch UML Manual specifically includes Figure 8-3 (A1665-

1666) showing an example of a UML "collaboration diagram" depicting "message

flow":



**Figure 8-3.** *Collaboration diagram*

A1801 (SAS-28).  This "Collaboration diagram" with its "message flows" and

sequence numbers corresponds to Coad's FIG. 15 (a UML collaboration diagram

of source code).  *See* A571 (col. 4:19-21:  FIG. 15 depicts a user interface

displayed by the software development tool depicted in FIG. 2, where the user

interface displays a collaboration diagram of the source code.").

Figure 8-3 of the Booch UML Manual shows a collaboration diagram

depicting arguments as part of the "message flows."  These arguments on the lines

with arrows represent "data flows" as they depict what data (e.g., "order," "date,"

"count," "customer," and "cost") is flowing from one entity contained within the

source code to another portion of the source code.  The same code in Figure 8-3

also reflects "data flow" to a database as shown by the "TicketDB" code icon

43

(where "DB" stands for "database").  The Booch UML Manual thus demonstrates that a person of ordinary skill in the art would understand a collaboration diagram, like Coad FIG. 15, to include icons and arrows to depict the movement of data through source code, *i.e.*, data flow.

Admittedly, Coad and the Booch UML Manual do not use the exact term "data flows" in describing the respective collaboration diagrams.  But Coad FIG. 15 shows "message flows."  SAS presented evidence to the Board in the IPR that "message flows" are "data flows" in this context, since the "message flows" depict the movement of data through source code.  Moreover, ComplementSoft's expert witness, Mr. Zatkovich, admitted during his deposition (A1826-1864) that "messages" can be "data."

> Q.    What are messages?
> A.    Messages are specific attributes or parameters within the method call.
> Q.    Are messages data?
> A.    They can be data, yes.

A1844 (p. 71:19-23).

## 2.    As Properly Construed, Claim 4 Is Unpatentable In View Of The Prior Art.

The only limitation of claim 4 that the Board found missing from the prior art combination of Antis, Coad and Burkwald was the claimed "data flows." Applying the proper, broadest reasonable construction of "data flows," however, claim 4 is obvious over Antis, Coad and Burkwald.  This Court should reverse the

Board's contrary finding in the Final Written Decision and declare claim 4 to be unpatentable. *See Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1342-43 (Fed. Cir. 2011) (reversing jury verdict founded on overly narrow claim construction, and holding patent claims invalid as anticipated by prior art under correct claim construction). In the alternative, the Court should reverse and remand to the Board with instructions to apply the broadest reasonable construction of the claim term "data flows" in determining the patentability of claim 4.

III. **THE BOARD ERRED AS A MATTER OF LAW BY FAILING TO ISSUE A FINAL WRITTEN DECISION ON ALL PATENT CLAIMS CHALLENGED BY SAS.**

A. **As Required By Statute, The Board Should Have Issued A Final Written Decision On All Patent Claims Challenged In SAS's IPR Petition, Including Claims 2 and 11-16.**

Under 35 U.S.C. § 311(a), "a person who is not the owner of a patent may file with the Office a petition to institute an *inter partes* review of the patent." The Board cannot institute an IPR unless it initially "determines that the information presented in the petition . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a).

Once an IPR is instituted (upon finding that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 challenged claim), then

the statute unambiguously requires that the Board "**shall** issue a final written decision with respect to the patentability of **any patent claim challenged by the petitioner**." 35 U.S.C. § 318(a) (emphasis added). This statutory language is both mandatory (as to the decision) and broad (the decision must address "the patentability of any patent claim challenged").

The identification of the "claim[s] challenged by the petitioner" under § 318(a) necessarily depends on which claims the petitioner elects to "challeng[e] in the petition," 35 U.S.C § 314(a), not on the Board's initial assessment of the challenged claims in its threshold institution decision. On its face, the statute mandates that the Board's "final written decision" must address the patentability of "**any patent claim challenged by the petitioner**" in the petition, and the statutory language does not permit a piecemeal decision addressing only certain claims challenged in the petition.

In this case, contrary to 35 U.S.C. § 318(a), the Board's Final Written Decision failed to include any decision regarding the patentability of claims 2 and 11-16 of the '936 patent.[9] By statute, the Board was expressly required to "issue a

---

[9] The PTO has adopted a rule that "[w]hen instituting *inter partes* review, the Board may authorize the review to proceed on all or some of the challenged claims," 37 C.F.R. § 42.108(a). But that Rule directly conflicts with the statutory requirements for the Board's final written decision and is "trumped by the clear language of the AIA." *See Intellectual Ventures II, LLC v. JPMorgan Chase & Co.*, No. 14-1724, ___ F.3d ___, 2015 WL 1454828, at *5 (Fed. Cir. Apr. 1, 2015) (rejecting PTO regulation and stating: "The PTO's interpretation, however, is

final written decision" addressing the patentability of **all** the claims challenged by SAS, including claims 2 and 11-16, not just a subset of the challenged claims. Because the Final Written Decision here directly contravenes the clear requirements of 35 U.S.C. § 318(a) and is therefore "not in accordance with law," this Court should vacate the Final Written Decision in relevant part and remand to the Board for further proceedings.[10] *In re Sullivan*, 362 F.3d 1324, 1326 (Fed. Cir. 2004); 5 U.S.C. § 706(2)(A).

**B.     By Its Literal Terms, 35 U.S.C. § 318(a) Requires That The Board "*Shall* Issue A Final Written Decision With Respect To The Patentability Of *Any Patent Claim Challenged By The Petitioner*."**

Section 318(a) is plain on its face: "If an *inter partes* review is instituted and not dismissed under this chapter, the Patent Trial and Appeal Board **shall** issue a final written decision with respect to the patentability of **any patent claim challenged by the petitioner** and any new claim added under section 316(d)"

---

(continued…)

trumped by the clear language of the AIA.") (citing 35 U.S.C. § 2(b)(2) ("[The PTO] may establish regulations, *not inconsistent with law . . . .*" (emphasis by Court)).

[10] Consistent with 35 U.S.C. §§ 141(c) & 319, SAS appeals here the Board's failure to issue its Final Written Decision in compliance with 35 U.S.C. § 318(a). To the extent the Court considers any part of SAS's appeal to be a challenge to the Board's Institution Decision declining to review challenged claims 2 and 11-16, then SAS requests that this appeal be considered a mandamus petition.  According to *In re Cuozzo*, "mandamus may be available to challenge the PTO's decision to grant a petition to institute IPR after the Board's final decision in situations where the PTO has clearly and indisputably exceeded its authority."  778 F.3d at 1277-78.

(emphasis added). This statutory language is clear and unambiguous. *Intellectual Ventures II*, 2015 WL 1454828, at *3 ("Our first step in construing the statute is to look to the language of the AIA."); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."). Section 318(a) is mandatory, and it does not authorize the Board to pick and choose which claims to address in the final written decision.

The ordinary meaning of "shall" is "must"—if the condition is satisfied, the Board must act. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661 (2007); *Miller v. French*, 530 U.S. 327, 337 (2000); *Sharp Elecs. Corp. v. McHugh*, 707 F.3d 1367, 1373 (Fed. Cir. 2013). "'Shall' is 'mandatory' language." *Sharp Elecs.*, 707 F.3d at 1373; *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1560 (Fed. Cir. 1984).

What the Board must do is equally plain: "issue a final written decision with respect to" not just selected claims, but "**any** patent claim challenged by the petitioner." 35 U.S.C. § 318(a) (emphasis added). Simply put, "[t]he word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive." *Barsebäck Kraft AB v. United States*, 121 F.3d 1475, 1481 (Fed. Cir. 1997) (internal quotation marks omitted); *accord United States v. Gonzales*,

48

520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning: … 'one or some indiscriminately of whatever kind'" (citing cases and quoting Webster's Third New International Dictionary 97 (1976))); *United States v. Rosenwasser*, 323 U.S. 360, 363 (1945) ("The use of the words 'each' and 'any' to modify 'employee,' … leaves no doubt as to the Congressional intention to include all employees within the scope of the [Fair Labor Standards] Act unless specifically excluded.").

Thus, "the word 'any' necessarily includes 'all,'" and the only question that remains is "'all of what'?" *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1308 (Fed. Cir. 2001). And, on that question too, the statute is clear: The final written decision must address "any **patent claim challenged by the petitioner**." 35 U.S.C. § 318(a) (emphasis added). A "patent claim challenged by the petitioner" is one—as these terms plainly suggest—that the petitioner challenged, which is to say included in the IPR petition.

"[I]dentical words used in different parts of the same act are intended to have the same meaning," *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990); *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1381 (Fed. Cir. 2001), and here the AIA uses "claim(s) challenged" to refer to "claims" that the petitioner "challenged" in its petition. Indeed, the same phrase – "claim(s) challenged" – is used in the AIA to define what a petitioner must include in the petition: The petition must "identif[y],

49

in writing and with particularity, each **claim challenged**, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." *Id*. § 312(a)(3) (emphasis added). Similarly, the Director may institute an IPR if "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the **claims challenged in the petition**." *Id*. § 314(a) (emphasis added). Thus, the meaning of "any patent claim challenged by the petitioner" in § 318(a) is confirmed by the usage of "claim(s) challenged" in related, adjacent statutory sections, and it plainly refers to the entirety of the claims chosen for challenge by the petitioner, and included in the petition.[11]

The statute mandates that the Board's treatment of each "challenged claim" must be incorporated into its final written decision. This clear statutory requirement enables meaningful appellate review of the Board's decisions on patentability. The complete, final written decision gives rise to review in this Court. *See* 35 U.S.C. § 319 ("A party dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 318(a) may appeal the decision…."); *id*. § 141(c); *see St. Jude Medical v. Volcano Corp.*, 749 F.3d 1373, 1375-76 (Fed. Cir. 2014). Accordingly, the Board's failure to comply with

---

[11] Moreover, the PTO itself has used the term "claims challenged" to mean the claims that were asserted in the petition, not those on which proceedings were instituted. *See* USPTO's AIA Trial Roundtables at 9 (distinguishing between "claims challenged" and "claims instituted"), available at http://tinyurl.com/ownwbs4; *see also id.* at 13, 25, 46.

§ 318(a)—that is, its failure to address the patentability of challenged claims 2 and 11-16 in the Final Written Decision here—potentially shields significant aspects of the PTO's decision-making from appellate review.

    **C.    Had It Complied With Section 318(a), The Board Could Have Avoided The Need To Craft A New And Overly Narrow Claim Construction For "Data Flows" In The Final Written Decision In This Case.**

The Board's handling of this IPR demonstrates why its partial institution practice is flawed. The Board instituted an IPR of dependent claim 4, but not dependent claim 2. Claim 2 is indisputably broader than claim 4, however, as confirmed by even a cursory comparison of these claims:

> 2. The integrated development environment as recited in claim 1, wherein the graphical representations of flows depict data flows.

> 4. The integrated development environment as recited in claim 1, wherein the graphical representations of data flows are expandable and collapsible.

The Board had no justification for its decision to institute an *inter partes* review of **narrower** claim 4, while declining to conduct an IPR of **broader** claim 2.

Because the Institution Decision declined to review claim 2, the Board was faced with the prospect of cancelling narrower claim 4 in view of prior art, but allowing broader claim 2 to survive the IPR despite that prior art. Rather than squarely address the patentability of broader claim 2 in its Final Written Decision, however, the Board instead adopted an entirely new construction for the claim term "data flows" as recited in both claim 2 and 4. The Board then used this new claim

construction (which is contrary to the broadest reasonable construction standard) as its basis for distinguishing narrower claim 4 (and by implication broader claim 2) from the prior art.

Had the Board conducted the IPR in compliance with Section 318(a), by addressing in the Final Written Decision the patentability of all the patent claims challenged in SAS's Petition (including both claim 4 and broader claim 2), the Board would not have been forced to rely upon an artificially-narrow and legally-erroneous construction of "data flows." The demonstrated unpatentability of broader claim 2, applying the correct construction for "data flows" and based on the same evidence developed and presented during the IPR regarding narrower claim 4, further illustrates why the Board should not have instituted the IPR on just a subset of the challenged claims. The Board's Final Written Decision should have addressed the patentability of **all** claims challenged by SAS, including claim 2.

Similarly, the Board declined to include dependent claims 11-16 in the Final Written Decision solely because it asserted SAS had not provided in the Petition a specific construction for the limitation "a means for allowing the source code to be executed both locally and remotely" as recited in claim 11. A175-176. But the Board and the parties could have easily addressed that narrow claim construction issue during the IPR trial leading up to the Final Written Decision, including whether or not the means-plus-function statute is even applicable to the "means for allowing"

52

limitation.  To the extent 35 U.S.C. § 112 ¶ 6 is applicable, the parties could have presented arguments and evidence to the Board, including expert testimony, regarding the claimed function and the corresponding structure (if any) for that claim term as disclosed in the specification to a person of ordinary skill in the art. The Board's refusal to address the patentability of claims 11-16 in the Final Written Decision based on an alleged initial omission in the Petition regarding claim construction cannot be squared with the literal requirement of 35 U.S.C. § 318(a) to address "any patent claim challenged by the petitioner."

### D.    The PTO's Partial Institution Practice Frustrates Congress's Goal For The *Inter Partes* Review Process, And The Board's Disregard For The Requirements Of Section 318(a) Will Increase The Burdens On The District Courts And This Court.

Because estoppel only applies to claims that "result[] in a final written decision," 35 U.S.C. § 315(e)(2), a final written decision that fails to address all "claims challenged" will have limited estoppel effect.  But Congress's goal for IPRs was "to force a party to bring all of [its] claims in one forum … and therefore to eliminate the need to press any claims in other fora."  154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl).[12]

_____

[12] *See also* 157 Cong. Rec. S1376 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) ("if an inter partes review is instituted while litigation is pending, that review will completely substitute for at least the patents-and-printed publication portion of the civil litigation"); *accord id.* at S1361; *see also* 110 S. Rep. No. 259 at 4, 71 (Jan. 25, 2008) (intending to "limit unnecessary and counterproductive litigation costs" by "tak[ing] issues off the table that cannot be resurrected in subsequent

Consistent with that goal, once the Board grants an IPR petition, it must resolve all claims challenged in the petition and issue "a final written decision with respect to the patentability of any patent claim challenged by the petitioner." 35 U.S.C. § 318(a).  This requirement is fundamental to enabling the *inter partes* review process to limit litigation, as opposed to merely adding another layer of cost and process.  By resolving the petition in full, a proper Board ruling under § 318(a) estops further litigation over the patentability of the challenged claims based on Section 102 or 103 grounds that the petitioner raised or reasonably could have raised.  35 U.S.C. §§ 311(b), 315(e)(2). A partial petition grant and a partial final written decision, however, leave the patentability of any non-instituted claims to be resolved in litigation, defeating Congress's purpose in enacting the IPR process.

The Board's partial institution practice will result in unnecessary complexity in the district courts.  When a district court stays a case to await the Board's completion of an IPR—as the district court did in ComplementSoft's litigation against SAS asserting the '936 patent—the court does so with the expectation that issues will be resolved and the case, when reinitiated at the conclusion of the Board proceedings, will be simplified.  *See, e.g., Softview LLC v. Apple, Inc.*, Nos. 12-989

---

(continued…)

litigation"); 153 Cong. Rec. H10280 (Sept. 7, 2007) (statement of Rep. Jackson-Lee) ("[T]he bill establishes a single opportunity for challeng[ing]" the patent and "prohibits a party from reasserting claims in court that it raised in post-grant review").

& 10-389-LPS, 2013 WL 4757831, at *1 (D. Del. Sep. 4, 2013) (granting stay that was "likely to simplify the issues for trial" in view of newly-filed IPR of asserted patents, after earlier denying stay pending *inter partes* reexamination).  Challenged claims that are cancelled for lack of patentability vanish from the litigation entirely.  Challenged claims that undergo review, and survive, will return to the district court with statutory estoppel, which prevents the accused infringer from making the same invalidity arguments before the district court that it made before the Board.  Thus, whether or not the challenged claims are cancelled or survive, the case is simplified for claims addressed in a Board trial.[13]

But when the Board elects to review and issue a final written decision regarding only some of the challenged claims, but not others, it undermines the intended efficiency of these trials and saddles the district courts with potentially greater and redundant workloads.  When the Board issues a final written decision on less than all the challenged claims, a petitioner, upon return to the district court, will have the right to challenge the validity of the non-instituted claims using prior

---

[13] *See Softview*, 2013 WL 4757831, at *1 ("Should all of the asserted claims be found invalid, this litigation would be 'simplified' because it would be concluded. Alternatively, should even some of the asserted claims be found invalid, that finding would reduce the number of issues left to be litigated. Another possibility is that some or all of the claims are found not invalid, yet even in that scenario, litigation should be somewhat simplified due to the estoppel effect on [the patent challengers] of PTAB findings relating to certain prior art.").

art grounds that it cannot use to challenge the instituted claims, due to the statutory estoppel.

For example, as this case is currently postured, if the Board's Final Written Decision is affirmed, the litigation would be restarted in the district court with two different types of claims: (1) challenged claim 4, to which statutory estoppel will apply; and (2) challenged claims 2 and 11-16, to which no statutory estoppel will apply. SAS would be free to make any and all arguments regarding the invalidity of claims 2 and 11-16, but estopped from making certain invalidity arguments regarding claim 4. As a general matter, this kind of claim-by-claim complexity will significantly increase the burden on district court judges (and juries) in determining the merits of patent infringement cases. And this result is even more incongruous here, given that SAS would be estopped from making certain invalidity arguments about narrower claim 4 in the district court, but would be free to make any and all invalidity arguments regarding broader dependent claim 2.

Likewise, the possible burdens on this Court are greater under the PTO's partial institution practice. This Court may experience overlapping appeals involving the same prior art, first from the Board on the patentability of the instituted claims, and later from the district court on the validity of the non-instituted claims. Further, the different underlying proceedings may require different panels of this Court to apply different standards of claim construction and

different standards of proof to highly similar claims. Whereas the broadest reasonable interpretation construction standard, and the preponderance of the evidence standard for patentability, would apply to claims for which Board proceedings were instituted, non-instituted claims would be reviewed under this Court's standard for district court claim constructions and would require clear and convincing evidence for invalidity. The result could be inconsistent decisions and a burden on judicial resources.

### E.    The PTO's Partial Institution Practice Has Affected And Will Continue To Affect A Substantial Percentage Of Board Trials.

SAS is not alone in the predicament created by the PTO's partial institution practice. The Board's partial institution practice has affected well over 100 Board trials instituted at the PTO. According to the PTO's most recently-released data, as of May 1, 2014 (nearly one year ago), more than 20% (112 of 528) of IPR and CBM proceedings had been improperly instituted on a subset of the challenged claims. *See* AIA Trial Roundtables slides at 25, *available at* http://tinyurl.com/ownwbs4 (last visited April 13, 2015).

Not only is this problem significant, it will persist and become more pervasive. According to the PTO's statistics, well over 100 petitions for IPR and CBM review are being filed every month—amounting to 3,068 petitions as of April 9, 2015. *See* USPTO, AIA Progress Statistics at 3, *available at* http://tinyurl.com/n4zbuea (last visited April 13, 2015). Assuming a 20% partial

institution rate as noted above, over 600 trials from those 3,068 petitions will be partially instituted and will result in final written decisions that are contrary to the AIA.

## CONCLUSION

The Court should reverse the Board's construction of the claim term "data flows" and its decision confirming the patentability of claim 4 of the '936 patent. The Court should declare claim 4 to be unpatentable or, in the alternative, remand to the Board for a determination of patentability of claim 4 applying the proper construction of "data flows."  Additionally, the Court should reverse and vacate the Board's decision in relevant part regarding claims 2 and 11-16 and remand with instructions to comply with § 318(a).

Dated:  April 21, 2015                    Respectfully submitted,

*/s/ John A. Marlott*
JOHN A. MARLOTT
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
jamarlott@jonesday.com

GREGORY A. CASTANIAS
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
gcastanias@jonesday.com

DAVID B. COCHRAN
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dcochran@jonesday.com

MATTHEW W. JOHNSON
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone:  (412) 391-3939
Facsimile:  (412) 394-7959
mwjohnson@jonesday.com

*Counsel for Appellant,*
*SAS Institute, Inc.*

# ADDENDUM

Trials@uspto.gov                                         Paper 38
Tel: 571-272-7822                            Entered: August 6, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

SAS INSTITUTE, INC.,
Petitioner,

v.

COMPLEMENTSOFT, LLC,
Patent Owner.

———————————————

Case IPR2013-00226
Patent 7,110,936 B2

———————————————

Before KEVIN F. TURNER, JUSTIN T. ARBES, and JENNIFER S. BISK,
*Administrative Patent Judges.*

BISK, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00226
Patent 7,110,936 B2

## I. INTRODUCTION

### A. Background

Petitioner, SAS Institute, Inc., filed a Petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 1-16 ("the challenged claims") of U.S. Patent 7,110,936 B2 (Exhibit 1001, "the '936 patent"). 35 U.S.C. §§ 311-319. Patent Owner, ComplementSoft, LLC, filed a Preliminary Response. Paper 8. On August 12, 2013, we instituted trial (Paper 9, "Dec."), concluding that Petitioner had shown a reasonable likelihood of showing that claims 1 and 3-10 were unpatentable based on the following grounds:

| References [1] | Claims Challenged |
|---|---|
| Coad, Oracle Primer, and Oracle8 Primer | 1 |
| Antis and Coad | 1, 3, 5, 6, 8, and 10 |
| Antis, Coad, and Burkwald | 4 |
| Antis, Coad, and Eick | 7 |
| Antis, Coad, and Building Applications | 9 |

We have jurisdiction under 35 U.S.C. § 6(c). This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

---

[1] U.S. Patent No. 5,572,650 (Ex. 1005) ("Antis"); U.S. Patent No. 6,851,107 (Ex. 1006) ("Coad"); U.S. Patent No. 6,356,285 (Ex. 1007) ("Burkwald"); U.S. Patent No. 5,937,064 (Ex. 1008) ("Eick"); Microsoft Corporation, BUILDING APPLICATIONS WITH MICROSOFT ACCESS 97 (1996) (Ex. 1011) ("Building Applications"); Rajshekhar Sunderraman, ORACLE PROGRAMMING: A PRIMER (1999) (Ex. 1012) ("Oracle Primer"); and Rajshekhar Sunderraman, ORACLE8 PROGRAMMING: A PRIMER (2000) (Ex. 1013) ("Oracle8 Primer").

IPR2013-00226
Patent 7,110,936 B2

Petitioner has shown, by a preponderance of evidence, that claims 1, 3, and 5-10 are unpatentable. Petitioner has not met its burden to show that claim 4 is unpatentable.

Patent Owner's motion to amend claims is *denied.*

### B. Related Proceedings

Patent Owner asserted the '936 patent against Petitioner in *ComplementSoft, LLC v. SAS Institute, Inc.*, No. 1:12-cv-07372 (N.D. Ill. Sept. 14, 2012). *See* Pet. 58; Paper 6 at 2. The related case is currently stayed pending this *inter partes* review. Transcript of Proceedings, *ComplementSoft*, No. 1:12-cv-07372, ECF No. 44 (granting stay), 54 (denying motion to lift stay).

### C. The '936 Patent

The '936 patent describes a language independent software development tool having a graphical user interface, also referred to as an Integrated Development Environment or IDE. Ex. 1001, 1:15-19. In particular, the patent describes an IDE for exchanging, editing, debugging, visualizing, and developing software code for "data manipulation centric languages." *Id.* at 1:64-2:3.

The Summary of the Invention describes the IDE as including, among other features, a visualizer that generates a graphical representation of the program flow, data flow, or logic of the code. *Id.* at 2:34-49. In other words, the visualizer allows for displaying code in ways other than a typical text editor. A detailed description of a preferred embodiment uses a series of drawings, and corresponding text, to describe an exemplary IDE with a visualizer that can display source code using several different graphical formats. *Id.* at 3:24-26. For instance, Figure 9, reproduced below, depicts

3

IPR2013-00226
Patent 7,110,936 B2

"a program flow for a selected file, along with arrows that indicate the flow of data within the program flow."  *Id.* at 3:49-51.



**FIG. 9**

Figure 9, above, shows visualizer 120 displaying source code.  *Id.*  Each program and data block of a code section is represented by an icon, program flow icon 126.  *Id.* at 8:8-14.  Program flow icons 126 are displayed in the order that they occur in the source code (*id.* at 15:56-59) and are connected by arrows that illustrate the flow of data (*id.* at 8:8-14).

Visualizer 120 also is shown in Figure 17, reproduced below, showing "a data flow" for the selected program.  *Id.* at 4:12-13.

4

IPR2013-00226
Patent 7,110,936 B2



**FIG. 17**

Figure 17, above, shows visualizer 120 displaying individual processes and data blocks, represented by program flow icons 126, in separate columns. *Id.* at 16:6-12. The arrows that connect program flow icons 126 indicate the direction of the data flow. *Id.*

### D. Illustrative Claim

Claim 1, reproduced below, is the '936 patent's only independent claim:

1. An integrated development environment, comprising:

a document manager for retrieving source code programmed using one of a plurality of types of data manipulation languages;

an editor for displaying the retrieved source code and providing a means for a user to edit the retrieved source code;

a parser layer which detects the one of the plurality of types of data manipulation languages in which the retrieved source code is programmed and which activates rules and logic applicable to the detected one of the plurality of types of data manipulation languages; and

a visualizer dynamically linked to the editor for displaying graphical representations of flows within the retrieved source code using the rules and logic applicable to the detected one of the plurality of types of data manipulation languages and activated by the parser,

wherein the editor, parser layer and visualizer cooperate such that edits made to the source code using the editor are automatically reflected in the graphical representations of flows displayed by the visualizer and edits made to the graphical representations of flows in the visualizer are automatically reflected in the source code displayed by the editor.

## II. ANALYSIS

### A. Claim Construction

For purposes of the Decision to Institute we expressly construed the terms "data manipulation language" and "graphical representation of flows." Dec. 6-9. We construed (1) "data manipulation language" as "a programming language used to access data in a database, such as to retrieve, insert, delete, or modify data in the database," and (2) "graphical representation of flows" as "a diagram that depicts a map of the progression (or path) through the source code." *Id.*

In the post-institution briefs, the parties directly disagree regarding only the construction of the term "data manipulation language." Paper 16 ("PO Resp.") 10-11; Paper 24 ("Reply") 1-2. In analyzing the issues in this case, however, we have determined that many of the arguments purportedly directed to the proposed obviousness grounds are more accurately arguments regarding claim construction. Thus, to properly resolve the issues presented

IPR2013-00226
Patent 7,110,936 B2

in this proceeding, we construe several terms not addressed explicitly by either party, including "graphical representation of flows," "program flows," and "data flows." We construe all terms, whether or not expressly described below, using the broadest reasonable construction in light of the '936 patent specification. 37 C.F.R. § 42.100(b).

### 1. Data Manipulation Language

Much of this proceeding turns on the interpretation of the term "data manipulation language," recited by every challenged claim. In the Decision to Institute, we interpreted this term as "a programming language used to access data in a database, such as to retrieve, insert, delete, or modify data in the database." Dec. 6-8. This interpretation is consistent with dictionary definitions from the time period of the invention. *See* MICROSOFT COMPUTER DICTIONARY at 125 (4th ed. 1999) ("a language that is used to insert data in, update, and query a database"); Ex. 1040, 272 (THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS (7th ed. 2000)) ("A language used to retrieve, insert, delete, or modify the data in a database.").

### a. "retrieve"

In its response brief, Patent Owner contends that the definition we adopted in the Decision to Institute is too broad. PO Resp. 10-11. Specifically, Patent Owner argues that a programming language that includes *only* the functionality for retrieving data would not have been considered a data manipulation language by a person of ordinary skill in the art. *Id.* Patent Owner's declarant, Ivan Zatkovich, testifies that an SQL [Structured Query Language] SELECT statement—which retrieves data from a database—"does not alter the data in any way and thus does not, by

7

IPR2013-00226
Patent 7,110,936 B2

itself, perform any manipulation of data." Ex. 2001 ¶ 19. Accordingly,

Patent Owner proposes that our interpretation of the term "data manipulation

language" be altered to either remove the word "retrieve" or "qualify the use

of the term retrieve by stating that the retrieval must be followed by some

*manipulation* procedure." PO Resp. 11. Petitioner disagrees, asserting that

Patent Owner's proposed change would result in too narrow an

interpretation because retrieval of data *does* constitute data manipulation.

Reply 1-2.

We decline to make Patent Owner's proposed change. First, this

change does not affect the substantive analysis in this case. In other words,

our decision on patentability is the same whether or not we adopt

Petitioner's proposed modification.

Second, we are not persuaded by Patent Owner's arguments that we

should depart from the dictionary definitions, proffered by Petitioner's

declarant, Dr. Nick Roussopoulos (Ex. 1015 ¶ 48), and upon which we based

our preliminary construction. For instance, during the oral hearing, Patent

Owner conceded that retrieving data from a database is a type of

manipulation.

> JUDGE TURNER: But if I'm obtaining a smaller set [of data
> items from a database], isn't that manipulating or is it not? I
> understand I'm giving you a hypothetical and putting you on a spot.
>
> MR. HANFT: What I'm having trouble with is in that
> hypothetical you're talking about retrieving data from a dataset, but
> then you're trying to say, well, is that within the definition of a data
> manipulation language? It's just kind of slightly apples and oranges
> because the data manipulation language has to have certain
> characteristics and be capable of certain things.
> *Taking a dataset and reducing it down to a smaller set*
> *according to some characteristics is some type of manipulation*, but a

8

IPR2013-00226
Patent 7,110,936 B2

> data manipulation language has to be able to do more than just
> retrieve. It's got to do more than that.

Paper 36 ("Tr.") 38:7-18 (emphasis added). Fen Hiew, one of the named

inventors of the '936 patent, agreed with this understanding. Ex. 1045,

47:15-18 (Q: "Would selection of data be a type of manipulation that's

performed by a data manipulation system?" A: "Yes").

We are not persuaded otherwise by Mr. Zatkovich's testimony to the

contrary. *See* Ex. 2001 ¶ 19. Mr. Zatkovich does not explain why retrieving

data would not be considered manipulation of that data. Nor does he point

to any objective evidence to support this conclusion. And Patent Owner

does not point to persuasive language in the specification or other evidence

that supports an interpretation of "data manipulation language" with the

word "retrieve" removed or qualified as proposed.

Thus, we decline to alter our preliminary construction of data

manipulation language by removing or adding a qualification to the word

"retrieve."

### b. "directly"

Although not couched as claim construction, Patent Owner argues that

a data manipulation language must *directly* access data in a database. PO

Resp. 33, 38-39. Patent Owner argues that because of this requirement, an

object-oriented programming language cannot be a data manipulation

language, even if it includes extensions, such as JDBC [Java Database

Connectivity] or embedded SQL, for accessing a database. *Id.* In explaining

this assertion, Mr. Zatkovich testifies that object-oriented programming

languages facilitate the creation of programs that are a collection of

interacting objects, as opposed to conventional programming languages, in

9

IPR2013-00226
Patent 7,110,936 B2

which a program is a list of tasks. Ex. 2001 ¶ 22. As part of this paradigm, according to Mr. Zatkovich, the object-oriented approach typically places data in an object, where the data are not directly accessible by the rest of the program, but instead are accessed solely through methods bundled with the object. *Id.* ¶ 23. Mr. Zatkovich concludes that "[o]ne skilled in the art would not consider C++ and Java [which are object-oriented programming languages] to be data manipulation languages since they do not directly interact or directly perform data manipulation within databases." *Id.* ¶ 24.

Patent Owner adds that simply adding database functionality in the form of JDBC or embedded SQL to an object-oriented language does not convert the language into a data manipulation language. PO Resp. 38-39. Mr. Zatkovich testifies that when SQL is embedded in Java, the Java program simply passes the SQL statement to the database system—the embedded SQL statement is "processed merely as a text string to be passed to the DataBase Management System." Ex. 2001 ¶ 47. According to Patent Owner, this shows that it is not actually Java or C++ code accessing data in a database, but instead the access is "being performed at and by the database itself." PO Resp. 39. Thus, Patent Owner concludes that Java and C++ are not data manipulation languages, even when augmented by JDBC or embedded SQL. *Id.*

Petitioner argues that a data manipulation language is a language that allows a program to simply access data in a database, without the requirement that the access be *direct.* Reply 9. According to Petitioner, Java and C++ access a database using embedded SQL and JDBC statements. *Id.* Petitioner relies on statements in the Oracle8 Primer to support this assertion. *Id.* at 9-10 (quoting Ex. 1013, 225 ("JDBC is an Application

10

IPR2013-00226
Patent 7,110,936 B2

Programming Interface (API) that enables database access in Java."), 93, 96, 226).  In addition, Dr. Roussopoulos testifies that "[e]mbedding SQL allows each of [the Java and C++] programming languages to access data in a database."  Ex. 1015 ¶ 114 (citing Ex. 1013, 93, 95, 103, 108, 118, 277, 280, 281, 294, and 301); *see also* Ex. 1015 ¶¶ 49-51.  Dr. Roussopoulos also states that "Oracle8 Primer discloses that the object-oriented nature of Java is no bar to having data manipulation language operations."  *Id.* ¶ 52 (quoting Ex. 1013, 281 (showing that the "select" statement is translated into pure Java code), 301 (showing the same for inserting data in a database), 294 (showing the same for creating database tables and rows)); *see also* Ex. 1015 ¶ 53 (showing the same for embedded C++).

We are persuaded by the testimony of Dr. Roussopoulos that a data manipulation language does not require *direct* access to data in a database. To the extent that Patent Owner argues that Java and C++ never actually retrieve or manipulate data in a database because the embedded functionality does not *directly* access the database, we credit Petitioner's evidence, particularly Exhibit 1013, which supports Dr. Roussopoulos's conclusion that embedded SQL accesses and manipulates data in a database.  All of Patent Owner's evidence to the contrary hinges on the testimony of Mr. Zatkovich, which we do not find persuasive.  Mr. Zatkovich's conclusion that access to a database from a data manipulation language must be direct is unsupported.  Mr. Zatkovich simply asserts this to be the case, without providing credible support.  *See* Ex. 2001 ¶ 47.

Patent Owner does not point to persuasive language in the specification or other evidence that supports an interpretation of data manipulation language restricted to *direct* access to a database.  In fact, the

11

IPR2013-00226
Patent 7,110,936 B2

'936 patent discusses, in several places, SQL and Oracle® RDBMS as examples of languages to which the invention is targeted.  Ex. 1001 1:20-25; 1:64-2:3; 8:22-26; 9:47-53; 10:5-7; 16:34-49; 17:17-19.  And the '936 patent does not specify that these languages would be excluded if the database access functionality is indirect.  Dr. Roussopoulos agrees, stating that the '936 patent's reference to these languages is consistent with embedding SQL in Java or C++.  Ex. 1015 ¶ 54.

Thus, we decline to alter the interpretation of "data manipulation language" by adding a qualification that access to the database be direct.

### c. Conclusion

For these reasons, we adopt the interpretation of "data manipulation language" used in the Decision to Institute—"a programming language used to access data in a database, such as to retrieve, insert, delete, or modify data in the database."  We do not adopt any of the modifications to this interpretation urged by Patent Owner.

### 2. Graphical Representation of Flows

The term "graphical representation of flows" is recited by every challenged claim.  In the Decision to Institute, we interpreted this term as "a diagram that depicts a map of the progression (or path) through the source code."  Dec. 8-9.  Patent Owner does not explicitly challenge this interpretation, but makes several arguments that amount to a narrowing of the interpretation of the term.  We address these arguments here.

### a. "data flows" and "program flows"

In the Decision to Institute, we explained that the '936 patent explicitly discusses two types of flow diagrams—"program flow diagrams" and "data flow diagrams."  Dec. 8-9 (citing Ex. 1001, 2:38-42).  The '936

12

IPR2013-00226
Patent 7,110,936 B2

patent describes a "program flow diagram" as being "comprised of program block icons and arrows to depict the code's program flow" and a "[d]ata flow diagram" as "comprised of icons depicting data processing steps and arrows to depict the flow of the data through the program." Ex. 1001, 2:38-42. We were not persuaded, however, that the claim term "graphical representation of flows" is restricted to these two types of flow diagrams. Dec. 8-9.

Patent Owner does not explicitly argue otherwise. Nevertheless, in its analysis, Patent Owner often limits the term to either program or data flow diagrams. These arguments are appropriate only for dependent claims 3 ("wherein the graphical representations of flows depict program flows") and 4 ("wherein the graphical representations of data flows are expandable and collapsible"). Patent Owner goes further and applies the narrower interpretation to all the claims. For example, Patent Owner argues that Coad does not show "graphical representations of flows" by asserting that the "communications shown in Fig. 14 are not directly related to program or data flow" and "none of the remaining diagrams of Coad show program or data flow." PO Resp. 31-32.

Patent Owner, however, presents no persuasive explanation or evidence to support such a narrow interpretation of the claim term "graphical representations of flows." As we pointed out in the Decision to Institute, Patent Owner has not directed us to language in the '936 patent that limits the term to only these two examples. Nothing in Patent Owner's response brief persuades us otherwise.

IPR2013-00226
Patent 7,110,936 B2

### b. "within the retrieved source code"

Patent Owner argues that the term "graphical representations of flows" cannot properly be interpreted without taking into consideration the phrase that follows it in the claims—"within the retrieved source code." PO Resp. 32-33. According to Patent Owner, because the source code is further defined in the claims to be a "data manipulation language," the "claims require that the flows show source code steps actually performing data manipulation procedures." *Id.* at 35. Patent Owner explains that the "intent and purpose of the invention is to permit the graphical representation of the flow within languages that manipulate data." *Id.* at 36. Patent Owner also points to Figure 19 as showing that the graphical representations depict the program flow within the "*actual source code that is manipulating the data.*" *Id.*

We agree with Patent Owner that the claim language clearly requires the graphical representations of flows to show flows within source code created with a data manipulation language. However, we are not persuaded that this requires the flows to show source code steps that are actually performing data manipulation. As described above, we have interpreted data manipulation language to be a programming language used to access data in a database, such as to retrieve, insert, delete, or modify data in the database. Although this interpretation requires that a data manipulation language allow a program to be written that manipulates data, the interpretation does not *limit* such a program to source code that manipulates data. In other words, source code written using a data manipulation language performs many types of actions, including, but not limited to, manipulating data.

14

IPR2013-00226
Patent 7,110,936 B2

For example, Figure 20 of the '936 patent shows a portion of the source code being displayed in the graphical representation. One of the function calls listed in the source code is "PRINT," which is represented in the graphical representation as an icon. It is unclear, however, whether a print function is "actual manipulation of data." *See* Tr. 65:19-23 (Q: "In the patent in figure 20(a) there is some code, and it has print data. Is that a data manipulation procedure? I don't know if printing is manipulating." A: "You're not going to like my answer, which is I'm not an expert in this field, so I can't answer that."). And Patent Owner has not directed us to evidence that sheds light on this question.

Moreover, as discussed above, Patent Owner asserts that retrieving data, as in an SQL SELECT statement, is not a manipulation of data. PO Resp. 10-11 (citing Ex. 2001 ¶ 19). Nevertheless, Patent Owner concedes that a program written with a data manipulation language may include functions used for retrieving data. *See, e.g.,* PO Resp. 11 ("The Board's interpretation should be modified to either remove the term 'retrieve' or to qualify the use of the term retrieve by stating that the retrieval must be followed by some *manipulation* procedure."). Thus, it is undisputed that a program written using a data manipulation language may contain portions of code that perform actions independent from the manipulation of data. And Patent Owner does not point to persuasive language in the '936 patent or other evidence supporting an interpretation that excludes those portions of the source code from the graphical representation. In other words, the claims require that the "received source code" is "programmed using one of a plurality of types of data manipulation languages," but nothing in the

15

IPR2013-00226
Patent 7,110,936 B2

claims requires that the "retrieved source code" contain functionality that actually manipulates data.

Figure 19 does not persuade us otherwise. Patent Owner has not pointed to any indication in the '936 patent that this figure is meant to limit the subject matter of the claims. To the contrary, the "Brief Description of Drawings" clearly identifies all the figures as depicting a preferred embodiment of the invention. Ex. 1001, 3:24-26 ("For a better understanding of the invention, reference may be had to a preferred embodiment shown in the following drawings."). And the "Detailed Description" concludes by clarifying that the specific embodiments are not limiting. *Id.* at 17:62-66 ("While specific embodiments of the present invention have been described in detail, it will be appreciated by those skilled in the art that various modifications and alternatives to those details could be developed in light of the overall teachings of the disclosure."); 18:13-17 ("Accordingly, the particular arrangement disclosed is meant to be illustrative only and not limiting as to the scope of the invention which is to be given the full breadth of the appended claims and any equivalents thereof.").

Thus, we decline to alter the interpretation of "graphical representations of flows" by adding a requirement that the flows show source code steps that are actually performing data manipulation.

### c. Actual Pathways

Petitioner states that Patent Owner improperly suggests that graphical representations of flows are limited to the *actual* path through source code as opposed to including *all possible* pathways through the code. Reply 8-9. In particular, Petitioner points to Patent Owner's description of Coad, "[t]he

16

IPR2013-00226
Patent 7,110,936 B2

concept underlying Coad is limited to depicting all potential (as opposed to actual) scenarios within an object-oriented program." Reply 8 (citing PO Resp. 13). Patent Owner does not point to persuasive explanation or evidence supporting such a limitation. To the extent that Patent Owner is making this argument, we are not persuaded that the term should be so limited.

### d. Conclusion

For these reasons, we adopt the interpretation of "graphical representations of flows" used for the Decision to Institute—"a diagram that depicts a map of the progression (or path) through the source code." We do not adopt any of the modifications to this interpretation urged by Patent Owner.

### 3. Program Flows

The term "program flows" is recited in dependent claim 3. In the Decision to Institute, we did not explicitly interpret this term as part of the claim construction section. *See* Dec. 5-10. In the analysis portion of our decision, however, we stated that "Figure 14 [of Coad] depicts the source code program's path of control from one step to another through the program—a program flow diagram." Dec. 14. Neither party directly challenges this statement.

Although the '936 patent does not explicitly define "program flows," it does define the term "program flow diagrams" as "comprised of program block icons and arrows to depict the code's program flow." Ex. 1001, 2:38-40. The specification then proceeds to use the terms "program flows" and "program flow diagrams" interchangeably. *See, e.g., id.* at 3:49-51 ("FIG. 9 is an exemplary screen shot depicting a program flow for a selected file,

17

along with arrows that indicate the flow of data within the program flow.");
16:3-5 ("By assigning meanings and attributes to tokens 144, the document
view engine 200 allows the visualizer to create program flows 122 and data
flows 124.").

Thus, we begin with the definition for "program flow diagrams" for
our interpretation.  Because it is not constructive for the definition of
"program flows" to include the term "program flow," we adopt the
following slightly modified version—"a graphical representation comprised
of program block icons and arrows to depict the progression of control
through source code."

### 4.  Data Flows

The term "data flows" is recited by dependent claim 4.  In the
Decision to Institute, we did not explicitly interpret this term as part of the
claim construction section.  *See* Dec. 5-10.  In the analysis portion of our
decision, when discussing the data flow limitation, we stated that "[w]e are
not persuaded that [the code view of Antis] is equivalent to a depiction of a
map of the path of data through the executing source code."  Dec. 19.
Petitioner argues that the word "executing" in that statement is improper.
Reply 4.

Although the '936 patent does not explicitly define "data flows," it
does define the term "[d]ata flow diagrams" as "comprised of icons
depicting data processing steps and arrows to depict the flow of the data
through the program."  Ex. 1001, 2:40-42.  The specification then proceeds
to use the terms "data flows" and "data flow diagrams" interchangeably.
*See, e.g., id.* at 4:12-13 ("FIG. 17 is an exemplary screen shot depicting a
data flow for a selected file."); 16:3-5 ("By assigning meanings and

18

attributes to tokens 144, the document view engine 200 allows the visualizer to create program flows 122 and data flows 124.").

Thus, we begin with the definition for "data flows diagrams," for our interpretation. Because it is not constructive to interpret the term "data flows" by using the phrase "flow of data," we adopt the following slightly modified version—"a graphical representation comprised of icons depicting data processing steps and arrows to depict the movement of data through source code."

### B. Overview of Coad

Coad discloses a software development tool that allows a developer simultaneously to view and modify textual and graphical displays of source code regardless of the programming language in which the code is written. Ex. 1006, Abstract, 4:38-41. In the Background of the Invention, Coad describes conventional software development tools that allow the user to view Unified Modeling Language (UML)—a graphical representation or model using object-oriented design—and source code at the same time. *Id.* at 1:47–2:22.

### C. Overview of the Oracle Primers

The Oracle Primers are books describing the Oracle database system. The Oracle8 Primer includes a chapter titled "Embedded SQL," which refers to adding embedded SQL to C++, thus allowing writing application programs in C++ that "interact (read and write) with the database." Ex. 1013, 93. Another chapter, titled "Oracle JDBC" describes JDBC, "an Application Programming Interface (API) that enables database access in Java" and "consists of a set of classes and interfaces written in Java that allow the programmer to send SQL statements to a database server for

19

IPR2013-00226
Patent 7,110,936 B2

execution and, in the case of an SQL query, to retrieve query results." Ex. 1013, 225.

### D. Alleged Obviousness over Coad and the Oracle Primers

Petitioner asserts that claim 1 would have been obvious over Coad combined with Oracle Primer and Oracle8 Primer. Petitioner relies on Coad for every limitation except that Petitioner relies on the Oracle Primers for describing the use of SQL within Java and C++ and thus disclosing the data manipulation language limitation. Pet. 31-32 (citing Ex. 1015 ¶¶ 111-115). Petitioner points to Figures 11-17 of Coad as depicting aspects of the view for displaying graphical representations of flows in source code. Pet. 29-30.

In the Decision to Institute, we determined that Petitioner had shown a reasonable likelihood of prevailing on this proposed ground of unpatentability. Dec. 15. In particular, we determined that Petitioner had a reasonable likelihood of prevailing on its assertions that the combination of Coad and the Oracle Primers disclosed every limitation of claim 1. *Id.* at 12-14. We also found reasonable Petitioner's asserted rationale that a person of ordinary skill would have combined the teachings of Coad and the Oracle Primers in order to enhance the utility of the programming environment to include data manipulation. *Id.* at 14-15 (citing Pet. 25); *see* Ex. 1015 ¶ 115.

In its response brief, Patent Owner argues that the combination of Coad and the Oracle Primers fails to disclose the limitations "graphical representations of flows within the retrieved source code" where the source code is written in a "data manipulation language." PO Resp. 34-42. Patent Owner does not address any other limitations of claim 1 or the rationale to combine the references. *Id.*

20

IPR2013-00226
Patent 7,110,936 B2

### 1. Data Manipulation Language

Patent Owner argues that Coad combined with the Oracle Primers does not describe a data manipulation language because C++ and Java are object-oriented languages.  PO Resp. 13, 36-39.  According to Patent Owner, combining these languages with embedded SQL or JDBC, as disclosed by the Oracle Primers, does not solve the problem because the database access is not direct.  *Id.*

As described above, our interpretation of the term "data manipulation language"—a programming language used to access data in a database, such as to retrieve, insert, delete, or modify data in the database—is broad enough to encompass object-oriented languages that do not directly access data in a database.  We agree with Petitioner that when used with an embedded SQL or JDBC API, Java and C++ can be used to access data in a database and therefore qualify as data manipulation languages as we have construed that term.  *See, e.g.,* Ex. 1015 ¶¶ 49-50 ("Java, C, C++, and other programming languages had functions and structures through the use of/embedding of SQL statements that allowed the programming language to access data, such as to retrieve, insert, delete, or modify data in a database.").

### 2. Graphical Representations of Flows

Patent Owner also argues that the combination of Coad and the Oracle Primers does not disclose the limitation "graphical representations of flows."  PO Resp. 40-42.  In particular, Patent Owner asserts that "[i]mplementing JDBC or embedded SQL within the environment of Coad would produce, at best, a graphical depiction of objects that show undefined external function calls, and would fail to show the program or data flow within the string quotes being passed to the database."  PO Resp. 40.

21

IPR2013-00226
Patent 7,110,936 B2

We are not persuaded by this argument.  First, this argument is based on an interpretation of the term "graphical representations of flows" that we rejected above.  As explained, the interpretation we adopt is a diagram that depicts a map of the progression (or path) through the source code.  This interpretation is broad enough to include, but is not limited to, program and data flows.  We also reject Patent Owner's assertion that the graphical representation must show flow within source code steps that are actually performing data manipulation.  Our interpretation of the term includes, but does not require, that the flows are shown within source code that is actually performing data manipulation.

Petitioner relies on Figures 11-17 (depicting UML diagrams) of Coad as disclosing graphical representations of flows.  Pet. 28-30.  We agree with Petitioner that at least Figures 14 and 17 of Coad disclose graphical representations of flows as we have construed that term.  *See, e.g.,* Ex. 1015 ¶¶ 97-98; *see also* Ex. 1043, 88-89 (describing UML diagrams as showing flows).

Patent Owner concedes that Figure 14 shows communications between objects, which "would at best only show program flow in a purely object[-]oriented language—between objects."  PO Resp. 32 (citing Ex. 2001 ¶ 36).  Nonetheless, Patent Owner asserts that because object messages "cannot sensibly be asserted to constitute program or data flow," Figure 14 does not show flow through source code.  *Id.* at 31-32.  Because our interpretation of the term is broad enough to encompass flows that are not program or data flows, we conclude that Figure 14 discloses graphical representations of flows.

22

Similarly, Mr. Zatkovich agrees that Figure 17 shows a type of flow—"Figure 17 can depict a type of flow [], within an object, but only within state-based objects.  So it's a very specialized type of flow in a very limited circumstance."  Ex. 1044, 104:12-17.  Because our interpretation of the term is broad enough to encompass flows that are not program or data flows, we conclude that Figure 17 discloses graphical representations of flows as well.

### 3.  Conclusion

We conclude that a preponderance of the evidence demonstrates that claim 1 is unpatentable based on the combination of Coad and the Oracle Primers.

### E.  Overview of Antis

Antis relates to visually displaying structural characteristics of a large database in various graphical views for development purposes.  Ex. 1005, Abstract.  In particular, Antis describes a tool to display the characteristics of a database without semantic information such that explicit and implicit data structures can readily be observed to facilitate use, development, and maintenance of large databases.  *Id.* 2:25-29.

### F.  Alleged Obviousness over Antis and Coad

As summarized in the table above, Petitioner asserts that claims 1 and 3-10 would have been obvious over Antis combined with Coad (claims 1, 3, 5, 6, 8, and 10) or Antis combined with Coad and one other reference (claims 4, 7, and 9).  Pet. 41-52.  In the Decision to Institute, we determined that Petitioner had shown a reasonable likelihood of prevailing on these proposed grounds of unpatentability.  Dec. 18-19.  In particular, we determined that Petitioner had a reasonable likelihood of prevailing on its assertions that the combination of asserted references discloses every

23

limitation of the challenged claims. *Id.* We also found reasonable
Petitioner's asserted rationale that a person of ordinary skill would have
combined the teachings of the references in order to allow for easier source
code debugging and a more accurate code view display. *Id.* at 18 (citing Pet
18); *see also* Ex. 1015 ¶¶ 164-67.

### 1. Independent Claim 1

In its response brief, Patent Owner argues that the combination of
Antis and Coad fails to disclose the limitations (recited in every challenged
claim) "graphical representations of flows within the retrieved source code"
where the source code is written in a "data manipulation language." PO
Resp. 42-45. Patent Owner does not address any other limitations of claim 1
or Petitioner's asserted rationale to combine Antis and Coad. *Id.*

### a. Data Manipulation Language

Patent Owner argues that Antis combined with Coad does not describe
a data manipulation language because Antis instead describes the use of a
data definition language. PO Resp. 42-45. A data definition language is
designed specifically for describing the relationships between data in a
database, such as defining data structures and schema. *Id.*

We agree with Patent Owner that a data definition language is
different than a data manipulation language. *See* Ex. 1015 ¶ 48 (quoting The
Authoritative Dictionary of IEEE Standards Terms at 100 (7th 2000)
(defining data manipulation language followed by ("*Contrast:* data
definition language"))). However, we do not agree that Antis's disclosure is
limited to data definition languages.

Antis also discusses the use of RDBMS. *See, e.g.,* Ex. 1005, 3:30-35,
5:4-8; Ex. 1044, 138:19-139:12. The '936 patent expressly mentions

24

IPR2013-00226
Patent 7,110,936 B2

RDBMS several times, stating, for example, that "a need exists for a system and method for exchanging, editing, debugging, visualizing[,] and developing SAS®, SPSS®, SQL®, DB2 UDB®, Oracle RDBMS®[,] and other relational database management software." Ex. 1001, 1:66-2:3; *see also* 1:20-25; 8:26-30. Thus, the '936 patent contemplates the use of a database management system with the invention. *Id.* Mr. Hiew testifies that a data management system typically includes a data manipulation language to retrieve and manipulate the data from the storage management by the system. Ex. 1045, 47:19-48:12. Consistent with this definition, Antis shows some source code that retrieves data from a database—a data manipulation language. Ex. 1005, Fig. 12 ("/HOME/PYRCE/DATA/*EXTRACT*/V6.0/") (emphasis added); Ex. 2002, 101:4-102:19 (Dr. Roussopoulos testifying that although he is not familiar with the language the source code in Figure 12 is in, it shows a database query).

We are persuaded that Antis discloses a data manipulation language as we have construed that term.

### b. *Graphical Representations of Flows*

Patent Owner also argues that the combination of Coad and Antis does not disclose the limitation "graphical representations of flows." PO Resp. 42-45. Patent Owner argues that Antis does not disclose graphical representations of flows because it only shows relations within a database, not any type of flow. *Id.* at 43-44. We are not persuaded by this argument. As explained above, we have found that Coad discloses graphical representations of flows, so it is irrelevant that Antis does not also show this particular limitation, given that the asserted ground is based on the combination of the two references.

25

IPR2013-00226
Patent 7,110,936 B2

### c. Conclusion

We conclude that a preponderance of the evidence demonstrates that independent claim 1 is unpatentable based on the combination of Antis and Coad.

### 2. Claims 5, 6, 8, and 10

Claims 5, 6, and 8 depend directly from independent claim 1. Claim 10 depends from claim 8. Patent Owner does not separately argue the limitations added by these dependent claims. After considering all the papers filed in this proceeding, we are persuaded that dependent claims 5, 6, 8, and 10 are unpatentable based on the combination of Antis and Coad for the reasons argued by Petitioner.

### 3. Claim 3

Claim 3 depends directly from claim 1 and adds the limitation "wherein the graphical representations of flows depict program flows." Because claim 3 specifically limits the graphical representations to program flows, we revisit some of Patent Owner's arguments that we did not find persuasive when applied to the broader term. In other words, although we determined above that Coad discloses graphical representations of flows, we must now determine whether Coad shows *program flows* as we construe that term—a graphical representation comprised of program block icons and arrows to depict the progression of control through source code.

In our Decision to Institute, we stated that "Figure 14 [of Coad] depicts the source code program's path of control from one step to another through the program—a program flow diagram." Dec. 14. We based this determination on Coad's description that Figure 14, showing a sequence diagram, depicts "the time ordering of messages along the vertical axis"

26

IPR2013-00226
Patent 7,110,936 B2

representing "an interaction . . . to effect a desired operation or result." *Id.*
(citing Ex. 1006, 17:1-15). Dr. Roussopoulos's testimony is consistent with
this determination. Ex. 1015 ¶¶ 100, 101. In particular, Dr. Roussopoulos
states that "Figure 14 depicts a program flow by showing a *particular*
*sequence of operations,* where one operation follows another in time." *Id.* ¶
100. He points to objective evidence supporting his conclusion that a person
of ordinary skill would understand sequence diagrams to include program
flows. *Id.* ¶ 101 (quoting Mehmet Aksit, *et. al.*, *Use Cases in Object-*
*Oriented Software Development*, AMIDST, Feb. 5, 1999, at 10-11); *see also*
*id.* ¶ 102.

Patent Owner argues that Figure 14 does not disclose program flows
because "the sequence diagrams show the *communications* that occur
between objects, not the flow of program control between objects, nor the
flow of data being manipulated by the objects." PO Resp. 31. Mr.
Zatkovich testifies similarly, stating that "sequence diagrams show the
communications between active objects" and there is "nothing in this type of
model representation that is intended to show how data flows." Ex. 2001
¶¶ 28-29. Thus, according to Mr. Zatkovich, "one skilled in the art
reviewing Fig. 14 and the accompanying text would not conclude that this
discloses program or data flow in Java or C++, nor program or data flow in a
data manipulation language." *Id.* ¶ 30.

We are persuaded that a person of ordinary skill in the art would
conclude that Figure 14 discloses program flows as we have construed that
term. Patent Owner does not persuasively address the language of Coad
itself—that sequence diagrams "emphasize the time ordering of messages
along the vertical access" (Ex. 1006, 17:11-15), and thus depict the

27

IPR2013-00226
Patent 7,110,936 B2

progression of control through the source code of an object. Moreover, Patent Owner does not persuasively address the supporting evidence stating that "[t]he flow of control in use cases can be displayed in interaction diagrams, especially the sequence diagrams." Ex. 1015 ¶ 101 (emphasis omitted).

As between the conflicting evidence on this point, we credit Petitioner's evidence, particularly Dr. Roussopoulos's testimony, which is supported by objective evidence. All of Patent Owner's evidence, to the contrary, hinges on the testimony of Mr. Zatkovich, which we do not find persuasive on this point. Mr. Zatkovich's conclusion that a person of ordinary skill would not conclude that Figure 14 depicts program flows is unsupported. Mr. Zatkovich simply asserts this to be the case, without providing credible support. *See* Ex. 2001 ¶¶ 28-30.

We conclude that a preponderance of the evidence demonstrates that claim 3 is unpatentable based on the combination of Antis and Coad.

### 4. *Claim 4*

Petitioner asserts that claim 4 would have been obvious over Antis, Coad, and Burkwald. Pet. 52-53. Claim 4 depends from claim 1 and adds the limitation that "the graphical representations of data flows are expandable and collapsible." Petitioner relies on Burkwald—a patent directed to a "system for visually representing modification information about a[] characteristic-dependent information processing system"—as disclosing this limitation. *See id.* at 52 (citing Ex. 1007, 14:43 – 15:4); Ex. 1007, Title. Petitioner explains that a person of ordinary skill in the art would have had a reason to combine the three references because they are all related to software development tools that provide visual representations of

28

source code. Pet. 19. According to Petitioner, Burkwald's teaching of expanding and collapsing graphical representations of flows would have provided a developer with flexibility in the amount of detail shown in the view. *Id.* at 19-20. Patent Owner argues that the combination of Coad, Antis, and Burkwald does not disclose "data flows," but Patent Owner does not address any of the other limitations added by claim 4 or the rationale to combine the references. *See* PO Resp. 45-47.

Much like claim 3, claim 4 specifically limits the graphical representations, here to data flows. Thus, we must determine whether Coad shows *data flows* as we construe that term—a graphical representation comprised of icons depicting data processing steps and arrows to depict the movement of data through source code.

Petitioner argues that the UML sequence and collaboration diagrams of Coad show data flows. Pet. 43, 52-53; Reply 7. Consistent with this assertion, Dr. Roussopoulos explains that a person of ordinary skill in the art would understand Figure 14 to depict data flows. Ex. 1015 ¶¶ 97-98. According to Dr. Roussopoulos, "[t]he person of ordinary skill in the art would thus understand Figure 14 of Coad to disclose a graphical representation of data flow because it shows *which pieces of data* (*i.e.*, the data that is passed to the functions) *are accessed by which pieces of source code* (*i.e.,* the source code comprising the functions)." *Id.* ¶ 98.

We are not persuaded by Dr. Roussopoulos's unsupported conclusions on this point. For example, although his testimony addresses part of our interpretation of the term "data flows"—"arrows to depict the movement of data through source code," his testimony does not explain how Coad depicts "icons depicting data processing steps." Conversely, Dr. Roussopoulos

29

IPR2013-00226
Patent 7,110,936 B2

explicitly states that "[i]n Figure 14 of Coad, the horizontal dimension represents different objects" and "[i]n transitioning between the objects of the horizontal dimension, various functions are invoked." *Id.* Consistent with this testimony, Figure 14 appears to show "various functions" using arrows and objects using icons, but it is unclear that any icons represent "data processing steps" as required.

Dr. Roussopoulos also testifies that "a person of ordinary skill in the art would understand the statechart diagram of Figure 16 to disclose both data flows and program flows." *Id.* ¶ 103. This testimony relies on evidence that "a statechart diagram can be translated into a data flow diagram" leading a person of ordinary skill in the art to "understand that data flow must necessarily be depicted in a statechart diagram." *Id.* ¶ 104. Coad, however, explains that Figure 16 depicts "the sequences of states 1602 that an object or interaction goes through during its life." Ex. 1006, 17:16-20. Dr. Roussopoulos does not explain how this figure shows "icons depicting data processing steps." Dr. Roussopoulos's testimony that Figure 17, an activity diagram, depicts data flows suffers from the same problem. *Id.* ¶ 107.[2]

In its reply brief, Petitioner adds that the UML diagrams of Coad (Figures 14-17) depict the same types of data flows as shown in Figures 8-2 and 8-3 of the UML Manual (Ex. 1043). Reply 6. The figures depicted in the UML Manual, however, suffer from the same problem as we have

---

[2] This conclusion is consistent with our decision declining to institute an *inter partes* review of claim 2 because we were not persuaded that either Antis or Coad discloses the claimed "graphical representation" of a "data flow." Dec. 19.

30

IPR2013-00226
Patent 7,110,936 B2

identified for Figures 14, 16, and 17 of Coad—they do not appear to show "icons representing data processing steps."

We conclude that Petitioner has not shown by a preponderance of the evidence that dependent claim 4 would have been obvious to a person of ordinary skill in the art based on the combined disclosure of Coad, Antis, and Burkwald.

### 5. *Claims 7 and 9*

Claim 7 depends from claim 6 and adds the limitation that "the document manager comprises a security layer for managing secure connections with the one or more remote computers." Petitioner relies on Eick—a patent directed to a "system and method for interactive visualization, analysis and control of a dynamic database"—as disclosing this limitation. *See* Pet. 53 (citing Ex. 1008, 4:19-27); Ex. 1008, Title. Petitioner explains that a person of ordinary skill in the art would have had a reason to combine the three references because they are all related to visual representations of source code and data structures. Pet. 21. Moreover, according to Petitioner, Eick's teaching of a security layer for managing secure connections with remote computers would allow the systems of Antis and Coad to be distributed to one or more locations without a substantial security risk. *Id.* at 21-22.

Claim 9 depends from claim 8 and adds the limitation that "the template manager is adapted to automatically correct segments of the source code." Petitioner relies on Building Applications—a book including information about Microsoft Access 97 software—as disclosing this limitation. Pet. 54-55 (citing Ex. 1011, 52-54). Petitioner explains that a person of ordinary skill in the art would have had a reason to combine the

31

IPR2013-00226
Patent 7,110,936 B2

three references because they are all related to software development tools that provide visual representations of source code.  Pet. 23.  According to Petitioner, Building Applications's teaching of automatically correcting segments of source code determined to have errors would simplify the debugging of source code in Antis and Coad.  *Id.* at 23-24.

Patent Owner does not separately argue these grounds, but instead states that "[t]hese claims are patentable for the same reasons as set forth . . . with respect to claim 1."  PO Resp. 47.  For the reasons discussed with respect to claim 1, and considering the record, we conclude that a preponderance of the evidence demonstrates that claim 7 is unpatentable based on the combination of Antis, Coad, and Eick, and claim 9 is unpatentable based on the combination of Antis, Coad, and Building Applications for the reasons argued by Petitioner.

### G. Patent Owner's Contingent Motion to Amend Claims

Patent Owner filed a motion to enter proposed, amended claims 17-25, contingent on the Board determining that claims 1 and 3-10, respectively, are unpatentable.  Paper 20 ("Mot. to Amend").  Patent Owner also filed a Second Contingent Motion to Amend solely addressing potential antecedent basis issues in the proposed substitute claims.  Paper 28 ("Second Mot. to Amend").  Because we determine that claims 1, 3, and 5-10 are unpatentable, we consider the proposed substitute claims 17, 18, and 20-25.  However, because we do not determine that claim 4 is unpatentable, we do not consider the proposed substitute for that claim—claim 19.

During an *inter partes* review, we enter proposed amended claims only upon a showing that the amended claims are patentable.  *Idle Free Sys. v. Bergstrom, Inc.*, Case IPR2012-00027, slip op. at 33 (PTAB Jan. 7, 2014)

32

IPR2013-00226
Patent 7,110,936 B2

(Paper 66). This burden may not be met by merely showing that the proposed claims are distinguished over the prior art references applied to the original patent claims. Instead, because there is no examination of the proposed claims, the Patent Owner must show that the subject matter recited is not taught or suggested by the prior art for us to determine if they comply with 35 U.S.C. §§ 102 and 103. *Id.*

Petitioner argues that Patent Owner has not met its burden because it makes no statement that the substitute claims are patentable over prior art not of record, does not include any discussion of the level of ordinary skill in the art, and does not discuss what was previously known regarding the features of the substitute claims. Paper 25 ("Opp."), 2.

We agree that, although it is Patent Owner's burden to show patentability over the prior art, Patent Owner does not assert, or direct us to evidence, that the IDE claimed in the proposed substitute claims was novel over other IDE's known in the art. *See* Tr. 53:15-54:13. Instead, Patent Owner focuses only on Coad, the Oracle Primers, Antis, and U.S. Patent No. 6,785,668 B1 ("Polo"). Accordingly, Patent Owner has not met the burden it undertook by putting forth the proposed amended claims. For that reason, the Motion to Amend is *denied* to the extent it seeks entry of substitute claims 17, 18, and 20-25.

Even if Patent Owner's burden was to show patentability over only the prior art of record, we would not be persuaded that the proposed claims are patentable. To the contrary, we are persuaded that the proposed claims would have been obvious over Coad combined with either the Oracle Primers or Antis.

33

IPR2013-00226
Patent 7,110,936 B2

### 1. Proposed Substitute Claim 17

Claim 17, the proposed substitute for independent claim 1, is identical to original claim 1 except that it adds the following limitation to the visualizer element:  "the graphical representations of flows showing a flow within the retrieved source code between data manipulation procedures in an order in which the data manipulation procedures are performed on retrieved data."  Second Mot. to Amend 2 (emphasis omitted).

Patent Owner argues that proposed substitute claim 17 is patentable over Coad combined with the Oracle Primers, Coad combined with Antis, and Polo.  Mot. to Amend 8-11.  According to Patent Owner, the added limitation "clarifies that the flow is 'between' data manipulation procedures and that the data manipulation procedures must be performed on 'retrieved data.'"  Mot. to Amend 8-9.

Patent Owner explains that because the graphical depictions of JDBC or embedded SQL in the environment of Coad do not access a database *directly*, they would only show the retrieval of data ("retrieved data"), but would not show a subsequent data manipulation step or flow between subsequent data manipulation steps.  *Id.* at 9 (citing Ex. 2001 ¶¶ 67-68).  Thus, according to Patent Owner, proposed substitute claim 17 would not have been obvious over the combination of Coad and the Oracle Primers.  *Id.* As for the combination of Antis and Coad, Patent Owner argues that neither Coad nor Antis discloses graphical representations of flows of data manipulation procedures being performed on retrieved data.  *Id.* at 9-10 (citing Ex. 2001 ¶ 69).

We do not find these arguments persuasive.  As discussed above, we have determined that a person of ordinary skill in the art would have found

IPR2013-00226
Patent 7,110,936 B2

independent claim 1 obvious over the combination of Coad and the Oracle Primers.  We are not persuaded that the added limitation of proposed substitute claim 17 would not have been obvious to a person of skill in the art in view of the disclosure of Coad and the Oracle Primers.

a. *Data Manipulation Procedures*

Patent Owner's arguments all rely on the added limitation requiring that a graphical representation show "a flow within the retrieved source code between data manipulation procedures."  Despite the fact that the term "data manipulation procedure" is not used in the '936 patent, Patent Owner does not provide a claim construction for the term.  *See* Mot. to Amend.  Based on Patent Owner's patentability arguments, we infer that a "data manipulation procedure" under Patent Owner's interpretation requires that the procedure *directly* access data in a database.  *See* Paper 26 ("Mot. to Amend Reply") 2-3 ("A function call in source code to an external program is not a 'data manipulation procedure' since any data manipulation would occur *external* to the source code."); Tr. 47:20-24 ("I think that the base assumption there is that a function call within C++ would be a data manipulation procedure, and I think that's entirely inconsistent with the specification read by one skilled in the art in 2001.").

Petitioner argues that this interpretation of "data manipulation procedures" is too narrow.  Opp. 5.  Instead, Petitioner asserts that the proper interpretation of the claim term is based on the interpretation of "data manipulation language."  *Id.*  According to Petitioner, because a data manipulation procedure requires only a procedure that is used to access data in a database, but does not require that access to be direct, a "data manipulation procedure" correspondingly is a procedure that accesses data

35

IPR2013-00226
Patent 7,110,936 B2

in a database, and extends to procedures that access the data indirectly. *Id.* Patent Owner appears to agree that the interpretation of "data manipulation procedure" is tied to the interpretation of "data manipulation language." *See* Tr. 49:22-50:9 ("Essentially, once you start defining data manipulation languages as broad as C++ with embedded SQL, you've eviscerated the point of adding this claim limitation."); *see also* Mot. to Amend Reply 3 (referring to "data manipulation procedures" as "DML procedures").

For the reasons explained with respect to the interpretation of "data manipulation language," we agree with Petitioner that the broadest reasonable interpretation of "data manipulation procedure" does not require direct access to a database, and, thus, interpret "data manipulation procedure" to mean a procedure used to access data in a database, such as to retrieve, insert, delete, or modify data in the database.

### b. *Retrieved Data*

Again, the term "retrieved data" is not used in the '936 patent and Patent Owner does not proffer a proposed interpretation of this term. However, Patent Owner asserts that data retrieved from a database are no longer "retrieved data" once they are returned to the database. Mot. to Amend Reply 3. Petitioner does not address the construction of this element. We are persuaded that our patentability analysis is unaffected, regardless of whether we adopt Patent Owner's definition. Therefore, we proceed under Patent Owner's understanding of the term.

### c. *Patentability*

We are not persuaded that proposed substitute claim 17 is patentable over Coad combined with the Oracle Primers. Patent Owner argues because the "data manipulation procedures are performed on retrieved data," a C++

36

IPR2013-00226
Patent 7,110,936 B2

function call with embedded SQL would not meet the additional claim limitation of proposed substitute claim 17.  Mot. to Amend Reply 3; *see also* Tr. 50:10-16.  Specifically, Patent Owner asserts that "one skilled in the art would not consider" following an embedded SQL retrieve step with a second embedded SQL manipulation step "because that would be inefficient and unnecessary."  Mot. to Amend Reply 3.  Patent Owner, however, does not direct us to evidence supporting this attorney argument.

Petitioner, on the other hand, states that "[a]fter retrieving data, additional functional calls may be used to perform data manipulation procedures on the retrieved data."  Opp. 6-7 (citing Ex. 1015 ¶ 53).  We credit Dr. Roussopoulos's testimony on this issue, which he bases on language in the Oracle8 Primer.  Ex. 1015 ¶ 53 (citing Ex. 1013, 93, 95, 103, 118).  We, therefore, are not persuaded that proposed substitute claim 17 is patentable over the combination of Coad and the Oracle Primers.

### 2.  *Proposed Substitute Claim 18*

Claim 18, the proposed substitute for dependent claim 3, depends from proposed substitute claim 17 and adds the following limitation to claim 3:  "having procedure icons and arrows that show an actual execution path within the retrieved source code as performed on the retrieved data."  Second Mot. to Amend 2.

According to Patent Owner, proposed substitute claim 18 is patentable because "[t]he UML diagrams of Coad, at best, disclose all possible pathways within the source code, as opposed to the added limitation that would only show a graphical execution path of the actual flow of data within the source code."  Mot. to Amend 12.

37

IPR2013-00226
Patent 7,110,936 B2

We do not agree with Patent Owner's interpretation of the scope of proposed substitute claim 18. The claim does not require, on its face, that *only* the actual execution path be shown. Instead, it simply states that such "actual execution path" will be shown. Thus, Patent Owner concedes that Coad discloses this limitation by showing all possible pathways, which logically includes the actual execution path.

Thus, we are not persuaded that claim 18 is patentable over Coad combined with Antis.

### 3. Proposed Substitute Claim 23

Claim 23, the proposed substitute for dependent claim 8, is written in independent form to include the language of proposed substitute claim 17. Second Mot. to Amend 3-4. In addition, proposed substitute claim 23 adds the following limitations to the visualizer element: "having data processing procedure icons and arrows to depict program flow or icons depicting data processing steps and arrows to depict flow of data in an order data processing procedures or data processing steps occur" and "the data processing procedures or data processing steps being graphically depicted as being completed prior to showing flow to a next procedure or step." *Id.* at 4.

Patent Owner points to Figures 9 and 19 of the original '936 patent application as providing support for the feature that "the data processing procedures or data processing steps being graphically depicted as being completed prior to showing flow to a next procedure or step." Mot. to Amend 7-8. Specifically, Patent Owner asserts that "one skilled in the art would understand that the ['936] patent discloses the graphical depiction of flow between completed DML procedures or steps." Mot. to Amend Reply 5 (citing Ex. 2001 ¶¶ 72-76).

38

IPR2013-00226
Patent 7,110,936 B2

Petitioner argues that proposed substitute claim 23 is unpatentable due to a lack of written description support because the '936 patent specification does not disclose graphical representations including steps that are completed prior to showing flow to the next step. Opp. 13-14. Addressing Mr. Zatkovich's testimony on the issue, Petitioner argues that the testimony describes aspects of the underlying source code from which a flow diagram may be created, but does not point to any particular feature of the figures or any particular language in the '936 patent application that depicts this limitation. *Id.* at 14.

A motion to amend must set forth the support in the original disclosure of the patent for each claim that is added or amended and the support in an earlier-filed disclosure for which the benefit of the filing date of the earlier filed disclosure is sought. 37 C.F.R. § 42.221(b). We agree with Petitioner that Patent Owner's Motion to Amend fails to show where the '936 patent supports the limitation "the data processing procedures or data processing steps being graphically depicted as being completed prior to showing flow to a next procedure or step."

As an initial matter, Patent Owner does not explain what is meant by "graphically depicted as being completed." This language is not found in the specification of the '936 patent, and Patent Owner does not direct us to language in the '936 patent that sheds light on the meaning of this phrase. In support of the Motion to Amend, Patent Owner directs us to the declaration of Mr. Zatkovich. Ex. 2001. Mr. Zatkovich, however, also does not explain what meaning a person of ordinary skill in the art would give to the phrase. Without such explanation, Patent Owner has neither provided a sufficient

IPR2013-00226
Patent 7,110,936 B2

explanation of the additional claim language nor established sufficient written description support for such language.

Moreover, in the Motion to Amend, Patent Owner does not identify specifically what portion of the specification actually supports this limitation. *See*, *e.g.,* Mot. to Amend 7 ("The limitations [of claim 23] are supported by the original specification, page 3, line 23 to page 4, line 2; page 28, lines 1—16; page 29, lines 3-6; and Figs. 9, 17, and 19."). In its Reply, Patent Owner asserts that Figure 19 of the '936 patent shows source code in the bottom of the window "and the corresponding graphical representation of flow between *completed* DML procedures in the top window." Mot. to Amend Reply 5. Patent Owner adds that the specification states that the visualizer window represents "the procedures and data blocks as program flow icons 126." *Id.* (emphasis omitted). Nothing in this language explains how any of the figures of the '936 patent "graphically depict [a procedure] as being completed." Patent Owner directs us to testimony of Mr. Zatkovich stating that Figure 9 depicts a "simple flow" where "[e]ach step is a process that begins when the process receives an[] input and terminates when the outputs are sent to another step." Ex. 2001 ¶ 73. However, we are not persuaded by this testimony that Figure 9 provides sufficient support for this limitation. For example, it is unclear how Figure 9 "graphically depicts [a procedure] as being completed."

Thus, we are not persuaded that claim 23 is patentable over Coad combined with Antis.

### 4. *Proposed Substitute Claims 20-22, 24, and 25*

Patent Owner argues that proposed substitute claims 20-22, 24, and 25 are patentable over the prior art for the same reason as proposed substitute

IPR2013-00226
Patent 7,110,936 B2

claims 17 and 23, and does not present separate arguments as to the alleged patentability of these claims. Mot. to Amend 14. For the reasons discussed above, we are not persuaded by these arguments. Thus, we are not persuaded that Patent Owner has met its burden to show that proposed substitute claims 20-22, 24, and 25 are patentable over the prior art.

## III. CONCLUSION

Petitioner has shown, by a preponderance of the evidence, that the challenged claims are unpatentable based on the following grounds: (1) claim 1 would have been obvious over Coad combined with Oracle Primer and Oracle8 Primer; (2) claims 1, 3, 5, 6, 8, and 10 would have been obvious over Antis combined with Coad; (4) claim 7 would have been obvious over Antis combined with Coad and Eick; and (5) claim 9 would have been obvious over Antis combined with Coad and Building Applications.

Petitioner has not shown that claim 4 is unpatentable. Claims 2 and 11-16 are not at issue in this trial.[3]

Patent Owner has not shown that its proposed substitute claims 17, 18, and 20-25 are patentable over the prior art.

Accordingly, it is

ORDERED that claims 1, 3, and 5-10 of the '936 patent are determined to be *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Amend Claims is *denied*; and

---

[3] In the Decision to Institute, we declined to institute an *inter partes* review of claims 2 and 11-16 because we were not persuaded that Petitioner had shown that there was a reasonable likelihood of prevailing on its challenges to these claims. Dec. 11, 19, 21.

IPR2013-00226
Patent 7,110,936 B2

FURTHER ORDERED that because this is a final written decision,
parties to the proceeding seeking judicial review of the decision must
comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00226
Patent 7,110,936 B2

PETITIONER:

John Biernacki
David Cochran
John Marlott
Joshua Nightingale
Jones Day
jvbiernacki@jonesday.com
dcochran@jonesday.com
jamarlott@jonesday.com
jrnightingale@jonesday.com

PATENT OWNER:

George Yu
Laura Brutman
James Hanft
Schiff Hardin LLP
gyu@schiffhardin.com
lbrutman@schiffhardin.com
jhanft@schiffhardin.com

43

Trials@uspto.gov                                          Paper 40
Tel: 571-272-7822                          Entered: November 10, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SAS INSTITUTE, INC.,
Petitioner,

v.

COMPLEMENTSOFT, LLC,
Patent Owner.
_____

Case IPR2013-00226
Patent 7,110,936 B2
_____

Before KEVIN F. TURNER, JUSTIN T. ARBES, and JENNIFER S. BISK,
*Administrative Patent Judges*.

BISK, *Administrative Patent Judge*.

DECISION
Request for Rehearing
*37 C.F.R. § 42.71(d)*

IPR2013-00226
Patent 7,110,936 B2

## SUMMARY

SAS Institute, Inc. ("Petitioner") requests rehearing of the Board's Final Decision ("Dec."), dated August 6, 2014 (Paper 38). In the Final Decision, we determined that claims 1, 3, and 5–10 of U.S. Patent No. 7,110,936 B2 (Ex. 1001) (the "'936 patent") were unpatentable, but that Petitioner had not shown that claim 4 was unpatentable. Petitioner requests rehearing on two issues: (1) Petitioner's contention that we are required to conduct an *inter partes* review of "all claims of the '936 patent, including claims 2 and 11–16"; and (2) the proper interpretation of the claim term "data flows." Paper 39, 3 ("Req. Reh'g"). For the reasons that follow, Petitioner's request for rehearing is *denied*.

## DISCUSSION

A party challenging a final written decision by way of a request for rehearing must identify specifically all matters the party believes the Board misapprehended or overlooked. 37 C.F.R. § 42.71(d). The challenging party bears the burden of showing that the decision should be modified. *Id.*

We are not persuaded by Petitioner's argument that we overlooked the contention that 35 U.S.C. § 318(a) requires that we address in the Final Decision the patentability of all claims challenged by Petitioner, including claims 2 and 11–16. Req. Reh'g 3–5. All claims at issue in this trial (claims 1 and 3–10) were addressed in the Final Decision. As stated in the Final Decision, trial was not instituted on claims 2 and 11–16, because Petitioner did not show a reasonable likelihood of prevailing on its challenges to those claims. Dec. 41. Accordingly, the unpatentability of claims 2 and 11–16 was not at issue in this trial. Dec. 41.

2

IPR2013-00226
Patent 7,110,936 B2

We also are not persuaded by Petitioner's argument that we misapprehended the construction of the claim term "data flows." Req. Reh'g 5–15. Petitioner argues on rehearing that in the Decision to Institute, "the Board interpreted 'data flow' to mean 'a depiction of a map of the path of data through the executing source code." *Id.* at 6. Further, Petitioner asserts that "neither party challenged that interpretation during the IPR" and that the construction adopted in the Decision to Institute "is consistent with the broadest reasonable construction." *Id.* at 6, 12. This assertion is contrary to the argument in Petitioner's reply brief that "the 'executing' requirement for 'data flows' is improper, especially in view of the BRI [broadest reasonable interpretation] standard." Paper 24 ("Reply") 4; *see* Dec. 18. Thus, Petitioner *did* challenge the interpretation of "data flows" during the IPR.[1]

Moreover, we are not persuaded by Petitioner's assertion that the construction of "data flows" in the Final Decision was erroneous. Petitioner asserts that our interpretation of "data flows" results in claim 4 reciting "graphical representations of a graphical representation," which is "obviously repetitive." Req. Reh'g 11. Similarly, Petitioner asserts that there is a difference between a "data flow" and the depiction of a "data flow." We agree that the Final Decision could have further defined "data flow diagrams" and "graphical representations of

---

[1] To the extent Petitioner contends that it was prejudiced by not being able to respond to the interpretation of "data flows" in the Final Decision, Petitioner had the opportunity in the Petition to argue its position on claim interpretation and explain why it believes the prior art teaches "data flows." *See, e.g.*, 37 C.F.R.

3

IPR2013-00226
Patent 7,110,936 B2

data flows" to be equivalent. However, we are not persuaded that our interpretation of "data flows" was erroneous.

As discussed in the Final Decision, the '936 patent defines "data flow diagrams" as "comprised of icons depicting data processing steps and arrows to depict the flow of the data through the program." Dec. 18 (citing Ex. 1001, 2:40-42). The '936 patent does not explicitly define the term "data flows," or "graphical representations of data flows," but uses the term "data flows" interchangeably as meaning both the flow of data ("data flows") and visualization of the flow of data ("data flow diagrams" and "graphical represenations of flows"). *See, e.g., id.* at 4:12-13 ("FIG. 17 is an exemplary screen shot *depicting a data flow* for a selected file.") (emphasis added), 16:3-5 ("By assigning meanings and attributes to tokens 144, the document view engine 200 allows the *visualizer to create* program flows 122 and *data flows 124*.") (emphasis added). Petitioner appears to agree on this point because its own proposed construction of the term "data flows" conflates the flow of the data with the visualization of that flow—"*a depiction of a map* of the path of data through the executing source code." Req. Reh'g 6, 12 (emphasis added).

Petitioner asserts that the '936 patent reasonably supports a reading that "data flows" may be illustrated with more general "program flow icons" that do not necessarily depict data processing steps. *Id.* at 9–10 (citing Ex. 1001, Abstract, 8:8–14, 16:12–30). "Program flow icons" are used in the '936 patent to represent

---

§ 42.104(b) (requiring a petition to explain "[h]ow the challenged claim is to be construed" and "[h]ow the construed claim is unpatentable").

4

IPR2013-00226
Patent 7,110,936 B2

both program "code sections" and "data blocks." *See, e.g.,* Ex. 1001, 8:8–14 ("For viewing the program flow and data flow of a selected program . . . the visualizer 120 . . . displays the code for the selected program, *representing each program and data block with a program flow icon 126*.") (emphasis added), 15:63–67 ("Using information provided by the parser layer 140, the document view engine can . . . represent the procedures and data blocks as program flow icons 126."). It does not follow that visualization of a data flow may be shown by program code sections that are unrelated to data processing. Instead, the '936 patent consistently differentiates the visualization of program flows and data flows; the visualization of program flows as "program block icons and arrows to depict the code's program flow" and the visualization of data flows as "icons depicting data processing steps and arrows to depict the flow of the data through the program." *Id.* at 2:38–42, 8:8–14, 16:6–30. We are not persuaded by Petitioner's arguments to the contrary. *See* Req. Reh'g 5–15. Thus, we are not persuaded that our interpretation requiring the visualization of "data flows" to include "icons depicting data processing steps and arrows to depict the movement of data through source code" was erroneous.

## CONCLUSION

We have reviewed and considered all arguments in Petitioner's request for rehearing and determine that Petitioner has not carried its burden of demonstrating that the Board misapprehended or overlooked any matters in rendering the Final Decision. 37 C.F.R. § 42.71(d). The request for rehearing is *denied*.

5

IPR2013-00226
Patent 7,110,936 B2


PETITIONER:

John Biernacki
David Cochran
John Marlott
Joshua Nightingale
Jones Day
jvbiernacki@jonesday.com
dcochran@jonesday.com
jamarlott@jonesday.com
jrnightingale@jonesday.com

PATENT OWNER:

James Hanft
George Yu
Schiff Hardin LLP
jhanft@schiffhardin.com
gyu@schiffhardin.com

6

## (12) United States Patent
### Hiew et al.

(10) Patent No.: **US 7,110,936 B2**

(45) Date of Patent: **Sep. 19, 2006**

(54) **SYSTEM AND METHOD FOR GENERATING AND MAINTAINING SOFTWARE CODE**

(75) Inventors: **Fen Hiew**, Mendota Heights, MN (US); **Edwin M. Schroeder**, Chicago, IL (US)

(73) Assignee: **Complementsoft LLC**, Chicago, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 923 days.

(21) Appl. No.: **09/992,624**

(22) Filed: **Nov. 19, 2001**

(65) **Prior Publication Data**

US 2005/0229154 A1    Oct. 13, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/270,950, filed on Feb. 23, 2001, provisional application No. 60/293,854, filed on May 25, 2001.

(51) **Int. Cl.**
*G06F 9/45* (2006.01)

(52) **U.S. Cl.** .......................... **703/22**; 703/26; 717/100; 717/108; 717/134; 717/135

(58) **Field of Classification Search** ................. 703/22; 717/108, 100, 134, 135; 345/700
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,187,788 A    2/1993   Marmelstein
5,485,615 A    1/1996   Wennmyr

(Continued)

FOREIGN PATENT DOCUMENTS

EP    1001338 A2    5/2000

(Continued)

OTHER PUBLICATIONS

"Language Independent Generation of graphical Representations of Source Code", Hendrix et al, ACM 0-89791-737-5, ACM 1995.*

(Continued)

*Primary Examiner*—Fred Ferris
(74) *Attorney, Agent, or Firm*—Gary R. Jarosik

(57) **ABSTRACT**

A system and method for intelligently generating computer code. The system being comprised of a local computer, which is connected to a remote computer via a network system or the Internet and which is capable of exchanging files with the remote computer. The local computer is further comprised of a document manager for transferring files between the local computer and the remote computer and for providing enhanced file management functions. The document manager works in connection with the server module, the site manager and the connectivity layer to connect to remote computers, to transparently exchange files with the remote computer and to manage server profiles and connection information that related to remote computers and transferred files. Once the file is transferred to the local computer, the editor can modify the code associated with the file; the editor is also capable of creating new files. The visualizer is capable of displaying a program flow diagram and a data flow diagram, which are comprised of program flow icons and data flow arrows to depict the code in terms of processing blocks and data blocks. To assist in developing new code or editing existing code, the template manager allows the user to browse through a directory of existing code sections or templates and to copy templates into the selected code for editing. For allowing the editor to process code that is written in different Data Management System programming languages and for creating the program flow icons, the parser layer detects the file type of a selected file and activates the rules and logic that apply to the corresponding Data Management System.

**16 Claims, 42 Drawing Sheets**



SAS Exhibit 1001

# US 7,110,936 B2
Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,652,899 | A | | 7/1997 | Mays et al. |
| 5,937,190 | A | * | 8/1999 | Gregory et al. ............ 717/131 |
| 6,243,703 | B1 | * | 6/2001 | Couch et al. ............... 707/10 |
| 6,311,323 | B1 | | 10/2001 | Shulman et al. |
| 6,356,285 | B1 | * | 3/2002 | Burkwald et al. .......... 715/853 |
| 6,604,110 | B1 | | 8/2003 | Savage et al. |
| 6,851,107 | B1 | * | 2/2005 | Coad et al. ................. 717/108 |
| 2001/0049682 | A1 | * | 12/2001 | Vincent et al. ............. 707/100 |
| 2002/0059003 | A1 | * | 5/2002 | Ruth et al. .................... 700/19 |
| 2002/0097253 | A1 | * | 7/2002 | Charisius et al. ........... 345/700 |
| 2002/0112225 | A1 | * | 8/2002 | Charisius et al. ........... 717/125 |
| 2002/0116702 | A1 | * | 8/2002 | Aptus et al. ................. 717/170 |
| 2003/0041314 | A1 | * | 2/2003 | Heeren et al. .............. 717/109 |
| 2003/0056192 | A1 | * | 3/2003 | Burgess ...................... 717/100 |
| 2003/0061600 | A1 | * | 3/2003 | Bates et al. ................. 717/133 |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 97/40443 | A1 | 10/1997 |
| WO | WO 01/08007 | A1 | 2/2001 |

## OTHER PUBLICATIONS

"GENOA-A Customizable, Frount-End-Retargetable Source Code Analysis Framework", Devanbu, ACM Transactions on Software Engineering, vol. 8, No. 2, Apr. 1999.*

"Visualizing th Performance of Higher-Order Programs", Waddell et al., ACM 1-58133-055-04/98/0006, 1996 ACM.*

"Using a Fine-Grained Comparative Evaluation Technique to Understand and Design Software Visualization Tools", Mulholland, Seventh workshop on Empirical studies of programmers, ACM 1997.*

"An Analysis of Geometric Modeling in Database Systems", Kemper et al, ACM Computing Surveys, vol. 19, No. 1, Mar. 1987.*

Togethersoft Corporation, Together Documentation Set Version 4.2, Dec. 21, 2000, pp. 1-257.

Benedusi, P. et al., A Reverse Engineering Methodology to Reconstruct Hiearchical Data Flow Diagrams for Software Maintenance, Oct. 16-19, 1989, pp. 180-189.

SAS Institute, SAS Companion for the Microsoft Windows Environment, Using the Enhanced Editor, Sep. 1999.

SAS Institute, Bibliographic and copyright information, SAS onlinedoc, version 8, Sep. 1999, 1page.

Anonymous, Togethersoft Ships Together Control Center 4.2, Latest Business Process Automation Software Speeds Development Time for E-Business Apps, Dec. 21, 2000, 2 pages.

SAS e-intelligence, Know Your Customers, SAS Institute Inc., 2001.

* cited by examiner



# FIG. 1



**FIG. 2**



**FIG. 3**



| Menu Item | Functionality |
|---|---|
| New | Create a new document ( a program ) |
| Open | Open an existing document |
| Close | Close the currently opened document |
| Save | Save the currently open document |
| Save As | Save the currently open document using a different name or in a different location |
| Print Preview | Print Preview of the currently open (active) document |
| Print | Print the currently open (active) document |
| Exit | Exit the application |

## FIG. 4a



## FIG. 4b



**FIG. 4c**



**42**

**44**

**48**

**46**

| Menu Item | Functionality |
|---|---|
| Document Manager Configuration | Activate the Document Manager Configurator |
| Editor Configuration | Activate the Editor Configurator |
| Visual Configuration | Activate the Visual Configurator |
| Connection Configuration | Activate the Connection Configurator |
| Network File Configuration | Activate the Network File Configurator |

# FIG. 4d



## FIG. 4da

**FIG. 4db**

**FIG. 4dc**

**Network File Configuration**                              ☒

☐ Enable Network File location for Site Manager

    Path: [                              ]      ...

☐ Enable Network File location for Message Manager

    Path: [                              ]      ...

    Precedence: ⦿ Local file   ○ Network file

☐ Enable Network File location for Templates

    Path: [                              ]      ...

        OK        Cancel

# FIG. 4dd



| Menu Item | Functionality |
|---|---|
| On-line Documentation | Show On-line Documentation |
| Product Support | Displays the Product Support Page with e-mail address, How to . . . and Frequently Asked Questions |
| License | Detailed license information with the ability to renew and/or upgrade the license |
| Registration | Perform on-line product registration |
| Purchase | Displays the complementSoft e-store |
| Download Updates | Retrieve Product Updates |
| Send complementsoft Support files | E-mail support files to complementSoft |
| About ASAP | Version and copyright information |

FIG. 4e



**FIG. 4f**

48          46

| Menu Item | Functionality |
|---|---|
| Undo | |
| Redo | |
| Cut | |
| Copy | |
| Paste | |
| Find | |
| Find Next | |
| Replace | |
| Replace Next | |
| Close | Close the currently active document |
| Line numbering | Turn line numbering on of off |
| Tree Split | Activate the Tree View split screen mode |
| Template Manager | Activate the Template Manager |
| Edit Properties | Edit the properties (timestamp, originating location, etc.) of the document |
| Execute Program | Execute the currently active program (i.e., the one that the user is currently editing)<br><br>The user can further specify the execution mode (i.e., how to execute, with which option turn on/off, etc) and execution location (i.e., where to execute, which server, which execution engine, which location)<br><br>If the user has previously activated Break-Point execution (see below), then the execution will be carried out based out the break-points, i.e., start at where the user indicate that it should start, end at where the user indicate that it should end and skipping statements as indicated by the user. |
| Toggle Break Points | Activate / deactivate Break-Point execution.<br>Setup Break-Points if they have not been previously setup.<br>Reset/Remove Break-Points if they have been previously setup |
| Message Manager | Activate the Message Manager to add, remove, or update the messages in the message repository |

# FIG. 4f (continued)

**44**



| Menu Item | Functionality |
|---|---|
| New | |
| Open | |
| Save | |
| Print | |
| Print Preview | |
| Undo | |
| Redo | |
| Cut | |
| Copy | |
| Paste | |
| Find | Find a word |
| Refresh | Refresh the Editor display |
| Toggle Line Numbers | Show or hide line numbers |
| Toggle Tree View | Enable or disable Tree View |
| Template Manager | Activate the Template manager |
| Execute Program | Execute the currently active program |
| Close | Close the currently active program |
| Toggle Break Point Execution | Enable of disable Break Point Execution |

## FIG. 5



**FIG. 6**



**FIG. 7**



**FIG. 8**



**FIG. 9**



48            162        **FIG. 10**            160

170



**FIG. 11**



**FIG. 12**



**FIG. 13**

69a          69

42



**FIG. 14a**

48                                                          82        80



**FIG. 14b**

**FIG. 14c**

**84a**    **84d**

| ⊙ Editor Configuration | ✕ |
|---|---|

General | Fonts | Color | Execute |

┌─ Execution Mode ──────────────────────────────────┐

**84b**    **84c**

☐ N Observations        Observations  0

☐ Expand Macros (MPRINT)

└────────────────────────────────────────────────────┘

┌─ Execution Location ──────────────────────────────┐

Execution Path

☐ Local      Program Files\SAS Institute\SAS\V8\SAS.exe    [ ... ]

☑ Remote

└────────────────────────────────────────────────────┘

☑ *Don't show option dialog before execution.*

[ Reset ]                    [ OK ]    [ Cancel ]

# FIG. 14d



**FIG. 14e**



**FIG. 15**



**FIG. 16**



**FIG. 17**

124b    122b



48    121    124    120

# FIG. 18a

124b  122b



**FIG. 18b**

48        121        120



**FIG. 18c**



FIG. 19



**FIG. 20**

```
Code & Log                                                      _ □ ×
 39  PROC PRINT DATA=JOURNAL1x;
 40      TITLE 'MASTER AFTER FIRST TRANSACTIONS ADDED';
 41
 42  DATA TODAY2;
 43      INPUT ID AMOUNT TYPE;
 44      DATE='01DEC87'd;
 45      FORMAT DATE DATE7.;
 46      CARDS;
 47  0024 270.48 1
 48  0024 578.31 1
 49  0027 380 00 3

 38          PROC APPEND BASE=JOURNAL;

NOTE: Appending WORK.TODAY to WORK.JOURNAL.
NOTE: BASE data set does not exist. DATA file is being copied to BASE file.
□2                               The SAS System              08:22 Friday,

NOTE: There were 5 observations read from the dataset WORK.TODAY.
NOTE: The data set WORK.JOURNAL has 5 observations and 4 variables.
NOTE: PROCEDURE APPEND used:
      real time        2.14 seconds


 39          PROC PRINT DATA=JOURNAL1x;
ERROR: File WORK.JOURNAL1X.DATA does not exist.
```

## FIG. 20a

Debugging Hints

ERROR: File *.*.* does not exist.

Suggested Action:
1) Make sure that the dataset name is spelled correctly
2) Make sure that the libref is spelled correctly
3) Call Samantha

Edit    OK    Cancel

# FIG. 20b

FIG. 20c



# FIG. 21



**FIG. 22**



**FIG. 23**

US 7,110,936 B2

1

# SYSTEM AND METHOD FOR GENERATING AND MAINTAINING SOFTWARE CODE

## RELATED APPLICATION

This subject application claims the benefit of U.S. Provisional Application Ser. Nos. 60/270,950, entitled "GUI SAS CODE Development and Maintenance Environment Software," filed on Feb. 23, 2001 and 60/293,854, entitled "Integrated Development Environment and GUI for Data Management Systems," filed on May 25, 2001.

## BACKGROUND OF THE INVENTION

This invention relates generally to software maintenance and development tools and, more particularly, to an extensible, language independent software development tool having a graphical user interface, i.e., a GUI Integrated Development Environment.

The evolution of data manipulation and data management systems, such as SAS®, SPSS® and SQL®, and relational database management systems, such as IBM® DB2 UDB® and the Oracle® RDBMS, has resulted in several high-level software languages that are inconsistent and, in some cases, unstructured. Based on these inconsistencies and the unstructured nature of some of these languages, database management languages may be difficult to use, edit and debug. Moreover, because of the lack of a standardized syntax among these programming languages, it has been difficult for users of these languages to share code. This is particularly the case with SAS®.

Since the advent of personal computers and the GUI Interfaces such as Windows® Interfaces, it has become increasingly necessary for businesses to develop or purchase customized software in order to support specific business strategies or processes. This, in turn, has led to the implementation of a variety of software development tools and Integrated Development Environments ("IDEs"). Generally, these software development tools assist users and programmers in editing, debugging and developing software for specific programming languages. Software providers of data manipulation languages or systems have, however, failed to provide a single comprehensive software development tool capable of assisting users in the editing, visualizing, debugging and development of software. Furthermore, the creation of graphical development tools for particular programming languages, such as, SAS®, has been inhibited by the intricacies of the programming language itself.

Over the years, point solutions have been introduced to address specific issues. For example, there are a few GUI based ftp software packages to make the job of transferring and managing code easier. There are also a few GUI based editor software packages to make editing code easier. Still further, there are software packages that one can use to manually diagram program flow and data flow. What is lacking, however, is a software package that integrates these best of breed point solutions and integrates them in such a way that they work seamlessly with each other, e.g., to have an editor that is integrated with a ftp package so that the editor can edit files that are located in a remote server or to have the editor integrated with the diagramming package so the user does not have to manually generate and update program flow or data flow diagrams.

Thus, a need exists for an Integrated Development Environment for generating and maintaining software code, in particular, for data manipulation centric languages. More specifically, a need exists for a system and method for

2

exchanging, editing, debugging, visualizing and developing SAS®, SPSS®, SQL®, DB2 UDB®, Oracle® RDBMS and other relational database management system software.

## SUMMARY OF THE INVENTION

In accordance with these needs, the present invention is embodied in an Integrated Development Environment for generating and maintaining source code (software programmed in a software language), in particular, programmed in data manipulation languages. Generally, the system in which the Integrated Development Environment resides includes a local computer capable of exchanging files with a remote computer via a network system, i.e., a Local Area Network, a Wide Area Network, or the Internet. The local computer preferably hosts the Integrated Developers Environment which is further comprised of a document manager for transferring files and otherwise providing enhanced file management functions, such as, version synchronization across multiple platforms. The document manager works in connection with a server module, a site manager and a connectivity layer which is part of the Integrated Development Environment to connect to remote computers, to transparently exchange files with the remote computer and to manage server profiles and connection information that is related to remote computers and transferred files.

Once a file is transferred to the local computer, an editor, which is included as part of and integrated with the Integrated Development Environment, can modify the code associated with the file. In addition, the editor is also capable of creating new files and provides many advanced editing features such as visual execution break points, standardized formatting of files, and line numbering to name a few. A visualizer, i.e., a software tools that reads the code and generates diagrams and graphical representation of the program flow, data flow or the logic of the code, is also integrated and included as part of the Integrated Development Environment. Program flow diagrams are comprised of program block icons and arrows to depict the code's program flow. Data flow diagrams are comprised of icons depicting data processing steps and arrows to depict the flow of the data through the program. Preferably, the visualizer and editor are integrated so that changes made to the code in the editor are immediately reflected in the visualizer and vice-versa. The visualizer can also read information from execution logs and execution outputs to display the execution path for selected code and automatically display insightful debugging and optimization information for the selected code to the user.

To assist in developing new code or editing existing code, the Integrated Development Environment further includes a template manager that allows the user to browse through a repository of existing code or templates and to copy templates into the selected code for editing.

For allowing the editor to process code that is written in different Data Manipulation System programming languages and for creating the program flow icons, the Integrated Development Environment additionally includes a parser layer. The parser layer detects the type of code in the selected file and activates the rules and logic that apply to the corresponding Data Manipulation System programming language.

As will become apparent from the detailed description that follows, the subject Integrated Development Environment provides, among others, the following unique functions: seamlessly exchanging with and executing files on local and remote computers, where the site manager is

US 7,110,936 B2

3

capable of compiling connection information for remote computers necessary to achieve the seamless transfer and execution of files; automatically generating program flow and data flow diagrams, where the program flow and data flow diagrams can be viewed at various levels of abstraction and where the user is capable of utilizing a step-wise function to collapse or expand the levels of abstraction to view; and automatically parsing the execution log to automatically match errors and warnings in the log file to the appropriate corresponding lines of code in the program file in order to ease the ability to correct the error, to visually highlight problematic areas, and to generate user customizable error messages and debugging advice for such problematic areas.

A better understanding of these and other objects, advantages, features, properties and relationships of the invention will be obtained from the following detailed description and accompanying drawings which set forth an illustrative embodiment and which are indicative of the various ways in which the principles of the invention may be employed.

BRIEF DESCRIPTION OF DRAWINGS

For a better understanding of the invention, reference may be had to a preferred embodiment shown in the following drawings in which:

FIG. **1** is a diagram illustrating an exemplary computer network for generating, maintaining and executing computer code;

FIG. **2** is a diagram illustrating exemplary components of the local computer;

FIG. **3** is an exemplary screen shot depicting a graphical user interface displaying a Menu bar, a Tool bar, a Display area (in this case the Editor) and a Navigation bar;

FIG. **4***a–f* are exemplary screen shots and corresponding tables depicting icons that are representative of menu items included on the Menu bar, along with the name of each menu item and a functional description of pertinent menu items;

FIG. **5** is a diagram illustrating the tool bar and a corresponding table describing the pertinent functions associated with the buttons included on the Tool bar;

FIG. **6** is an exemplary screen shot depicting an Editor window in Full Screen mode, along with corresponding output and log file tabs;

FIG. **7** is an exemplary screen shot depicting a tree view, along with the corresponding code segments;

FIG. **8** is an exemplary screen shot depicting a template manager window with available templates;

FIG. **9** is an exemplary screen shot depicting a program flow for a selected file, along with arrows that indicate the flow of data within the program flow;

FIG. **10** is an exemplary screen shot depicting a server module window configured for automated login and including session tabs for Server A and Server B;

FIG. **11** is an exemplary screen shot depicting a site manager window;

FIG. **12** is an exemplary screen shot depicting a document manager window;

FIG. **13** is an exemplary screen shot depicting a search panel for locating files;

FIG. **14***a* is an exemplary screen shot depicting an Enhanced Editor Options window;

FIG. **14***b* is an exemplary screen shot depicting a Color tab window for customizing the font colors associated with the code displayed by the Editor;

FIG. **14***c* is an exemplary screen shot depicting a General tab window for configuring the usage of an external editor

4

in-lieu of the built-in editor, enabling and disabling line numbering for the code displayed by the Editor, and selecting print options;

FIGS. **14***d&e* are exemplary screen shots depicting an Execution Configuration tab for configuring the execution mode and execution location for selected files;

FIG. **15** is an exemplary screen shot depicting the template window as it is displaying available web-based templates to the user;

FIG. **16** is an exemplary screen shot of a web-based template that is already configured;

FIG. **17** is an exemplary screen shot depicting a data flow for a selected file;

FIG. **18***a–c* are a series of exemplary screen shots depicting operation of a step-wise function and various data flows as the data flows are being collapsed;

FIG. **19** is an exemplary screen shot depicting the visualizer employing the Split Screen view;

FIG. **20** is an exemplary screen shot depicting the visualizer with a problematic code section and a corresponding program flow icon being displayed in red;

FIG. **20***a* is an exemplary screen shot depicting the visualizer with a problematic code section and a corresponding error log for that code section;

FIG. **20***b* is an exemplary screen shot depicting a debugging hint associated with a problematic code section;

FIG. **20***c* is an exemplary screen shot depicting an error message and a corresponding debugging hint being provided by the message manager;

FIG. **21** depicts a predefined class structure for recognizing and displaying tokens, which is employed by a file parser to parse a selected file; and

FIG. **22** depicts an exemplary file that has been parsed and the corresponding class structure of the parsed file.

FIG. **23** depicts an exemplary file with break points added.

DETAILED DESCRIPTION

Turning now to the Figures, wherein like reference numerals refer to like elements, there is illustrated an Integrated Development Environment having numerous cooperating modules which together provide a system and method for generating and maintaining software, in particular, the software for data development and data manipulation languages. Although not required, the system and method will be described in the general context of a computer network **20**, illustrated in FIG. **1**, and computer executable instructions being executed by general purpose computing devices within the computer network **20**. In this regard, the general purpose computing devices may comprise one or more remote computers **22***a*, and one or more local computers **22***b*, hosting an integrated software application **30**. The computer network **20** can also include one or more databases **24**. It should be appreciated that the network components could be described as having client and server relationships, as generally known in the art.

To allow the local computers **22***b* to generate and maintain code written in various programming languages, the integrated software application **30** will reside on the local computer **22***b*. Further, as shown in FIG. **2**, it is preferable that the integrated software application **30** execute on a Java Virtual Machine ("JVM") which acts as an interface between the integrated software application and the operating system for the local computer **22***b*. Although the operating system for the local computer **22***b* is preferably Windows® based, it should be understood that the local

US 7,110,936 B2

5

computer **22b** could employ any one of the currently existing operating systems, such as LINUX®, UNIX®, MAC OS®, etc.

For editing, generating and maintaining software (i.e., program code), the local computers **22b** include a graphical user interface **40**. As shown in FIG. **3**, the graphical user interface **40** is further comprised of a menu bar **42**, a tool bar **44**, a display area **46** and a navigation bar **48**. FIGS. **4a–4e** shows exemplary drop-down menu items included on the menu bar, along with a brief description of the functionality associated with those options. FIG. **4f** shows the "Right-Click" menu. The tool bar **44** is further comprised of and displays several buttons, including a template manager button **44a**, which serves as a link to a template manager **100**. In addition, FIG. **5** shows exemplary buttons included on the tool bar **44**, along with a brief description of the functionality associated with those buttons. The navigation bar **48** is further comprised of and displays a document manager button **48a**, a site manager button **48b**, an editor button **48c**, a visualizer button **48d**, a database manager button **48f**, and a server button **48e**, which serve as links to modules corresponding with these respective buttons, i.e., a document manager **60**, a site manager **70**, an editor **80**, a visualizer **120**, a database manager **121**, and a server module **160**, each of which will be described in greater detail below.

As will be appreciated by those of skill in the art, the computers **22a, 22b** need not be limited to personal computers, but may include hand-held devices, multiprocessor systems, microprocessor-based or programmable consumer electronics, minicomputers, mainframe computers, personal digital assistants, cellular telephones or the like depending upon their intended end use within the system. For performing the procedures described hereinafter, the computer executable instructions may be written as routines, programs, objects, components, and/or data structures that perform particular tasks. Within the computer network **20**, the computer executable instructions may reside on a single computer **22a, 22b** or the tasks performed by the computer executable instructions may be distributed among a plurality of the computers **22a, 22b**. Therefore, while described in the context of a computer network, it should also be understood that the present invention may be embodied in a stand-alone, general purpose computing device that need not be connected to a network.

To perform the particular tasks in accordance with the computer executable instructions, the computers **22a, 22b** may include, as needed, a video adapter, a processing unit, a system memory, and a system bus that couples the system memory to the processing unit. The video adapter allows the computers **22a, 22b** to support a display, such as a cathode ray tube ("CRT"), a liquid crystal display ("LCD"), a flat screen monitor, a touch screen monitor or similar means for displaying textual and graphical data to a user. The display allows a user to view information, such as, code, file directories, error logs, execution logs and graphical user interface tools.

The computers **22a, 22b** may further include read only memory (ROM), a hard disk drive for reading from and writing to a hard disk, a magnetic disk drive for reading from and writing to a magnetic disk, and/or an optical disk drive for reading from and writing to a removable optical disk. The hard disk drive, magnetic disk drive, and optical disk drive may be connected to the system bus by a hard disk drive interface, a magnetic disk drive interface, and an optical disk drive interface, respectively. The drives and their associated computer-readable media provide a means of non-volatile storage for the computer executable instruc-

6

tions and any other data structures, program modules, databases, etc. utilized during the operation of the computers **22a, 22b**.

To connect the computers **22a, 22b** within the computer network **20**, the computers **22a, 22b** may include a network interface or adapter. When used in a wide area network, such as the Internet, the computers **22a, 22b** typically include a modem or similar device. The modem, which may be internal or external, is connected to the system bus via a serial port interface. It will be appreciated that the described network connections are exemplary and that other means of establishing a communications link between the computers **22a, 22b** may be used. For example, the system may also include a wireless access interface that receives and transmits information via a wireless communications medium, such as a cellular communications network, a satellite communications network, or another similar type of wireless network. It should also be appreciated that the network interface will be capable of employing TCP/IP, FTP, SFTP, Telnet SSH, HTTP, SHTTP, RSH, REXEC, etc. and other network connectivity protocols.

For seamlessly transferring files, the document manager **60** is utilized. The document manager **60** is a file management program that performs many enhanced file management functions, such as recognizing related files, (e.g., execution log files, output files, include files, etc.) and managing related files as a unit, regardless of the location of such files. For example, if the user causes the document manager **60** to transfer a file from the remote computer **22a** to the local computer **22b**, the document manager **60** may also determine whether any related files exist, i.e., files that are or will be used in conjunction with the file that the user is transferring, and transfer those files as well. As will be described in further detail below, these enhanced file management functions, including managing related files and storing information, such as origination and timestamp information about these files, allow the user to exchange files with and execute code on local computers **22b** and/or remote computers **22a**. To accomplish the enhanced file management functions, the document manager **60** may also include an intelligent module **62**, a security layer **66** and a file transfer program **68**.

The intelligent module **62** enables the document manager **60** to track pertinent file transfer information **64** that enable the performance of enhanced file management functions, including, uploading files from a source computer and returning/downloading an edited version of the same file to the same source computer for storage, execution, etc. To accomplish the functions of returning edited files to the source computer and executing edited files remotely, the file transfer information **64** may include a source computer identifier, a file directory identifier, a content identifier, a timestamp or other information capable of allowing the tracking of the type or path of files that are transferred between computers **22a, 22b** or within a single computer **22b**.

To ensure that the integrity and security of the network **20** is maintained, a security layer **66** is utilized. The security layer **66**, which is part of the site manager **70**, may save server login information supplied by the site manager **70** thereby allowing subsequent file exchanges to be handled transparently. The security layer **66** may also be capable of configuring the integrated software application **30** to work with firewalls. The site manager **70** gathers server login information and similar information for use by the document manager **60**, the intelligent module **62** and the security layer **66**, and interacts closely with each of these modules. Pref-

7

erably, remote file access and file execution are handled centrally through the site manager **70**.

To maintain existing software and develop new software, the editor **80** allows the user to perform standard text editing functions, including, mouse placement of the cursor, click-and-drag text selection and standard Windows® key combinations for cutting, copying and pasting data. While editing code that has been previously executed, the associated log files and output files that are stored in the same directory **104** as the code will automatically be opened and each of these files will include a corresponding tab **84**a, **84**b, as shown in FIG. **6**. The user can access each of these files by clicking on the corresponding tab **84**a or **84**b and switch between several related files by clicking on different tabs. The editor **80**, the document manager **60** and the site manager **70** cooperate to track the association between edited code, the log files and output files that are generated by the edited code, and the remote system on which edited code may be executed. The editor **80** may also employ language-specific syntax checking and auto-correct functions to enhance the software development capability of the integrated software application **30**.

To make the code more manageable and allow the user to see a more abstract version of the code, the editor **80** also provides a means to invoke a tree view **90**, which may be displayed near the editor **80**. The tree view **90** depicts individual procedures and data blocks as active elements **82** and shows the code at a high level. Since each active element **82** is representative of a larger code segment, as shown in FIG. **7**, the user can navigate throughout the code by selecting active elements **82** and thereby displaying the larger code segment associated with the selected active element **82** (i.e., the editor will automatically scroll to the region where the code segment is visible). To make it easier to cut, copy or move code segment, the user can right-click on an active elements in the tree. This will cause the editor to automatically scroll to the region where the code segment is located and highlight the entire code segment. The user can then cut or copy the highlighted code segment to the clipboard.

For enabling users to add pre-existing lines of code or templates **106** to a program being edited or created, the editor **80** also includes the template manager **110**, which may be accessible to the user by clicking on the Template button on the tool bar **44** menu. As shown in FIG. **8**, the template manager window **102** includes a directory **104** of templates **106**, which are both pre-built and written by the user and which may be examined by navigating the directory **104** in a manner that is well-known in the art. The template manager **110** allows the user to insert templates **106** directly into the code that is being created/edited. In addition, the template manager **110** also allows the user to create and organize their own templates **106**. Still further, the template manager **110** could be used in connection with the Internet and a web browser to view and retrieve templates stored at remote locations, such as web sites, bulletin boards, etc. The Template Manager **100** can store the templates (both built-in and those developed by the user) locally and/or centrally on a remote server making it easy for the entire workgroup or enterprise to share these templates.

In addition, the editor **80** may also provide an auto-complete function capable of automatically generating code based on templates **106** managed by the template manager **100**. For example, as soon as a user keys in a recognized key word, the editor **80** will automatically perform a look-up function for that keyword in the directory **104**. If a template **106** includes a matching keyword, then the editor **80** may

8

automatically paste the template into the display area. If more than one template **106** matches the keyword, then a pop-up window will be displayed presenting the user with the option of selecting one of the matching templates. It should also be appreciated that the user customize the integrated software application **30** by enabling or disabling the auto-complete feature.

For viewing the program flow and data flow of a selected program, as will be further described below, the visualizer **120**, in connection with a parser layer **140**, reads, parses and displays the code for the selected program, representing each program and data block with a program flow icon **126**. As illustrated in FIG. **9**, arrows connect these program flow icons **126** to generally illustrate the flow of data.

Assuming that the designated code segment has been executed previously and that the execution log is readily available, the user may also "mouse-over" the program flow icon to display the comments and execution statistics, i.e., CPU usage, number of row processed, etc., associated with the block. Right-clicking on the program flow icon will activate specific functions or options associated with the icon. For example, the dataset icon (i.e., an icon that represents a dataset or a table) will display a list of data inspection or data discovery functions, including ad hoc SQL® queries. Ad hoc SQL® queries that are selected may be executed by the respective engine. These engines (e.g., SAS, DB2 UDB, or other RDBMS servers) can resides locally on the user's workstation or remotely on the LAN/WAN and the results, once retrieved will be displayed in a pop-up output window.

To access and interact with remote computers **22**a via command lines, the server module **160** acts as a robust terminal emulator. The server module **160** allows users to open one or more sessions thereby simultaneously gaining access to one or more hosts/remote computers **22**a. In addition, the user has the option of executing edited code on a remote computer **22**a, by employing the server module **160**, in connection with the site manager **70**, to connect the local computer **22**b to the remote computer **22**a, as will be described in more detail below. Once a session is opened, a terminal tab for the respective session can be created and displayed to the user by the server module **160**, as illustrated in FIG. **10**. It should be understood by those with skill in the art that the server module **160**, the site manager **70** and the document manager **60** all preferably interact with one another to effectuate the transfer of code between the remote server computers **22**a and the local computer **22**b. It should also be understood that each of these modules could be combined or further divided to form one single module or additional modules.

The site manager **70** assists the local computer **22**b with access to the remote computers **22**a. For example, the document manager **60** and the server module **160** use the site manager **70** to collect the connection information **78** necessary for the local computer **22**b to make a LAN/WAN connection to a remote computer **22**a using either FTP, SFTP, Telnet SSH, HTTP, SHTTP, RSH, REXEC and other TCP/IP connectivity protocols. Additionally, to avoid manually entering the connection information **78** each time a different remote computer **22**a is accessed, the site manager **70** is also capable of saving connection information **78** for different servers. Thus, the site manager **70** creates a virtual computing environment by expanding the computing boundary of the local computer **22**b to include remote computers **22**a and making various computing resources across the LAN/WAN seamlessly available for use by the local computer **22**b. As shown in FIG. **11**, the site manager

9

window **72** may be divided into a first panel **74** and a second panel **76**. The first panel **74** displays a tree structure that depicts the system configuration **74***a* for each of the remote computers **22***a* that are available to the local computer **22***b*. The second panel **76** displays the connection information **78** for a selected remote computer **22***a*, including but not limited to the following fields: Profile Name **78***a*, Host Address **78***b*, User **78***c*, Password **78***d*, FTP port **78***e* and Telnet Port **78***f*.

The site manager **70** also includes a PASV mode and Firewall option which can be selected by the user. PASV mode is supported as an option to allow file transfer programs ("FTPs") to work with a firewall. This feature reverses the connection between the remote computer **22***a* and the local computer **22***b* allowing many users whose sessions are hosted behind firewalls to use the document manager **60**. Therefore, PASV mode is useful for certain types of firewalls that do not allow FTP servers to initiate data connections back to the connected client. If the Firewall option is selected, the firewall configuration parameters from the Firewall tab of the Option Dialog will be used to initiate a connection to this profile. Moreover, if the local computer **22***b* resides behind a firewall that limits or restricts FTP access and the Firewall mode is selected, the necessary connection information **78** and Firewall selections for the local computer **22***b* must be entered, i.e., a host name, port number, user ID and password. In accordance with procedures that are generally known in the art, the Firewall Type box permits the user to select the command required by the firewall to initiate an FTP session from the site manager **70**. In addition to providing options that enhance the network connectivity of the local computer **22***b*, the Option button also provides tools and wizards for automatically searching the LAN/WAN for designated resources. These tools and wizards simplify the network/server connection setup between the local computer **22***b* and the remote computers **22***a*.

For parsing the code, the parser layer **140** is provided. The file parser **142** retrieves code utilizing the services provided by the document manager **60** and examines the words/tokens which comprise the code **144**. The file parser **142** also identifies and tags the tokens **144** to indicate that they are one of a variety of token classes, such as, a keyword token, a newline token, a quotestring token, a macro token and a comment token. Since the integrated software application **30** is language aware, the parser layer **140** may accommodate varying language types. Thus, although the preferred embodiment of the present invention is specifically designed to include modules for parsing SASS® and SQL code, it should be appreciated that the modules can be included for parsing and interpreting other language types, such as, SPSS®, DB2 UDB® Store Procedures, ORACLE® PL/SQL, etc.

For managing and interacting with database files, a database manager **220** may be provided which automatically interacts with the local ODBC registry to display a list of ODBC resources. In addition, the database manager **220** may automatically search the LAN/WAN for RDBMS servers and display the list of RDBMS servers that are found locally or remotely. The database manager also allows the user to select and drill down to a desired database and automatically connect to the selected database, unless a login screen is required to connect to the database. Once connected to the selected database, the Database Manager will display a list of tables which are stored and available in the database. The user can then right-click on a particular table to gather statistics or to retrieve sample data from those

10

tables. The user can also drill down on a particular table to display the columns of the tables. Similarly, the user can click on a particular table to gather statistics (e.g., frequency counts, min max, distinct value, average, etc.) or to retrieve sample data from those tables. The user can also drag and drop tables onto a work area to graphically generate SQL® statements to retrieve data from the database. Additional data manipulation functions, e.g., pivot, crosstab, and templates will be available to help users inspect, transform, import, export, map, format, transport and derive new data based on existing data. The database manager **220** may also include a meta data manager **222** to help the user document the business or logical definition of the data, and the technical or physical definition of the data. The meta data manager **222** may also assist the user in tracking the lineage of the data, i.e., the source of the data, the changes to the data that were made and the destination of the data.

To further exemplify the functionality of the integrated software application **30**, the following section will discuss an exemplary software development session, along with the modules used to effectuate the respective functions.

This hypothetical session commences with activation of the integrate software application **30**. Once the integrated software application **30** is launched, the graphical user interface **40** will be displayed and the user will have the opportunity to open modules in the navigation bar **48** or engage functions represented by buttons in the menu bar **42** or the tool bar **44**. For determining to which computer the user desires access, the user would begin by activating the site manager **70**, which causes the site manager window **72** to be displayed to the user. The site manager window **72** includes a first panel **74** and a second panel **76**. As shown in FIG. **11**, the first panel **74** of the site manager window **72** displays the defined/available remote computers **22***a* for the user's selection. As discussed above, the second panel **76** of the site manager window **72** displays a server profile for a selected remote computer **22***a*, comprising connection information **78**, including, but not limited to, the following fields: Profile Name **78***a*, Host Address **78***b*, User, Password, FTP port **78***e* and Telnet Port **78***f*. As will be appreciated, the site manager can be configured to search the network for servers or certain types of servers and display the found servers for selection by the user.

The server profiles **170** may be populated by selecting a folder icon **172** to use as a parent directory **174**. Once a parent directory **174** is opened, the user may click on the New button **176** to create a new server profile **170**. Therefore, it should also be understood that the site manager **70** allows the user to create new server profiles **170** by entering the necessary connection information **78**. To edit an existing server profile **170**, the user must select a remote computer **22***a* and click the Edit button **178**. After the Edit button **178** is selected, the cursor may be moved to the Profile Name **78***a* for editing or modification, or the user may click on the Option button for Advance Network/Server Connectivity Configuration Settings.

The text displayed in the Profile Name **78***a* field can be a profile name **78***a* that was selected in the first panel **74** of the site manager window **72** or text the user enters in creating a profile for a remote computer **22***a* or host. The Host Address **78***b* field may contain an IP address or a resolvable DNS host name of the FTP, SFTP, Telnet, SSH, REXEC, HTTP, or SHTTP server for the respective host definition. The User **78***c* field may contain the login name that the user will enter to access the remote server computer FTP account. If the selected remote computer **22***a* accepts anonymous FTP requests, "anonymous" may be entered in this field. The

US 7,110,936 B2

**11**

Password **78***d* field may contain a password **78***d* for the remote server computer FTP account, unless an anonymous login is used; then, the Password **78***d* field may remain blank. The FTP port **78***e* field is set by default to **21**, since most server computers **22***a* accept FTP connection requests on port **21**, however, the FTP Port **78***e* field may be changed as needed. The Telnet Port **78***f* field is set by default to **23**, since most server computers **22***a* accept Telnet connection requests on port **23**, however, the Telnet Port **78***f* field may also be changed as needed.

Once the user selects a remote computer **22***a* to access, the connection information **78** for the selected remote computer **22***a* is returned by the site manager **70** and displayed to the user. Then, the user is given the option of connecting to the selected remote computer **22***a* by selecting the Connect Telnet button. When the Connect Telnet button is selected, the server module **160** is activated. To connect to the remote computer **22***a*, the server module **160** utilizes the connectivity layer **180**. More specifically, as is known in the art, the connectivity layer **180** utilizes the connection information **78** with TCP/IP and other similar networking protocols to interconnect with the remote computer **22***a*. Once the server module **160** has made an initial connection with the selected remote computer **22***a*, a server module window **162** is displayed to the user. The server module window **162** displays the name of the remote computer **22***a* to which the user is trying to connect.

Prior to opening a session on a particular host, the user may be required to login or the server module **160** may automatically log the user on (depending on the settings that the user has selected in the server profile **170**, i.e., save login and password). FIG. **10** shows a server module window **162** that is configured for automated login, with a home path preset to the integrated software application's SAS® directory. The combination of the site manager **70**, the server module **160** and the connectivity layer **170**, enable the user to seamlessly access SAS® documents, log files and output files stored at the remote computer **22***b*.

Once the local computer **22***b* accesses a remote computer **22***a* using the combination of the site manager **70**, the server module **160** and the connectivity layer **170**, the document manager **60** will be activated automatically. Moreover, to view the available files for a selected computer, the document manager window **170** may be displayed to the user. As shown in FIG. **12**, the document manager window **170** includes a local panel **172** and a remote panel **174**. Each of these panels, **172**, **174** displays the available files for the respective computers **22***b*, **22***a* as a file tree structure, as shown in FIG. **12**. The user may then select one or more of the available files for editing or visualizing. In the preferred embodiment of the present invention, files that are located in the local panel **172** are resident on the local computer **22***b* and files that are located in the remote panel **174** are resident on the remote computer **22***a*, but it should be appreciated that such designations are for explanatory purposes only and that other variations of network systems and computer designations could be employed.

The document manager **60** also allows the local computer **22***b* to perform various Windows® commands, such as, creating new files, renaming, deleting and opening existing files, printing files, copying, cutting and pasting information to the Windows® clipboard, and other standard commands that are generally known in the art. In addition, the document manager **60** provides a Search Option **69**. As shown in FIG. **13**, selecting the Search Option **69** opens the search option window **69***a* and allows users to search any file system that is accessible to the local workstation/local computer **22***b*, in

**12**

accordance with generally known file searching techniques, including by exact or partial file name, modification date or date range, and content.

To open a file displayed in the local panel **172**, the user may double-click on the selected file, or highlight the selected file and start the desired module (i.e., the editor **80** or the visualizer **120**). If the user double-clicks on a file located in the local panel **172**, the editor **80** will automatically open and display the file. To open and edit a file displayed in the remote panel **174**, it is preferable that the user drag a selected file from the remote panel **174** of the document manager **60** and drop the selected file in the local panel **172** of the document manager **60**. It should also be understood by those with skill in the art that other methods for opening and moving files may be employed.

To retrieve a file that is stored on a remote computer **22***a*, the document manager **60** may utilize a file transfer program **64**, in connection with the site manager **70** and the connectivity layer **180**. For example, as is known in the art, the document manager **60** may send a request to the file transfer program **64** to import the selected file from a particular remote computer **22***a*. In response to this request, the file transfer program **64** may communicate with the remote computer **22***a* via the connectivity layer **180** and instruct the remote computer **22***a* to send the selected file to the local computer **22***b*. When the selected file is being transferred from the remote computer **22***a* to the local computer **22***b*, the intelligent module **62** of the document manager **60** may compile file transfer information **64**, as noted above. It should also be understood that, while it is preferred to have the intelligent module **62** compile file transfer information **64**, other similar modules may be equally capable of accomplishing the task of compiling file transfer information **64** for the system **20**.

Again, for exemplary purposes only, it is assumed that the user has chosen to edit the code before visualizing it. As mentioned above, to begin editing files, the user may either double-click on the selected file, which automatically opens the editor **80**, or the user may highlight the selected file and then open the editor **80**. To open the editor **80**, the user need only double-click on the Editor button **48***c* located in the navigation bar **48** of the graphical user interface **40**, as shown in FIG. **3**.

As shown in FIG. **6**, once the editor **80** begins the editing process (the default setting is Full Screen mode), the contents of a selected file are returned from the document manager **60** and displayed to the user beside a navigation bar **48** bar. For editing the code and implementing advanced code-handling capabilities, the editor **80** also includes features, such as, language-aware syntax highlighting, warning and error log file highlighting, automatic line numbering, automatic completion of code segment based on program templates, tree views of program blocks and code templates **106**. By highlighting key code statements, the language-aware syntax highlighting makes the code easier to read and edit. In addition, by highlighting the code, based on information contained within the warning and error log files, errors in the code are more apparent and the code is easier to trouble-shoot.

To allow the user to customize, edit and maintain error messages and the corresponding debugging hints, the message manager **88** is provided. More specifically, the message manager **88** allows the user to create, update and delete error messages. For example, the user can click on any error message in the log and in response to this selection, the message manager **88** may compare the selected error message to an existing repository of error messages The reposi-

13

tory of error messages can be stored locally and/or centrally in a remote server accessible and sharable by the entire workgroup or the entire enterprise. If the selected error message matches one of the existing error messages, a debugging window will pop-up. The debugging window will display the original error message, along with any corresponding debugging hints that are associated with the original error message as provided by the message manager **88**. If the selected error message does not match one of the existing error messages, the message manager **88** may automatically read the new message into the repository of error messages. Additionally, the user may have the option to associate debugging hints with the new error message.

To further add to the utility of the editor **80**, the user can open the Enhanced Editor Options window **84** by clicking the Editor Configuration button **86** in the Options pull-down menu. The Enhanced Editor Options window **84** is further comprised of a General tab **84***a*, a Font tab **84***b*, a Color tab **84***c* and an Execution tab **84***d*. As is generally understood in the art and as shown in FIG. **14***a*, the font type, size and style of the code may also be customized by the user by selecting the Font tab **84***b* in the Enhanced Editor Option window **84**. Additionally, as shown in FIG. **14***b*, the Color tab **84***c* of the Enhanced Editor Options window **84** may be selected to allow the user to select the colors that are used in connection with various syntactically significant language elements in the SAS® program file, thereby allowing the user to customize the language-aware syntax highlighting and warning and error log file highlighting functions. To further configure the user workspace, the editor **80** allows the user to choose whether or not to display line numbers in connection with editing the code. For example, as shown in FIG. **14***c*, the General tab **84***a* can be selected by the user and may provide options for selecting a line numbering button representative of disabling or enabling the line numbering, specifying printing options or indicating the use of alternate editor. For allowing the integrated software application **30** to configure the execution path for selected files, the Execution tab **84***d* can be selected by the user and the execution mode and execution location may be defined (i.e., Locally or Remotely), as illustrated in FIGS. **14***d*&*e*. By configuring the execution path for selected files, the user can execute the code on local or remote computers **22***b*, **22***a* via menu.

Once the selected code is displayed on the editor window **82**, the user can begin to edit the code. Although the default setting for the editor window **82** is the Full Screen mode, the user can also select a Split Screen mode. The Split Screen mode splits the editor window **82** into two panels, i.e., the tree view panel **82***a* and the code view panel **82***b*. To enhance the ability of the user to navigate within the body of the code, the tree view panel **82***a* displays the tree view **90**, which is comprised of a group of active elements **92**. The tree view panel **82***a* displays a high-level representation of the code and the code view panel **82***b* displays the corresponding code that is associated with a highlighted active element **92**. To this end, the editor **80** works in connection with the parser layer **140** to parse the code in a manner that allows the editor **80** to display a tree view **90** comprised of active elements **92** that are representative of code section that perform important functions, such as, the introduction of new variables or the execution of append, print or similar functions. Thus, the user can navigate through the code by clicking on the desired active element **92**, which causes the code that corresponds with that active element to be displayed in the code view panel **82***b*.

The user can also add pre-existing code to the program being edited, by opening the template manager **100**. The

14

template manager **100** allows the user to select existing templates **106** and to integrate the code associated with those templates **106** into the code by simply clicking on the paste button or by utilizing standard cut and paste tools, or similar functions, as will be explained in greater detail below.

Once the template button **44***a* is selected, the template manager **100** is activated and the template manager window **101** is opened. It should be appreciated that the template manager **100** may be a separate browser; therefore, the template manager window **101** may remain open throughout the users session. The template manager window **101** may be further comprised of a template directory panel **101***a* and a template code panel **101***b*. The template directory panel **101***a* may display a directory **104** of template folders **105** or available templates **106**. To display the code associated with an available template **106**, the user may select a file folder containing available templates **106** from the directory **104** and select an available template **106**, which is located within the selected file folder. Once a template **106** is selected, the template code **106***a* associated with the template **106** is returned to the template manager **100** and displayed in the template code panel **101***b*.

To insert the template code **106***a* associated with a selected template **106** directly into the code that is being edited, the user may click the Copy button **102** on the template manager window **101**; this places the template code **106***a* associated with the selected template **106** into the Windows® clipboard. Then, the user should place the cursor in the desired location within the code and select the Paste button **103**. Or the user may simply click the paste button and the template will be copied directly into the current location of the cursor in the document.

The template manager **100** may also allow the user to create new template folders **105** for storing templates **106**, to create new templates **106** and to edit existing templates **106**. These templates can reside on either the local drive or the network drive. In addition, for allowing the template manager **100** to import additional templates **106** from remote computers **22***a*, the template manager **100** also enables the user to browse web-based templates **108**. As shown in FIG. **15**, once the web-based templates **108** are accessed and displayed on the template manager window **101**, the web-based templates **108** may be utilized in a manner similar to the templates **106**. As shown in FIG. **16**, additional web-based templates **108** may be added to the template manager **100** by the user. It should also be understood that the templates **106** are web enabled, i.e., the user can associate links or URLs with the template during creation. Thus, users may be capable of clicking on a link and causing the template manager **100** to automatically activate a web browser to display any content associated with the link.

Once the user has completed the editing or development of the code, the user can execute and debug the code. In addition, the code can be executed locally or remotely. As is known in the art, the user may also use the editor **80** to set break points **112** in the code. As shown in FIG. **23**, break points **112** can be set by selecting the line numbers that correspond to the intended location of the break points **112**. It should also be appreciated that by setting break points **112** in the code, the code can be executed in its entirety or as a block of code with the additional option of skipping specified code segments within the selected blocks.

The site manager **70**, the document manager **60** and the editor **80** work in conjunction with one another to execute the code. For example, the site manager **70** manages the connections between the local computer **22***b* and the remote host/remote computer **22***a*; the document manager **60** tracks

15

the associations between the code, the log files and the output files that are generated and the remote system on which the code is to be executed; and the editor **80** allows the user to modify the code. Moreover, for assisting users in developing and maintaining software, the editor **80** and the visualizer **120** have an integrated relationship. For example, each of the active elements **92** displayed in the tree view **90** may also be represented in the visualizer **120** and any changes made in the editor **80** can be simultaneously reflected in the visualizer **120**.

To execute code remotely when the code resides on a remote computer **22***a*, the code is first copied to a directory on the local computer **22***b*. Next, the user should open the local copy of the code. After the local copy is opened and returned to the editor **80**, the code view panel **82***b* will display the code. The user can also use the document property wizard to specify the server and the location in which they intend to execute the code. The server or location may be selected by browsing the server list in the site manager **70**.

To execute code remotely when the code resides on a local workstation/local computer **22***b*, the user first instructs the site manager **70** to make a connection to the remote computer **22***a*. Then, the user may cause the document manager **60** to copy the code from the local computer **22***b* to a directory **104** on the remote computer **22***a*. To select code for execution, the user can drag an icon representing the selected code from the local panel **172** of the document manager **60** window and drop the icon in the remote panel **174** of the document manager **60** window. It should also be appreciated that the selected code could be copied by other means that are generally known in the art. Next, the user should open the local copy of the code. After the local copy is opened, the editor window **82** will display the code.

To execute the code or code segments, the user selects the Execute Program button **44***a* on the tool bar **44** or in the Right-Click menu. Once the Execute Program button **44***a* is selected, the server module **160** connects to the proper computer **22***a*, **22***b* using the connectivity layer **180** and causes the execution script, which may be defined in the site manager **70**, to operate on the selected code. After execution of the code is complete, a system prompt will be displayed. The user may then type "exit" to return to the editor **80** window; the document manager **60** automatically transfers the session's .log an .1st files to the same directory **104** from which the code was copied and displays them as separate tabs on the Editor **80** window. The user can also configure the remote execution function to that it will exit automatically.

As shown in FIGS. **9** and **17**, the visualizer **120** may be used to show the program flow **122** or the data flow **124** of the selected code on the visualizer window **121**. Additionally, the user will be able to toggle between the program flow display **122***a* and the data flow display **124***a* by selecting the View Program Flow button **122***b* or View Data Flow button **124***b*, respectively. As shown in FIG. **9**, the program flow **122** is displayed as a default and displays program flow icons **126**, which are graphical representations of code sections, in the order that they occur in the code.

For generating the program flow icons **126**, a document view engine **200** is provided. The document view engine **200** operates in conjunction with the parser layer **140** to parse the code. Using information provided by the parser layer **140**, the document view engine can intelligently recognize and arrange individual procedures and data blocks on the visualizer window **121** and represent the procedures and data blocks as program flow icons **126**. The document view

16

engine **200** may also allow users to assign meaning and attributes to tokens **144**, which are identified by the parser layer **140**. By assigning meanings and attributes to tokens **144**, the document view engine **200** allows the visualizer to create program flows **122** and data flows **124**.

As shown in FIG. **17**, the visualizer **120** may also show the data flow **124** of the subject code. The data flow **124** is generated by parsing the code, tracing the flow of the data through the code and displaying individual processes and data blocks in separate columns with arrows that connect the program flow icons **126** and indicate the direction of the data flow. In addition, as shown in FIG. **18**, the data flow visualizer also allows the user to combine flows in a stepwise manner, thereby following the flow of the data from start to finish. As the user clicks the Step-wise button **121***a* located on the visualizer window **121**, shown in FIG. **17**, the visualizer **120** and the document view engine **200** may re-generate the data flow **124***a* on the visualizer window **121** and collapse the number of program flow icons **126** that comprise the data flow **124**, ultimately showing the entire lineage of the data (i.e., where the data came from, how the data has been processed and where the data was stored). Thus, the visualizer **120** enables the user to view a representation of the flow of data during execution of selected code one step or program statement at a time. It should also be appreciated that the user may take a single data flow **124** and reverse the step-wise function, thereby expanding the number of program flow icons **126** that comprise the data flow **124** and showing the data flow **124** for individual sections or blocks of code.

It should also be appreciated that the integrated software application **30** allows changes to the code to be made textually or visually, i.e., by using the editor **80** or the visualizer **120**, respectively. Editing, creating or developing new code visually using the visualizer is achieved by reverse engineering the exiting code or code templates, i.e., SAS®, SQL®, SPSS®, DB2 UDB®, Oracle® RDBMS and UNIX® Scripts, and displaying the code visually using icons. As the user manipulate these icons visually, code will be generated. Any changes to the code via the visual interface can be forward engineered to assume a textual format capable of being executed on the respective Data Development and Data Management System. Therefore, the integrated software application **30** is capable of producing a textual file that is derived from a visual model and executing the derived textual file.

As shown in FIG. **19**, the visualizer window **121** may also be configured to display a split view. When the visualizer window **121** is in split view mode, the visualizer window **121** will be comprised of a flow panel **121***b* and an visualizer code panel **121***c*. The flow panel **121***b* will display either the program flow **122** or the data flow **124**, and the visualizer code panel **121***c* will display the code for program flow icons **126**, which are shown in the flow panel **121***b*. Moreover, by clicking on an icon in the program flow window or data flow window, the user can cause the editor **80** window **100** to display the portion of the code that corresponds to the program flow icon **126** that was selected. This is especially helpful in debugging the code.

For example, as shown in FIG. **20**, when elements appear in red, this signifies that the highlighted element contains an error in the underlying code. If the user selects the highlighted element, a pop-up window may be displayed to the user depicting the code associated with the highlighted element, along with the corresponding Error log, i.e., the editor **80** will scroll to the corresponding section of code and display the code to the user, while also displaying the Error

US 7,110,936 B2

**17**

log in close proximity to the code. It should be appreciated by those with skill in the art that during the user session, the user may freely navigate between the document manager **60**, the editor **80** and the visualizer **120**, as needed, by selecting the corresponding icon in the navigation bar **48**.

It should also be understood that the user can visualize the execution log. Visualizing the execution log will show the exact path of the program flow **122** and data flow **124**. The program flow **122** and the data flow **124** will be exact because they are based on the actual execution of the code. This in turns provides additional debugging and optimization information, such as, the code section that will get executed, how much data is being processed, the execution time for the code, the external files, library or macros that are referenced by the code, the format for the fully instantiated macro, etc.

For parsing the code, the document manager **60** first determines the file type for a selected file, i.e. the SAS®, SPSS®, SQL®, DB2 UDB®, Oracle® RDBMS etc. After the file type for a selected portion of code is determined, the parser layer **140** deploys the corresponding file parser **142**, e.g., a file parser **142** that corresponds to, in this case, one of a variety of data manipulation and/or data management programming languages. By deploying the appropriate file parser **142**, the parser layer **140** also activates the respective rules and logic that correspond to the detected programming language. Therefore, users are capable of developing, editing and maintaining code that can be executed by more than one data manipulation and/or data management program.

As mentioned earlier, the parser layer **140** is capable of processing varying file types, as the integrated software application **30** has been designed to be language aware. For example, as mentioned above, the document manager **60** recognizes file types and the integrated software application **30** includes enhanced, standalone productivity tools, such as, generic text editors, the Windows File Manager and File Transfer programs **68**. In addition, these productivity tools are also designed to work seamlessly with the integrated software application **30** by implementing XML protocols, as is generally known in the art. Thus, although the preferred embodiment of the present invention is designed to interact with SAS® code, it should also be appreciated that the system will also be capable of parsing and interpreting other file types, such as, SPSS®, SQL®, DB2 UDB®, Oracle® RDBMS, etc.

As is generally known in the art, after the file parser **142** retrieves code from the document manager **60**, the file parser **142** breaks the code document **146** into individual words/ tokens **144**. Based on the class of the individual tokens **144**, the file parser **142** identifies and tags the tokens **144**. Tokens **144** can be tagged to indicate that they are one of a variety of classes, such as, a keyword token **144**a, a newline token **144**b, a quotestring token **144**c, a macro token **144**d and a comment token **144**e. By tagging the tokens **144**, the parser layer **140** enables the document view engine **200** to recognize and display the program flow **122**. As shown in FIG. **21**, the document view engine **200** employs a predefined class structure for recognizing and displaying the tokens **144** provided by the file parser **142**. An example of the class structure as it might be implemented in a parsed document/ file is shown in FIG. **22**.

While specific embodiments of the present invention have been described in detail, it will be appreciated by those skilled in the art that various modifications and alternatives to those details could be developed in light of the overall teachings of the disclosure. For example, the processes described with respect to computer executable instructions

**18**

can be performed in hardware or software without departing from the spirit of the invention. Furthermore, the order of all steps disclosed in the figures and discussed above has been provided for exemplary purposes only. Therefore, it should be understood by those skilled in the art that these steps may be rearranged and altered without departing from the spirit of the present invention. In addition, it is to be understood that all patents discussed in this document are to be incorporated herein by reference in their entirety. Moreover, while the present invention may be described in terms of a particular programming language, it should also be understood that the present invention may be programmed in various other software languages. Accordingly, the particular arrangement disclosed is meant to be illustrative only and not limiting as to the scope of the invention which is to be given the full breadth of the appended claims and any equivalents thereof.

What is claimed is:

**1**. An integrated development environment, comprising:

a document manager for retrieving source code programmed using one of a plurality of types of data manipulation languages;

an editor for displaying the retrieved source code and providing a means for a user to edit the retrieved source code;

a parser layer which detects the one of the plurality of types of data manipulation languages in which the retrieved source code is programmed and which activates rules and logic applicable to the detected one of the plurality of types of data manipulation languages; and

a visualizer dynamically linked to the editor for displaying graphical representations of flows within the retrieved source code using the rules and logic applicable to the detected one of the plurality of types of data manipulation languages and activated by the parser, wherein the editor, parser layer and visualizer cooperate such that edits made to the source code using the editor are automatically reflected in the graphical representations of flows displayed by the visualizer and edits made to the graphical representations of flows in the visualizer are automatically reflected in the source code displayed by the editor.

**2**. The integrated development environment as recited in claim **1**, wherein the graphical representations of flows depict data flows.

**3**. The integrated development environment as recited in claim **1**, wherein the graphical representations of flows depict program flows.

**4**. The integrated development environment as recited in claim **1**, wherein the graphical representations of data flows are expandable and collapsible.

**5**. The integrated development environment as recited in claim **1**, wherein the document manager retrieves all files related to the source code to be edited.

**6**. The integrated development environment as recited in claim **1**, wherein the document manager comprises a site manager and a connectivity layer for retrieving source code from one or more remote computers.

**7**. The integrated development environment as recited in claim **6**, wherein the document manager comprises a security layer for managing secure connections with the one or more remote computers.

**8**. The integrated development environment as recited in claim **1**, wherein the editor comprises a template manager for allowing preprogrammed segment of source code to be placed within the source code being edited.

US 7,110,936 B2

19

**9**. The integrated development environment as recited in claim **8**, wherein the template manager is adapted to automatically correct segments of the source code.

**10**. The integrated development environment as recited in claim **8**, wherein the template manager is adapted to automatically generate segments of the source code.

**11**. The integrated development environment as recited in claim **1**, further comprising a means for allowing the source code to be executed both locally and remotely.

**12**. The integrated development environment as recited in claim **11**, wherein the parser layer further examines error log files generated by the means for allowing the source code to be executed to determine segments of the source code determined to include errors.

**13**. The integrated development environment as recited in claim **12**, wherein the visualizer cooperates with the parser layer to change the appearance of displayed flows as a

20

function of the source code segments determined to have errors.

**14**. The integrated development environment as recited in claim **12**, wherein the editor cooperates with the parser layer to change the appearance of portions of the displayed source code as a function of the software segments determined to have errors.

**15**. The integrated development environment as recited in claim **12**, further comprising a message manager cooperating with the parser layer for displaying debugging hints as a function of the source code segments determined to have errors.

**16**. The integrated development environment as recited in claim **15**, wherein the message manager allows a user to edit and maintain debugging hints for a variety of different errors.

*    *    *    *    *

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2015, I served a copy of the foregoing on all counsel of record by CM/ECF.

Dated:  April 21, 2015

*/s/ John A. Marlott*

JOHN A. MARLOTT
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

*Counsel for Appellant,*
*SAS Institute, Inc.*

## CERTIFICATION OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,538 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface using Microsoft Office 2007 in Times New Roman 14 point.

Dated:  April 21, 2015

/s/ John A. Marlott
JOHN A. MARLOTT
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
jamarlott@jonesday.com

GREGORY A. CASTANIAS
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
gcastanias@jonesday.com

DAVID B. COCHRAN
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dcochran@jonesday.com

MATTHEW W. JOHNSON
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone:  (412) 391-3939
Facsimile:  (412) 394-7959
mwjohnson@jonesday.com

*Counsel for Appellant,*
*SAS Institute, Inc.*