**2015-1346, -1347**

In The

# United States Court of Appeals

### For The Federal Circuit

# SAS INSTITUTE, INC.,

*Appellant*,

## v.

# COMPLEMENTSOFT, LLC.,

*Cross-Appellant.*

## APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NO. IPR2013-00226.

_____

## BRIEF OF CROSS-APPELLANT

_____

**Matthew V. Topic**
**LOEVY & LOEVY**
**312 North May Street, Suite 100**
**Chicago, Illinois  60607**
**(312) 243-5900**
**matt@loevy.com**

*Counsel for Cross-Appellant*

# CERTIFICATE OF INTEREST

1.    The full name of every party or amicus represented by me is: ComplementSoft, LLC.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: None.

3.    All parent corporations and publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are: None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are: ComplementSoft, LLC was represented before the PTAB and/or earlier in this appeal by the following attorneys, all of Schiff Hardin LLP at the relevant time: Brian Siff, George Yu, Laura Brutman, and James Hanft.

*/s/ Matthew V. Topic*
Matthew V. Topic
Loevy & Loevy
312 N. May Street, Suite 100
Chicago, IL 60607
(312) 243-5900

June 4, 2015

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........................................................................i

TABLE OF CONTENTS ............................................................................... ii

TABLE OF AUTHORITIES .........................................................................v

TABLE OF ABBREVIATIONS .....................................................................x

STATEMENT OF RELATED CASES ..........................................................xi

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES.....................................................................2

STATEMENT OF THE CASE.........................................................................3

    I.      INTRODUCTION.................................................................3

    II.    THE '936 PATENT AND PROSECUTION HISTORY.....................5

    III.   THE PRIOR ART AT ISSUE............................................12

    IV.   THE IPR PROCEEDINGS ..................................................13

SUMMARY OF THE ARGUMENT ....................................................16

ARGUMENT .................................................................................17

    I.      LEGAL STANDARDS.........................................................17

          A.    Standard of Appellate Review ...................................17

          B.    Claim Construction ...................................................17

II.    THE BOARD ERRED IN CONSTRUING "DATA MANIPULATION LANGUAGE" AND "WITHIN THE RETRIEVED SOURCE CODE" .......................................................21

    A.    The Board Improperly Construed "Data Manipulation Language" To Include Languages That Access Data Only Indirectly Through Code Written In Entirely Different Languages ....................................................................22

    B.    The Board Erred In Construing "Graphical Representations Of Flows Within The Retrieved Source Code" To Apply To Representations Of Code That Does Not Manipulate Data................................................27

III.    THE BOARD CORRECTLY CONSTRUED "DATA FLOWS" AND PETITIONER'S ATTEMPTED NEW CONSTRUCTION SHOULD BE REJECTED .................................32

    A.    The Board's Construction Of "Data Flows" Was Proper.........33

    B.    Petitioner May Not Introduce Its New Construction On Appeal .....................................................................39

    C.    Petitioner Waived Any Argument Under The Institution Decision Construction............................................41

    D.    Petitioner's New Construction And Application Of That Construction Are Wrong On The Merits ..................................42

IV.    THE BOARD AND PARTIES ARE NOT REQUIRED TO WASTE RESOURCES LITIGATING CLAIMS TO A FINAL WRITTEN DECISION THAT ARE CLEARLY PATENTABLE ..................................................................44

    A.    The Board Is Not Required To Issue A Final Written Decision For Claims On Which The Petitioner Has No Reasonable Likelihood Of Prevailing.......................................44

        1.    Petitioner Misinterprets The Statute ...............................44

2.    Petitioner's Policy Arguments Are Unjustified..............47

3.    The IPR Process Does Not Allow Petitioner A "Do-Over"...................................................................48

B.    Petitioner's Purported Footnote Mandamus Petition Should Be Rejected...................................................49

C.    The Board Did Not Manipulate Claim Construction To Hide Any Alleged Errors .........................................49

CONCLUSION ..................................................................51

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*,
   346 F.3d 1075 (Fed. Cir. 2003) ..................................................21

*Alloc, Inc. v. Int'l Trade Comm'n*,
   342 F.3d 1361 (Fed. Cir. 2003) ..................................................19

*Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*,
   651 F.3d 1318 (Fed. Cir. 2011) ..................................................20

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001) ............................................. 31-32

*Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v.*
*Mutual Pharm. Co., Inc.*,
   384 F.3d 1333 (Fed. Cir. 2004) ...........................................19, 35

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ..................................................................46

*Day Int'l, Inc. v. Reeves Bros., Inc.*,
   260 F.3d 1343 (Fed. Cir. 2001) ..................................................19

*Decisioning.com, Inc. v. Federated Dept. Stores, Inc.*,
   527 F.3d 1300 (Fed. Cir. 2008) ..................................................20

*Desper Prod., Inc. v. QSound Labs, Inc.*,
   157 F.3d 1325 (Fed. Cir. 1998) ..................................................20

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
   672 F.3d 1270 (Fed. Cir. 2012) ..................................................40

*Durel Corp. v. Osram Sylvania Inc.*,
   256 F.3d 1298 (Fed. Cir. 2001) ...........................................20, 24

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999) ......................................................20

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..................................................................45

*Finnigan Corp. v. Int'l Trade Comm'n*,
    180 F.3d 1354 (Fed. Cir. 1999) ..................................................40

*I.T.S. Rubber Co. v. Essex Rubber Co.*,
    272 U.S. 429 (1926)..................................................................21

*In re Abbott Diabetes Care Inc.*,
    696 F.3d 1142 (Fed. Cir. 2012) ............................................18, 19

*In re Am. Acad. of Sci. Tech Ctr.*,
    367 F.3d 1359 (Fed. Cir. 2004) ..................................................19

*In re Cortright*,
    165 F.3d 1353 (Fed. Cir. 1999) ..................................................23

*In re Cuozzo Speed Tech., LLC*,
    778 F.3d 1271 (Fed. Cir. 2015), *pet. for reh'g filed*,
    No. 2014-1301 (Mar. 23, 2015).............................................17, 45

*In re Giuffrida*,
    527 F. App'x 981 (Fed. Cir. 2013) .............................................18

*In re Sneed*,
    710 F.2d 1544 (Fed. Cir. 1983) ..................................................28

*In re Suitco Surface, Inc.*,
    603 F.3d 1255 (Fed. Cir. 2010) ............................................18, 19

*Johns Hopkins Univ. v. CellPro, Inc.*,
    152 F.3d 1342 (Fed. Cir. 1998) ..................................................20

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009) ..................................................23

*Lazare Kaplan Int'l, Inc. v. Photoscribe Tech., Inc.*,
    628 F.3d 1359 (Fed. Cir. 2010) ....................................................40

*MBO Lab., Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007) ...........................................18, 31

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) ....................................................40

*Netcraft Corp. v. eBay, Inc.*,
    549 F.3d 1394 (Fed. Cir. 2008) ............................................20, 24

*Norian Corp. v. Stryker Corp.*,
    432 F.3d 1356 (Fed. Cir. 2005) ....................................................25

*Nystrom v. TREX Co., Inc.*,
    424 F.3d 1136 (Fed. Cir. 2005), *cert. denied*,
    547 U.S. 1055 (2006) ...........................................................19, 23

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ....................................21, 25, 31

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006), *cert. denied*,
    127 S. Ct. 683 (2006)...................................................21, 30, 34

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*,
    546 U.S. 1170 (2006) ...................................................................23

*Phonometrics, Inc. v. N. Telecom Inc.*,
    133 F.3d 1459 (Fed. Cir. 1998) ............................................21, 30

*Reckitt Benckiser, Inc. v. Tris Pharma, Inc.*,
    No. CIV.A. 09-3125 FLW,
    2010 WL 4748648 (D.N.J. Nov. 16, 2010) ...................................32

*St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.*,
    749 F.3d 1373 (Fed. Cir. 2014) ....................................................45

*Tempo Lighting, Inc. v. Tivoli, LLC*,
  742 F.3d 973 (Fed. Cir. 2014) ...................................................................18, 20

## STATUTES

5 U.S.C. § 704 ...................................................................................................1

28 U.S.C. § 1295(a)(4)(A) ...............................................................................1

35 U.S.C. § 102(b) ...........................................................................................8

35 U.S.C. § 103 ................................................................................................8

35 U.S.C. § 141(c) ............................................................................................1

35 U.S.C. § 142 ................................................................................................1

35 U.S.C. § 314(a) ..........................................................................................45

35 U.S.C. § 314(d) ..........................................................................................45

35 U.S.C. § 316(a)(2) ......................................................................................46

35 U.S.C. § 316(a)(4) ......................................................................................46

35 U.S.C. § 318(a) ..........................................................................................46

35 U.S.C. § 319 ................................................................................................1

## RULES

Fed. Cir. R. 21 ................................................................................................49

Fed. Cir. R. 21(a)(5) .......................................................................................49

## REGULATIONS

37 C.F.R. § 42.108(a).......................................................................................46

37 C.F.R. § 90.3 ...............................................................................................1

## OTHER AUTHORITIES

Changes to Implement Inter Partes Review Proceedings,
77 Fed. Reg. 48,680 (Aug. 14, 2012) ......................................................................46

Hearing Before the Subcommittee on Courts, Intellectual Property,
and the Internet of the Committee on the Judiciary,
113th Cong. 13 (March 14, 2013)...........................................................................48

## TABLE OF ABBREVIATIONS

Patent Owner adopts the abbreviations set forth in Petitioner's principal brief.  Patent Owner also refers to "data manipulation language(s)" as "DML" in some instances.

## STATEMENT OF RELATED CASES

Patent Owner agrees with the Statement of Related Cases set forth in Petitioner's principal brief.  Patent Owner adds that the resolution of the following case may directly affect, or be directly affected by, the Court's decision with regard to whether the broadest reasonable construction in light of the specification standard applies to IPR proceedings:  *In re Cuozzo Speed Technologies,* No. 2014-1301 (Fed. Cir.).

## JURISDICTIONAL STATEMENT

Patent Owner appeals from the Board's Final Written Decision in IPR2013-00226 entered on August 6, 2014.  35 U.S.C. §§ 141(c) and 319; *see also* 5 U.S.C. § 704.  Patent Owner appealed within the time set by statute and rule.  35 U.S.C. § 142; 37 C.F.R. § 90.3.  This Court has exclusive jurisdiction over an appeal from a Board decision in an IPR.  28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1)    Whether the Board erred in its construction and application of "data manipulation language" by relying on dictionary definitions and expert testimony over the clear intrinsic record, including a disclaimer in the original prosecution in which the inventors added the limitation for the specific purpose of disclaiming the same reference that was relied upon by the Board in the IPR for that limitation.

2)    Whether the Board erred by construing the term "graphical representations of flows within the retrieved source code," which code must be programmed using a "data manipulation language," in a manner that is internally inconsistent throughout the multiple limitations in which the "data manipulation language" appears and so broadly as to include representations of flows of code that does not manipulate data.

3)    Whether Petitioner is permitted to argue for a new construction of "data flows" on appeal, where Petitioner did not seek that construction before the Board, where Petitioner's proposed new construction lacks support, and where the Board's construction is consistent with the intrinsic record.

4)    Whether the Board is required to issue a final written decision for claims for which it has already found there is no reasonable likelihood that the claims will be invalidated.

## STATEMENT OF THE CASE

## I.    INTRODUCTION

Under this Court's longstanding precedent, two important principles must guide every claim construction: the intrinsic record is paramount and limitations must be read in context.  The Board violated the first principle by construing "data manipulation language" based on dictionary definitions and expert testimony, ignoring the consistent use of the term in the specification as limited to a class of languages that allow direct access to data in a database and ignoring the fact that the inventors specifically disclaimed the claim scope resurrected by the Board's construction when the inventors added that claim term in prosecution.  In fact, that disclaimer was made in response to a non-final rejection based on the same passages of the same Coad reference relied on by the Board to meet that very limitation in the IPR.  The Board violated the second principle by construing the phrase graphical representations of flows "within the retrieved source code" to apply to representations of flows of entirely different code than the code the Board cited as having been written in a data manipulation language in the first place.  In doing so, the Board ignored that "**the** retrieved source code" refers back to source code that must be "programmed using one of a plurality of types of data manipulation languages."  Therefore, the Court should reverse the Board as to Claims 1, 3, and 5-10.

3

Equally fundamental to claim construction is that even though this Court reviews claim construction decisions *de novo*, a party may not raise new constructions for the first time on appeal. Yet Petitioner attempts to do exactly that with regard to the term "data flows," and does not even attempt to show how it would prevail under the Board's construction or the construction for which Petitioner argued before the Board. Even if considered on the merits, however, Petitioner's new construction is unfounded and the Board's construction, which relied on the "summary of the invention" section of the specification and the clear distinction between "program flows" and "data flows" throughout the patent, was proper. Therefore, the Court should affirm the Board as to Claim 4.

With regard to partial IPR institution, the Board was not required to issue a final written decision on claims for which Petitioner could not even show a reasonable likelihood of success in its Petition. There is no such requirement in the statute and the Board's rules on partial institution are reasonable and well within its authority.

Finally, Petitioner argues that the '936 Patent is a "questionable patent" that it claims the AIA was passed to invalidate and that it claims to have been improperly "wielded" against Petitioner in litigation. Petitioner's hyperbole has no place in these proceedings, and in fact, Petitioner is a former software licensee of Patent Owner who acknowledged Patent Owner's software to be a valuable

extension of Petitioner's own software platform before Petitioner created its own competing and infringing software product without a patent license and with full knowledge of Patent Owner's rights.

## II.    THE '936 PATENT AND PROSECUTION HISTORY

The '936 Patent addresses a problem in existence as of its February 23, 2001 priority date: the lack of an "integrated development environment for generating and maintaining software code, in particular, for data manipulation centric languages."  A493 (col. 1:64-66).  The Patent describes this problem "more specifically" as a need for "a system and method for exchanging, editing, debugging, visualizing and developing SAS®, SPSS®, SQL®, DB2 UDB®, Oracle® RDBMS and other relational database management system software." A493 (col. 1:64-2:3).  As the inventors explained in the specification, "[t]he evolution of data manipulation and data management systems, such as SAS®, SPSS® and SQL®, and relational database management systems, such as IBM® DB2 UDB® and the Oracle® RDBMS, has resulted in several high-level software languages that are inconsistent and, in some cases, unstructured," which caused difficulties in sharing source code among users.  A493 (col. 1:20-30).  The inventors noted that this problem was "particularly the case with SAS [the Petitioner]."  A493 (col. 1:30-31).  The "present invention" was developed "in accordance with these needs."  A493 (col. 2:7-12).

All of the claims of the '936 Patent require particular modules as part of an integrated development environment: a document manager, an editor, a parser layer, and a visualizer.  A501 (col. 18:19-43).  Claim 1, the only independent claim, recites:

> An integrated development environment, comprising:
>
> a document manager for retrieving source code programmed using one of a plurality of types of data manipulation languages;
>
> an editor for displaying the retrieved source code and providing a means for a user to edit the retrieved source code;
>
> a parser layer which detects the one of the plurality of types of data manipulation languages in which the retrieved source code is programmed and which activates rules and logic applicable to the detected one of the plurality of types of data manipulation languages; and
>
> a visualizer dynamically linked to the editor for displaying graphical representations of flows within the retrieved source code using the rules and logic applicable to the detected one of the plurality of types of data manipulation languages and activated by the parser,
>
> wherein the editor, parser layer and visualizer cooperate such that edits made to the source code using the editor are automatically reflected in the graphical representations of flows displayed by the visualizer and edits made to the graphical representations of flows in the visualizer are automatically reflected in the source code displayed by the editor.

A501 (col. 18:19-43).

The specific details of the functions of most of these modules are not relevant to this appeal, but key to the claim construction issues before the Court is

the requirement in the claims that the modules all perform functions on "the retrieved source code." A501 (col. 18:19-43). The document manager limitation, which is the first of the modules to appear in the claims, makes clear that "the retrieved source code," as used throughout the various modules, must be "programmed using one of a plurality of types of data manipulation languages." A501 (col. 18:20-22).

The development environment "may accommodate varying language types," including SAS and SQL, as well as "SPSS®, DB2 UDB® Store Procedures, ORACLE® PL/SQL, etc.," all of which are "data manipulation centric language." A493 (col. 1:64-66); A497 (col. 9:45-53). "For parsing the code, the document manager 60 first determines the file type for a selected file, *i.e.*, the SAS®, SPSS®, SQL®, DB2 UDB®, Oracle® RDBMS, etc." A501 (col. 17:17-19). When discussing the editing features of the invention, the inventors referred to "code or code templates, *i.e.*, SAS®, SQL®, SPSS®, DB2 UDB®, Oracle® RDBMS and UNIX® Scripts." A500 (col. 16:34-39). More globally, the specification states that "although the preferred embodiment of the present invention is designed to interact with SAS® code, it should also be appreciated that the system will also be capable of parsing and interpreting other file types, such as, SPSS®, SQL®, DB2 UDB®, Oracle® RDBMS, etc." A501 (col. 17:40-45).

Object-oriented languages are fundamentally different from data manipulation languages. A929 ("During prosecution, the Patent Owner attempted to distinguish the prior art, which was applicable to object-oriented languages, with the pending claims, which were directed to data manipulation languages."); A1872-1873 (object-oriented languages rely on "a collection of interacting objects, as opposed to the conventional model, in which a program is seen as a list of tasks"); A2161-2162, 2224, 2226, 2236 (Petitioner's expert unable to answer questions regarding Java based on lack of experience programming in Java despite his experience programming in SQL). Nowhere in the '936 Patent specification is any mention made of applying the invention to object-oriented source code, nor is any object-oriented language discussed or provided in the inventors' exemplifications of "data manipulation language"; rather, the inventors consistently referred to data manipulation centric languages such as SQL, SAS, and others when referencing data manipulation languages.

The claims, as originally submitted, did not include the phrase "programmed using one of a plurality of types of data manipulation languages." A511-512. In a non-final rejection of the original claims, the examiner cited the Coad reference relied upon extensively by the Board in these proceedings and rejected the claims under both 35 U.S.C. §§ 102(b) and 103 (in view of Burkwald). A505-509. In response to that rejection, the inventors added the limitation "programmed using

8

one of a plurality of types of data manipulation languages" to describe the "source code" and "retrieved source code."  A511-512.

In their remarks, the inventors stated that "Coad discloses a software development tool for use with object-oriented programming languages, such as Java or C++." A519.  Continuing, they explained that "rather than disclose the claimed system and method for examining software written using one of plural data manipulation language, *i.e.*, a language which suffers the problem of being unstructured (see Background section of subject application), the system and method described in Coad is limited to software written using an object oriented language, *i.e.*, a structured programming language such as Java or C++." A520.  In response to the amendment and remarks, the claims were allowed, with the examiner noting that Coad does not disclose "the specific arrangement of elements including a document manager, editor, parser layer, or visualizer as noted above, or **that the detected language is a data manipulation language**."  A528 (emphasis added).

The other aspect of the '936 Patent material to this appeal is the phrase "graphical representation of data flows" displayed by the visualizer, as found in Claim 4.  Throughout the patent, the inventors distinguished between "data flows" and "program flows."  The Abstract explains that the "visualizer is capable of displaying a program flow diagram and a data flow diagram, which are comprised

of program flow icons and data flow arrows to depict the code in terms of processing blocks and data blocks." A449. The Summary of the Invention described the graphical representations of both data flows and program flows by the visualizer:

> A visualizer, *i.e.*, a software tool that reads the code and generates diagrams and graphical representation of the program flow, data flow or the logic of the code, is also integrated and included as part of the Integrated Development Environment. Program flow diagrams are comprised of program block icons and arrows to depict the code's program flow. Data flow diagrams are comprised of icons depicting data processing steps and arrows to depict the flow of the data through the program.

A493 (col. 2:33-42). The summary further identifies, as one of the unique functions of the invention, "automatically generating program flow and data flow diagrams, where the program flow and data flow diagrams can be viewed at various levels of abstraction." A494 (col. 3:3-5). Figure 9 is "an exemplary screen shot depicting a program flow for a selected file, along with arrows that indicate the flow of data within the program flow." A494 (col. 3:49-51). Figure 17 shows "an exemplary screen shot depicting a data flow for a selected file," and Figures 18a-c show "a series of exemplary screen shots depicting operation of a step-wise function and various data flows as the data flows are being collapsed." A494 (col. 4:12-16). The Detailed Description explains that "for viewing the program flow and data flow of a selected program . . . the visualizer 120, in connection with a parser layer 140, reads, parses and displays the code for the selected program,

10

representing each program and data block with a program flow icon 126. As illustrated in FIG. 9, arrows connect these program flow icons 126 to generally illustrate the flow of data." A496 (col. 8:8-14).

The specification explains that Figures 9 and 17 alternately demonstrate a visualizer showing "the program flow 122 or the data flow 124 of the selected code on the visualizer window" and also explains that "the user will be able to toggle between the program flow display 122a and the data flow display 124a." A500 (col. 15:50-56); *see also* A500 (col. 16:51-59 (flow panel displaying "either the program flow 122 or the data flow 124")). Program flow icons can be generated by the document view engine, which "can intelligently recognize and arrange individual procedures and data blocks on the visualizer window 121 and represent the procedures and data blocks as program flow icons 126." A500 (col. 15:60-66). The specification provides that it is Figure 17 that illustrates that "the visualizer 120 may also show the data flow 124 of the subject code," which is generated "by parsing the code, tracing the flow of the data through the code and displaying individual processes and data blocks in separate columns with arrows that connect the program flow icons 126 and indicate the direction of the data flow." A500 (col. 16:6-12). Thus, the specification consistently distinguishes between program flows and data flows.

### III.   THE PRIOR ART AT ISSUE

The primary reference at issue in this appeal is U.S. Patent No. 6,851,107 ("Coad").  A549-582. It is the same reference upon which the PTO rejected the original claims of the '936 Patent and in response to which the inventors amended the claims to add the "data manipulation language" limitations as disclaimer to overcome the examiner's non-final rejection.  It is the primary reference for the various obviousness combinations, is part of every obviousness combination, and was relied on by the Board with regard to each of the claim limitations at issue in this appeal.

Coad teaches a software development tool used to view and modify object-oriented software code.  A176-177 (Institution Decision describing Coad as relying on "a graphical representation or model using object oriented design"); A570 (col. 1:52-55 ("UML formalizes the notion that real-world objects are best modeled as self-contained entities")); A572 (col. 5:13-20 ("The data processing system is discussed in detail below.  As is well known in object-oriented programming, the class 306 is a category of objects[.]")); A577 (col. 16:1-10 (describing Java and C++)).  These object-oriented languages can only access or manipulate data in a database by embedding code written in other languages like SQL into the object-oriented code using techniques disclosed in sources like Oracle Primers, and Coad does not teach how to modify or view such embedded code that is actually

manipulating data. A21 ("We agree with Petitioner that when used with an embedded SQL or JDBC API, Java and C++ can be used to access data in a database and therefore qualify as data manipulation languages as we have construed that term"); A22 ("We also reject Patent Owner's assertion that the graphical representation must show flow within source code steps that are actually performing data manipulation.").

The Board also relied on U.S. Patent No. 5,572,650 ("Antis"). Antis teaches "a method and apparatus for visually displaying structural characteristics of a large database for visualizing areas where new developments may be added, or finding places where old developments may need to be restructured or replaced." A23; A530 (Abstract). Antis "describes a tool to display the characteristics of a database" so that "data structures can be readily observed." A23. Antis does not teach graphical representations of flows, nor the ability to edit code. A25; A182.

## IV.    THE IPR PROCEEDINGS

In its Petition for IPR, Petitioner attacked every claim of the '936 Patent on multiple grounds, including both anticipation and obviousness based on multiple combinations. A55-56. With the exception of an anticipation argument that was ultimately rejected, all of Petitioner's arguments were based in whole or in part on the same Coad reference that was cited against the original claims and that the inventors overcame by amending the claims. In the Institution Decision, the Board

rejected several of Petitioner's arguments based on facial inadequacies, rejected all anticipation arguments, declined to institute on Claims 2 and 11-16, and instituted IPR on the remaining claims.  A177-187.  Rather than request rehearing on the partial institution decision, Petitioner filed a second IPR against the '936 Patent that was rejected, followed by a request for rehearing of that decision, which was also rejected.  A384-385.

Following trial, the Board issued a Final Written Decision concluding that Claims 1, 3, and 5-10 were obvious over combinations all based on Coad and concluding that Petitioner had failed to show that Claim 4 was unpatentable.  A41. The Board construed "data manipulation language" to mean "a programming language used to access data in a database, such as to retrieve, insert, delete, or modify data in the database," and rejected Patent Owner's argument that a DML must do these things directly, as opposed to doing them through embedded code written in an entirely different language.  A7; A9-12.  The Board construed graphical representation of flows "within the retrieved source code" as "a diagram that depicts a map of the progression (or path) through the source code," where the source code was "created with a data manipulation language," but rejected Patent Owner's argument that this required the flows to show source code steps that are actually performing data manipulation.  A12-15.

The Board concluded that Coad, combined with Oracle Primers, disclosed a "data manipulation language," and that Coad alone disclosed "graphical representation of flows within the retrieved source code," where the code is programmed in a DML. A20-22. The Board also concluded that Antis disclosed a "data manipulation language" but that Coad alone disclosed "graphical representation of flows within the retrieved source code" where the code is programmed in a DML. A24-25.

With regard to Claim 4, the Board construed "data flows" as "a graphical representation comprised of icons depicting data processing steps and arrows to depict the movement of data through source code" based on the summary of the invention in the specification. A18-19. The Board found that the prior art did not teach such data flows. A28-31. Petitioner requested rehearing on the "data flows" limitation, which the Board rejected in a detailed discussion on the merits, and the Board clarified that its construction could be modified, without affecting the Board's decision, to remove redundant "graphical representation" language to avoid the broader construction "graphical representation of graphical representations." A46-48.

## SUMMARY OF THE ARGUMENT

The Board's decision as to Claims 1, 3, and 5-10 should be reversed because the Board improperly construed "data manipulation language" and graphical representation of flows "within the retrieved source code." While these arguments are related, the Board should be reversed if the Court rejects the Board's construction of either limitation.

The Board's decision as to Claim 4 should be upheld. The Board properly construed "data flows," and even if it did not, Petitioner may not argue for an entirely new construction on appeal. Petitioner does not argue it should prevail under either the Board's actual construction or the construction for which Petitioner advocated before the Board.

The Board was not required to issue a Final Written Decision on claims for which it found no reasonable likelihood of invalidation based on the Petition, and so the Board's non-institution of the remaining claims should be upheld.

# ARGUMENT

## I.     LEGAL STANDARDS

### A.     Standard of Appellate Review

The Board's conclusions regarding the intrinsic evidence and ultimate claim construction decisions, and the Board's ultimate determination of obviousness, are reviewed by this Court *de novo*; the Board's factual determinations regarding extrinsic evidence and its factual findings with regard to obviousness are reviewed for substantial evidence. *In re Cuozzo Speed Tech.*, *LLC*, 778 F.3d 1271, 1282-83 (Fed. Cir. 2015), *pet. for reh'g filed*.

### B.     Claim Construction

This Court has recently ruled that the "broadest reasonable construction in light of the specification" standard applies to the Board's construction during *inter partes* review. *In re Cuozzo*, 778 F.3d at 1282.    The broadest reasonable construction standard is inappropriate in IPR proceedings.  *See* Appellant Petition for En Banc Rehearing, *In re Cuozzo Speed Tech.*, *LLC*, No. 2014-1301 (March 23, 2015).   Unlike a re-examination or initial prosecution, the IPR process does not allow the same unfettered right to amend claims.  *In re Cuozzo*, 778 F.3d at 1287 (Newman, J., dissenting).   Instead, an IPR is an adversarial process, complete with discovery and a trial, intended to be a substitute for district court validity litigation, and thus should be subject to the same claim construction standards.  *Id.* at 1288.

Even the Board conceded, in response to Patent Owner's contingent motion to amend, that "there is no examination of the proposed claims." A33. Patent Owner contends that it should prevail under either the district court standard or the broadest reasonable construction standard, but to the extent the Court's decision turns on which standard applies, Patent Owner contends that the broadest reasonable construction standard is inappropriate.

Under either standard, the "most relevant source in construing a claim term is the patent's specification, which is the single best guide to the meaning of a disputed term," followed by the prosecution history. *MBO Lab.*, *Inc. v. Becton*, *Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007); *see also Tempo Lighting*, *Inc. v. Tivoli*, *LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014); *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012); *In re Suitco Surface*, *Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). Dictionaries, expert testimony, and other subordinate extrinsic sources "may be helpful" but are "less significant than the intrinsic record in determining the legally operative meaning of claim language." *MBO Lab.*, 474 F.3d at 1329; *see also In re Giuffrida*, 527 F. App'x 981, 986 (Fed. Cir. 2013) ("We note, however, that the Board drew its construction from a dictionary, whereas the PTO's traditional pre-issuance approach has been to give claims their broadest reasonable construction in light of the specification as it would be interpreted by one of ordinary skill in the art." (internal quotation omitted)).

Claim terms are not subject to a "claim construction divorced from the context of the written description and prosecution history," and "in the absence of something in the written description and/or prosecution history to provide explicit or implicit notice . . . that the inventor intended a disputed term to cover more than the ordinary and customary meaning **revealed by the context of the intrinsic record**, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source." *Nystrom v. TREX Co.*, *Inc*., 424 F.3d 1136, 1145 (Fed. Cir. 2005) (emphasis added), *cert. denied*, 547 U.S. 1055 (2006); *see also In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004) (quoting *Alloc*, *Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003)); *In re Suitco Surface*, 603 F.3d at 1259. When the specification or prosecution history, through explicit definitional language "or otherwise," has limited the scope of the claims, those limitations, not dictionary definitions or general usage, control the claim construction analysis. *Day Int'l*, *Inc. v. Reeves Bros.*, *Inc*., 260 F.3d 1343, 1348 (Fed. Cir. 2001); *see also In re Abbott Diabetes Care*, 696 F.3d at 1150; *Alloc*, *Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The law does not require "rigid formalism" in applying lexicography. *Astrazeneca AB*, *Aktiebolaget Hassle*, *KBI-E, Inc. v. Mutual Pharm. Co.*, *Inc*., 384 F.3d 1333, 1336-42 (Fed. Cir. 2004) (inventors need not say "I define to mean" but

may define terms "by implication"). This includes limitation in the specification to a particular class of examples and characteristics even absent express limitation language. *Durel Corp. v. Osram Sylvania Inc*., 256 F.3d 1298, 1304 (Fed. Cir. 2001) ("if the inventor had intended to equate metal oxides with metal hydroxides, he could have so stated and avoided exclusively exemplifying metal oxides as binary compounds").[1]

Claim scope is also limited by the prosecution history, including arguments and amendments made during prosecution. *Tempo Lighting*, 742 F.3d at 977; *Elkay Mfg. Co. v. Ebco Mfg. Co*., 192 F.3d 973, 979 (Fed. Cir. 1999); *Desper Prod*., *Inc. v. QSound Labs*, *Inc*., 157 F.3d 1325, 1337 (Fed. Cir. 1998). "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent,

---

[1] *See also Am. Calcar*, *Inc. v. Am. Honda Motor Co.*, *Inc*., 651 F.3d 1318, 1337 (Fed. Cir. 2011) ("Given the manner in which the specification emphasizes the similarity of a car-mail message to a typical e-mail message, it is essential that a car-mail message have an address that includes an identifier unique to the vehicle. Thus, we conclude that the district court was correct in its construction of the two terms at issue."); *Netcraft Corp. v. eBay*, *Inc*., 549 F.3d 1394, 1398-99 (Fed. Cir. 2008) ("providing a communications link through equipment of a third party" construed to require that a third party provide internet access for the customer, based on the consistent description in the specification that the present invention related to internet access and failure in specification to describe any other alternatives for a customer communications link); *Decisioning.com*, *Inc. v. Federated Dept. Stores*, *Inc*., 527 F.3d 1300, 1308-11 (Fed. Cir. 2008) (construing "remote interface" to exclude personal computers based on specification's use of "kiosk" and absence of reference to a personal computer); *Johns Hopkins Univ. v. CellPro*, *Inc*., 152 F.3d 1342, 1355 (Fed. Cir. 1998) (example of chemical composition contained in specification of the only disclosed embodiment of the invention was "highly indicative of the scope of the claims").

the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g*, *Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003); *see also I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 444-45 (1926); *ACCO Brands*, *Inc. v. Micro Sec. Devices*, *Inc.*, 346 F.3d 1075, 1078 (Fed. Cir. 2003).

Finally, it is improper to construe individual terms in derogation of the overall context in which they are used. *On Demand Mach. Corp. v. Ingram Indus.*, *Inc.*, 442 F.3d 1331, 1344 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 683 (U.S. 2006). Similarly, "[a] word or phrase used consistently throughout a claim should be interpreted consistently." *Phonometrics*, *Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1464 (Fed. Cir. 1998).

## II. THE BOARD ERRED IN CONSTRUING "DATA MANIPULATION LANGUAGE" AND "WITHIN THE RETRIEVED SOURCE CODE"

The Board's constructions of "data manipulation language" and "within the retrieved source code" share a common error: the Board relied entirely on dictionary definitions and expert testimony, ignored the primacy that must be placed on the specification and prosecution history (including a clear disclaimer that conflicts with the Board's construction), and failed to construe the claims as a whole. In doing so, the Board construed the claims to include within their scope the very prior art reference and object-oriented code that the inventors amended the claims specifically to disclaim, and ignored the consistent references in the

21

specification to data manipulation centric languages and the absence of any references to the fundamentally different category of object-oriented code. Compounding its error, the Board then failed to apply its own construction consistently throughout the claims.

### A.    The Board Improperly Construed "Data Manipulation Language" To Include Languages That Access Data Only Indirectly Through Code Written In Entirely Different Languages

The Board construed "data manipulation language" as "a programming language used to access data in a database, such as to retrieve, insert, delete, or modify data in the database." A7. The Board acknowledged that object-oriented languages only indirectly access data in databases and only "when used with an embedded SQL or JDBC API." A21. The Board rejected Patent Owner's argument, however, that a DML must "directly access" data in a database, as opposed to accessing data through other code. A12. The Board's construction failed to give primacy to the intrinsic record and should be reversed.

The Board's support for its construction was nearly exclusively based on extrinsic evidence—dictionaries, expert testimony, and the Oracle8 Primer prior art reference. A7; A9-12. The Board's sole consideration of the intrinsic record was to reason that the specification identifies SQL and Oracle RDBMS "as examples of language to which the invention is targeted" and that "the '936 patent does not specify that these languages would be excluded if the database access functionality

22

is indirect," in essence requiring Patent Owner to disprove a construction that has

no basis in the intrinsic record or otherwise.[2]  A11-12.

As this Court has repeatedly held, the specification and prosecution history,

not dictionary definitions or expert testimony, are the primary sources for

construing claim limitations.  *E.g. Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1145

(Fed. Cir. 2005).   The Board's reliance on Oracle8 Primer was still further

improper because the Board failed to identify any use of the term "data

manipulation language" in the reference and so it is irrelevant to claim construction

of that term.  A10-11; *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999) (prior

art is potentially relevant to claim construction when it uses the same term being

construed).  The Board's reasoning that the specification did not rule out that SQL

---

[2] The Board incorrectly stated that "all of Patent Owner's evidence" on this point "hinges on the testimony" of  Patent Owner's expert, which the Board refused to credit because  it claimed the expert "simply asserts this to be the case, without providing credible support."  A11.   In fact, Patent Owner provided substantial intrinsic evidence on this point and the specification and prosecution history were before the Board.  A172, A217-219, A1871.  Further, the Board did not dispute that Patent Owner's expert was qualified to provide an opinion on these issues, and he explained that his opinions were based on his years of experience in the relevant industry.  A1866.  And in any event, expert testimony, including the testimony of **Petitioner's** expert on which the Board relied, "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."  *E.g. Phillips v. AWH Corp.*, 415 F.3d 1303, 1318-19 (Fed. Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1170 (2006); *see also Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("It is not uncommon in patent cases to have . . . dueling experts. When construing claims, however, the intrinsic evidence and particularly the claim language are the primary resources.").

or Oracle RDBMS may allow for indirect access to data cited no evidence that that they actually do or anything in the specification supporting such an interpretation, nor any basis to conclude that "data manipulation language" within the context of the '936 Patent includes object-oriented code embedded with data manipulation code written in other languages. The Board simply ignored that the inventors consistently and repeatedly described data manipulation languages using a list of languages such as SQL, not any object-oriented languages, with or without embedded SQL or other code. *See*, *e.g.*, *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1398-99 (Fed. Cir. 2008) ("providing a communications link through equipment of a third party" construed to require that a third party provide internet access for the customer, based on the consistent description in the specification that the present invention related to internet access and failure in specification to describe any other alternatives for a customer communications link); *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1304 (Fed. Cir. 2001) ("if the inventor had intended to equate metal oxides with metal hydroxides, he could have so stated and avoided exclusively exemplifying metal oxides as binary compounds").

The Board's construction suffers from a still greater error, however.  In response to the non-final rejection based on Coad, the inventors amended the claims to add the requirement that the code being operated on be programmed in a

data manipulation language: "[R]ather than disclose the claimed system and method for examining software written using one of plural data manipulation language, . . . the system and method described in Coad is limited to software written using an object oriented language." A520. This was a clear disclaimer of object-oriented code from the scope of the amended claims. *Omega Eng'g*, *Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

The Board's construction would eviscerate the doctrine of disclaimer and cannot be upheld. Whatever "data manipulation language" may mean in the abstract and however it may be defined in dictionaries, the inventors excluded from **their** claim scope modules operating on code programmed in object-oriented languages, including what was taught in Coad. *See Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1361-62 (Fed. Cir. 2005) ("[T]here is no principle of patent law that the scope of a surrender of subject matter during prosecution is limited to what is absolutely necessary to avoid a prior art reference that was the basis for an examiner's rejection. To the contrary, it frequently happens that patentees surrender more through amendment than may have been absolutely necessary to avoid particular prior art. In such cases, we have held the patentees to the scope of what they ultimately claim, and we have not allowed them to assert that claims should be interpreted as if they had surrendered only what they had to."); *see also* A415 ([Petitioner's counsel:] "I think this data manipulation is just really a label

25

that the patent uses to describe these different types of languages that are used to access data in the database.").

Finally, the Board found that Antis discloses a data manipulation language and invalidated Claims 1, 3, and 5-10 based on the combination of Coad and Antis. A24-28.    As the Board acknowledged, the dictionary definitions of "data manipulation language" on which the Board relied distinguished that term from "data definition language."   A24.   The Board nonetheless concluded that because both Antis and the '936 Patent discuss relational database management systems ("RDBMS") and because an RDBMS "typically" includes a data manipulation language, Antis must necessarily teach a DML.  A24-25.

To connect these dots, however, the Board relied on the testimony of Petitioner's expert, whom the Board conceded was "not familiar" with the language in which the code was written, and the Board failed even to discuss the testimony of Patent Owner's expert that Antis does not teach a data manipulation language but only a data definition language showing "the connections between relations among the various views" and not "any type of progression or path through the source code."  A25; *see* A1886-1889.  Nor did the Board consider the DML limitation in the context of any of the modules or actions involving any code programmed in DML, despite having found in the Institution Decision that Antis failed to disclose an editor acting on DML-programmed code.  Instead the Board

improperly treated "data manipulation language" as a stand-alone limitation completely out of the context in which it is used: as the language in which the code acted upon by the various modules must have been programmed. A18.

The Court should reverse the Board as to Claims 1, 3, and 5-10 based on its erroneous construction of "data manipulation language."

### B. The Board Erred In Construing "Graphical Representations Of Flows Within The Retrieved Source Code" To Apply To Representations Of Code That Does Not Manipulate Data

Even if "data manipulation language" is construed to include languages that only indirectly access or manipulate data using code written in other languages, the claims still require that the visualizer show "graphical representations of flows **within the retrieved source code**," which source code must have been programmed in a "data manipulation language."  The Board improperly construed this limitation so broadly as to apply to source code that does not actually access or manipulate any data, even indirectly, then relied on the very same passages of Coad that were cited in the non-final rejection in the original prosecution and led to the addition of "data manipulation languages" and the inventor's disclaimer of claim scope in the first place.  A14; A22.  The Board's construction ignores the clear intrinsic record and violates this Court's established claim construction precedents.

As an initial matter, the Board fundamentally misunderstood and misapplied its obligations under the PTO's "broadest reasonable construction" regulations. The Board is required to give claim terms the "broadest reasonable interpretation **consistent with the specification.**" *E.g. In re Sneed*, 710 F.2d 1544, 1548 (Fed. Cir. 1983) (emphasis added). The Board failed to apply this standard, instead rendering the broadest conceivable construction and requiring the Patent Owner to show that the specification specifically foreclosed that construction. A14-15 ("And Patent Owner does not point to persuasive language in the '936 patent or other evidence supporting an interpretation that excludes those portions of the source code from the graphical representation."). The Board cited no authority for this approach, and as discussed below, the intrinsic record clearly shows that the Board's overly broad construction is wrong.

Similarly, the Board improperly relied on one of Patent Owner's claim construction arguments with regard to DML to construe "within the retrieved source code" after rejecting that argument on the merits. The Board cited Patent Owner's argument that "[t]he Board's interpretation should be modified to either remove the term 'retrieve' or to qualify the use of the term retrieve by stating that the retrieval must be followed by some manipulation procedure" to reason that

code programmed in a DML can include the non-manipulation step of retrieving.[3] A15.  The Board ultimately concluded that steps of retrieving data **are** within the scope of the data manipulation language limitation, and therefore, they must also be within the scope of the limitation "within the retrieved source code" that must be programmed in a DML.  A9.  The Board cannot simultaneously reject and rely on the same argument.

Most importantly, though, the Board's construction is inconsistent with its own construction and application of "data manipulation language."  In construing and applying that limitation, the Board found that it was met by object-oriented code **with embedded SQL**.  A21 ("We agree with Petitioner that when used with an embedded SQL or JDBC API, Java and C++ can be used to access data in a database and therefore qualify as data manipulation languages as we have construed that term.").  In its construction of "within the retrieved source code," however, which the claims require to have been programmed using a data manipulation language, the Board concluded that merely visualizing **any** object-oriented code, including code **without** embedded SQL, met this limitation.  A22 ("We also reject Patent Owner's assertion that the graphical representation must show flow within source code steps that are actually performing data manipulation.").  The Board improperly failed to construe the same terms

---

[3] Patent Owner does not pursue this argument in this appeal.

consistently throughout the claims. *On Demand Mach. Corp. v. Ingram Industries, Inc.*, 442 F.3d 1331, 1344 (Fed. Cir. 2006) ("Although we agree with the district court that each term standing alone can be construed as having varying degrees of breadth, each term must be construed to implement the invention described in the specification. Care must be taken lest word-by-word definition, removed from the context of the invention, leads to an overall result that departs significantly from the patented invention."); *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1464 (Fed. Cir. 1998) ("A word or phrase used consistently throughout a claim should be interpreted consistently.").

The error of the Board's construction of "within the retrieved source code" is further apparent from its application of the construction to the prior art. To show this limitation, the Board relied solely on Coad **itself**. A22 (citing only Coad); A25 ("As explained above, we have found that Coad discloses graphical representations of flows, so it is irrelevant that Antis does not also show this particular limitation, given that the asserted ground is based on the combination of the two references.").[4]

---

[4] *See also* A20 ("Petitioner relies on Coad for every limitation except that Petitioner relies on the Oracle Primers for describing the use of SQL within Java and C++ and thus disclosing the data manipulation language limitation."); A178 (stating, in the Board's Institution Decision, that Coad does not anticipate any of the claims because it does not "either explicitly or inherently disclose[] the use of data manipulation languages" and that "Coad does not explicitly disclose that any of the programming languages referred to in the specification include data manipulation capabilities").

In fact, the Board relied on the **very passages** of Coad cited in the non-final rejection that led to the addition of the DML limitations in the first place.  A22 (citing figures 14 and 17 of Coad); A506 (citing Coad figures 11-17).  Thus, the Board's construction runs squarely afoul of the requirement that claims be construed in light of the prosecution history and any disclaimer or disavowal of prior art.  *E.g.*, *Omega Eng'g*, *Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).  The construction similarly ignored that the very purpose of the invention, as repeatedly explained in the specification, was to allow for more efficient handling of programming languages like SAS, SPSS, SQL, etc., not object-oriented code that does not even have embedded SQL, etc.  *MBO Lab.*, *Inc. v. Becton*, *Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007); A493 (col. 1:20-31, 1:41-48, 1:64-2:3); A500 (col. 16:6-30).

Finally, the Board's construction leads to a significant practical problem.  According to the Board's construction, the code whose flow is graphically represented need not actually contain any data access or manipulation code (or steps, as the Board called it), and includes object-oriented code in which there is no embedded SQL.  Under this reasoning, a development environment capable of visualizing the **exact same object-oriented code** would be within the scope of the claims if completely unrelated code in the program happened to have embedded SQL, yet outside the scope of the claims if it did not.  *See Amazon.com*, *Inc. v.*

*Barnesandnoble.com*, *Inc.*, 239 F.3d 1343, 1353 (Fed. Cir. 2001) ("We are not prepared to assign a meaning to a patent claim that depends on the state of mind of the accused infringer."); *Reckitt Benckiser*, *Inc. v. Tris Pharma*, *Inc.*, No. CIV.A. 09-3125 FLW, 2010 WL 4748648, at *7 (D.N.J. Nov. 16, 2010) ("To define a technical term based on the intention of the party using it, and not by the actual physical properties of the substance involved, raises more uncertainty than it eliminates.").  The Board's construction violated the principle that terms must be construed consistently throughout the claims as well as the primacy that must be placed on the intrinsic record and the inventor's clear disclaimer.

Because the Board's construction of "within the retrieved source code" was in error, and because it is undisputed that the prior art does not teach this limitation once construed such that "data manipulation language" is interpreted consistently throughout the claims, the patentability of all claims at issue should be affirmed.

## III.    THE BOARD CORRECTLY CONSTRUED "DATA FLOWS" AND PETITIONER'S ATTEMPTED NEW CONSTRUCTION SHOULD BE REJECTED

The Board properly construed the term "data flows" in light of the summary of the invention passage on point and consistent with the claims and totality of the specification.  A18-19.   In its brief, Petitioner complains that the Board "unfairly" construed "data flows" in the Final Written Decision in conflict with the preliminary construction used in the Institution Decision.   In reality, Petitioner's

arguments are an excuse to pursue a new and unsupported construction that Petitioner never raised below and cannot raise now. And because Petitioner offers no showing that it should have prevailed under the construction set forth in the Institution Decision—the only construction that would properly apply if the Board erred—it has waived the right to do so now. Even if considered, however, Petitioner's new construction is wrong on the merits. The Board's decision on Claim 4 should be affirmed.

### A.    The Board's Construction Of "Data Flows" Was Proper

In reliance on the summary of the invention and the totality of the specification and claims, the Board construed "data flows" or "graphical representations of data flows" as: "a graphical representation comprised of icons depicting data processing steps and arrows to depict the movement of data through source code." A18-19. The Board's construction was proper, and Petitioner's criticisms—leveled solely for the purpose of pursuing a new construction on appeal not raised below—are readily dismissed as unfounded and incorrect.

Throughout the '936 Patent, from the Abstract through the claims, the inventors separately discussed and distinguished graphical representations of "program flows" versus "data flows" being displayed by the visualizer. The inventors included separate dependent claims for the graphical representations of program flows and data flows by the visualizer. A501 (col. 18:44-53). The

specification similarly distinguishes between these two types of flows, as explained in detail above.  A449 (Abstract); A493 (col. 2:33-42); A494 (col. 3:3-5, 3:49-51, 4:12-16); A496 (col. 8:8-14); A500 (col. 15:50-66, 16:6-30, 16:51-59).

Claim terms also must be read in the context in which they are used.  *On Demand Mach. Corp. v. Ingram Industries*, *Inc*., 442 F.3d 1331, 1344 (Fed. Cir. 2006).  Thus, in construing the term "data flows," or "graphical representations of data flows," the full claim limitation must be considered: "a visualizer dynamically linked to the editor for displaying graphical representations of flows," which Claim 4 limits to graphical representations of data flows.  In construing this limitation, the Board was true to the principle that context matters and relied on the portion of the specification, from the summary of the invention, in which the inventors explained the visualizer displaying graphical representations of flows:

> A visualizer, *i.e.*, a software tool that reads the code and generates diagrams and graphical representations of the program flow, data flow or the logic of the code, is also integrated and included as part of the Integrated Development Environment.  Program flow diagrams are comprised of program block icons and arrows to depict the code's program flow.  Data flow diagrams are comprised of icons depicting data processing steps and arrows to depict the flow of the data through the program.

A493 (col. 2:33-42).

The specification throughout makes clear that the inventors used "data flows" and various terms indicating the visualization of those flows interchangeably, and so the Board properly considered the use of the term "data

flow diagrams." The inventors described Figure 17 as a screen shot "depicting a data flow." A494 (col. 4:12-13). They also state that the document view engine "allows the visualizer to create program flows 122 and data flows 124." A500 (col. 16:3-5). The patent, and common sense, make clear that a "visualizer" does not create actual data flows themselves, but rather, the graphical representation of those data flows, especially given that the patent contemplates an editor module for actually editing code. A449 (Abstract ("Once the file is transferred to the local computer, the editor can modify the code associated with the file; the editor is also capable of creating new files.")). Thus, it was perfectly appropriate for the Board to rely primarily on the section of the summary of the invention describing the visualizer displaying data flow "diagrams." *Astrazeneca AB*, *Aktiebolaget Hassle*, *KBI-E*, *Inc. v. Mutual Pharmaceutical Co.*, *Inc.*, 384 F.3d 1333, 1336-42 (Fed. Cir. 2004) (rejecting "rigid formalism" in construing terms). In fact, Petitioner itself conflates flows and flow diagrams: Petitioner cites to discussion of Figure 9 as demonstrating "'program flow' diagrams," but in fact, as the text (and Petitioner's carefully placed quotation marks) make clear, that passage refers to "program flows," not "program flow diagrams." Pet. Br. at 32.

While Petitioner relies extensively and primarily on Figure 9 in an attempt to show other types of data flows, the very next passage makes clear that it is Figure 17, not Figure 9, that illustrates the graphical representation of data flows as that

term is used in the '936 Patent.  The specification explains that Figures 9 and 17 **alternately** demonstrate a visualizer showing the program flow and the data flow and further explains that "the user will be able to **toggle between** the program flow display and the data flow display."  A500 (col. 15:50-56 (emphasis added)).  Similarly, the flow panel will display "**either** the program flow 122 **or** the data flow 124."  A500 (col. 16:51-59 (emphasis added)).  Therefore, Figure 9 does not control over the summary of the invention and explicit descriptions of the graphical representation of data flows.

Even if Figure 9 were instructive of graphical representations of data flows, however, it would still not support Petitioner's arguments nor undermine the Board's construction.  Contrary to Petitioner's assertion, the language surrounding Figure 9 discusses using a visualizer that displays "the code for the selected program, representing each program and data block with a program flow icon" and "arrows [to] connect these program flow icons to generally illustrate the flow of data."  A496 (col. 8:10-14).  This would still be consistent with the Board's construction, which requires "icons depicting data processing steps and arrows to depict the movement of data through the source code."

Petitioner also claims, incorrectly, that the language that forms the basis of the Board's construction conflicts with another "embodiment" in which "program flow icons," not "icons depicting data processing steps," are used to visualize the

data flow.    Pet. Br. at 35-38.    Petitioner's argument similarly warps the specification and is unfounded.  What Petitioner describes, as part of its argument, as a "lone sentence" supporting the Board's construction, is in fact taken from the section of the summary of the invention that describes the operation of the visualizer in showing graphical representations of both program flows and data flows.  A18-19.  Petitioner further ignores the surrounding language from its own cited passages: Petitioner cites the passage "collapse the number of program flow icons 126 that comprise the data flow 124," ignoring that the very next clause reads "ultimately showing the entire lineage of the data (*i.e.*, where the data came from, how the data has been processed and where the data was stored)."  Pet. Br. at 36; A500 (col. 16:19-22).   Petitioner still further ignores that the program flow icons that illustrate the flow of data comprise both program and data blocks.  A496 (col. 8:8-14).  These provisions make clear that the passages relied on by Petitioner, once put in context, are in fact entirely consistent with the language from the summary of the invention cited by the Board.

Ultimately, however, Petitioner's complaint that the Board conflated data flows and visualization of data flows is a red herring designed only to give Petitioner yet another shot at invalidating Claim 4 under a new construction not presented below.  As the Board noted correctly in denying Petitioner's request for rehearing, Petitioner **itself** advocated to the Board for a construction that suffers this same

perceived flaw: "**a depiction of a map of** the path of data through the executing source code." A47-48 (emphasis added). And any perceived error in this regard was remedied in the decision on rehearing, which explained that the construction could be modified to remove the redundant "graphical representations of" language without any impact on the ultimate conclusion, and, necessarily by extension, that the existing construction could be applied to the complete phrase "graphical representation of data flows."[5] A46-47.

In applying its proper construction, the Board found that Coad (the only reference at issue) did not disclose this limitation because Coad does not teach "icons representing data processing steps," finding Petitioner's evidence "unsupported."[6] A29. In response, Petitioner offers no actual evidence contradicting this conclusion (nor did Petitioner do so in its request for rehearing), but instead complains that the Board did not give it an opportunity to present further evidence in light of the Board's "new" construction, in essence

---

[5] Petitioner vaguely argues that the rehearing decision narrowed the construction from the final decision, which it implies was somehow improper. Pet. Br. at 28-30. If clarifying a construction on rehearing is somehow improper, then certainly Petitioner's attempt to introduce an entirely new construction for the first time on appeal must be as well.

[6] Petitioner claims, without citation, that "[t]he only thing the Board identified as missing in SAS's unpatentability arguments was prior art evidence corresponding to the new requirement for 'icons depicting data processing steps.'" Pet. Br. at 38-39. The Board did not address, and did not need to address, whether other grounds existed for rejecting Petitioner's arguments. A28-31.

complaining that that Board's procedures do not call for a separate claim construction hearing prior to the presentation of evidence of invalidity. Petitioner cites no authority requiring the Board to operate in such a manner, and Petitioner in fact argued to the Board that it would be perfectly appropriate to construe terms for the first time in the Final Written Decision. A380-381 (Petitioner's counsel: "Well, neither side has proposed [a construction of 'data'], but it's certainly something that you can construe as part of your final written decision.").

Further, it is Petitioner who chose to pursue its invalidity arguments before the Board instead of district court, where a claim construction hearing would have been held before the presentation of evidence. Petitioner cannot now complain about the "unfairness" of the Board's rules, which are well within the Board's discretion and are rules Petitioner chose to play by and impose on Patent Owner. And in any event, the Board entertained Petitioner's request for rehearing and rejected it on the merits. A46-48.

The Board's construction was proper and its finding of patentability of Claim 4 should be affirmed.

## B.    Petitioner May Not Introduce Its New Construction On Appeal

This Court has held, in case after case, that even though this Court reviews claim construction *de novo*, a party may not argue a new claim construction on appeal that was not raised below:

That this court may review a lower tribunal's claim construction *de novo* under *Cybor* does not require us to consider claim construction arguments that were not raised before the Commission. A party's argument should not be a moving target. The argument at the trial and appellate level should be consistent, thereby ensuring a clear presentation of the issue to be resolved, an adequate opportunity for response and evidentiary development by the opposing party, and a record reviewable by the appellate court that is properly crystallized around and responsive to the asserted argument. *Cybor* does not require a different result. While *Cybor* confirmed this court's ability to **review** claim construction *de novo*, it does not require us to effectively **retry** claim construction *de novo* by consideration of novel arguments not first presented to the tribunal whose decision is on review.

*Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1363 (Fed. Cir. 1999)

(citations omitted, emphasis in original).[7]

Petitioner did not pursue its proposed construction before the Board. In fact, even in its motion for rehearing, Petitioner did not raise this new construction,

---

[7] *See also*, *e.g.*, *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1273-74 (Fed. Cir. 2012) ("[A] party may not introduce new claim construction arguments on appeal or alter the scope of the claim construction positions it took below. Contrary to Digital-Vending's suggestion, [caselaw] does not stand for the proposition that a party is free to seek a claim construction on appeal substantially different from the construction it proposed below simply because the district court construed the claim language in a manner different from the construction proposed by either party." (internal quotation and citation omitted)); *Lazare Kaplan Int'l, Inc. v. Photoscribe Tech., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) ("As we have repeatedly explained, litigants waive their right to present new claim construction disputes if they are raised for the first time after trial." (internal quotation omitted)); *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1368 (Fed. Cir. 2008) ("This is not merely a new argument in support of a previously presented construction, but instead is a new and more expansive construction, which may not properly be asserted on appeal.").

instead arguing that the Board should have stuck to the construction in the Institution Decision because neither party had challenged it.  A444-445 ("The claim construction for 'data flows' previously adopted in the Institution Decision is consistent with the broadest reasonable construction. . . . That interpretation is consistent with the broadest reasonable construction standard, and neither party disputed that construction for the claimed 'data flows'.  Applying that broadest reasonable construction, as the Board should have done, Petitioner demonstrated by a preponderance of the evidence that the Coad reference does indeed disclose 'data flows' as recited in claim 4.").  In accordance with longstanding precedent, therefore, the Court should reject Petitioner's attempt to introduce a new construction on appeal.

### C. Petitioner Waived Any Argument Under The Institution Decision Construction

Petitioner may not argue for a new construction on appeal.  Thus, even if the Board's construction of "data flows" was wrong (which it is not), the correct remedy should be to apply the construction that Petitioner said was the proper construction in the proceedings before the Board: the construction used in the Institution Decision. A444-445.   On appeal, however, Petitioner offers no argument or evidence to show that any reference discloses data flows under that construction.  As a result, even if the Board's construction was in error, Petitioner cannot prevail.

### D.    Petitioner's New Construction And Application Of That Construction Are Wrong On The Merits

In support of its proposed new construction—"the movement of data through source code"—Petitioner relies on the very same passages that the Board relied on in the Final Written Decision, yet removes not only the purportedly redundant language regarding graphical representations that the Board addressed in its rehearing decision, but also the requirement that the representation show data flow through "data processing steps."   Pet. Br. at 41.   In doing so, Petitioner ignores that its own allegedly supporting passages of the specification require "displaying **individual processes and data blocks** in separate columns with arrows that connect the program flow icons 126 and indicate the direction of the data flow."   *Id.* (emphasis added).   And as made clear by another passage cited by Petitioner, expansion and collapse of the graphical representations of data flows involves "ultimately showing **the entire lineage of the data** (*i.e.*, where the data came from, **how the data has been processed** and where the data was stored)." Pet. Br. at 36 (emphasis added).

Petitioner's invalidity argument based on this improper construction further demonstrates that its proposed construction is overly broad and that its invalidity

position is meritless.[8]  Petitioner cites only to portions of Coad that show the flow of "messages exchanged among objects." Pet. Br. at 42-43.  In clear violation of the requirement that claim limitations be read in context, Petitioner not only ignored the full phrase "graphical representation of data flows," but even the phrase "data flows" itself, attempting to string together an argument based on the idea that "messages" can be "data." *Id.*  Petitioner then leaps to the conclusion that "data flows" would be understood by one of skill in the art to include "message flows."

Petitioner ignores that the Board found that "flows" in the context of Claim 1 includes "data flows," "program flows," and entirely **other** flows not specifically listed.  A13.  To succeed in its substantive argument, therefore, if the Court even entertains it, Petitioner must show, among other things, that a person of skill in the art would understand that a "message flow" between objects would be understood, in the context of the '936 Patent, to fall within the scope of "data flows" as opposed to other types of flows, like "message flows" themselves.

The only support Petitioner provides for its argument is that Patent Owner's expert testified that messages "can be data." Pet. Br. at 44.  Petitioner elicited no

---

[8] Petitioner makes no effort to reconcile, on the one hand, its request that this Court enter and apply a brand new claim construction on appeal with, on the other hand, its complaint that, as a matter of "basic fairness," the Board should have afforded Petitioner an opportunity to present further evidence in the proceedings below.  Pet. Br. at 39.

testimony and provides no other evidence of **when** messages can be data, and the testimony did not discuss this in the context of how "data flows" is used in the '936 Patent or how "message flows" is used in the cited prior art. The cited testimony does not discuss "data flows" at all, and therefore Petitioner's reliance on the testimony lacks relevant context, is unfounded, and fails to consider the claim term as a whole. Thus, even if the Court elects to consider Petitioner's new claim construction on appeal and to decide the merits of patentability in the first instance on appeal, Petitioner's proposed construction and invalidity arguments fail.

## IV.   THE BOARD AND PARTIES ARE NOT REQUIRED TO WASTE RESOURCES LITIGATING CLAIMS TO A FINAL WRITTEN DECISION THAT ARE CLEARLY PATENTABLE

### A.   The Board Is Not Required To Issue A Final Written Decision For Claims On Which The Petitioner Has No Reasonable Likelihood Of Prevailing

#### 1.   Petitioner Misinterprets The Statute

Petitioner argues that so long as the Board determines that there is a reasonable likelihood that at least one claim in a patent will be invalidated in an IPR, the Board must either reject the IPR altogether or spend time and resources reaching a final written decision on all claims that the Petitioner decided to challenge, no matter how incorrect or even frivolous those challenges are. There is no basis in the statutory language or otherwise to conclude that Congress intended

such an irrational and wasteful exercise from a statute intended to resolve these kinds of invalidity claims as quickly, cheaply, and efficiently as possible. The AIA grants the Director discretion to deny any IPR petition on any claims and makes that decision unreviewable. 35 U.S.C. §§ 314(a), (d); *St. Jude Med.*, *Cardiology Div.*, *Inc. v. Volcano Corp.*, 749 F.3d 1373, 1375 (Fed. Cir. 2014) ("We hold that we may not hear St. Jude's appeal from the Director's denial of the petition for inter partes review."); *In re Cuozzo Speed Tech.*, *LLC*, 778 F.3d 1271, 1276 (Fed. Cir. 2015) ("We conclude that § 314(d) prohibits review of the decision to institute IPR even after a final decision."), *pet. for reh'g filed*. Further, Petitioner's argument that Congress intended to require institution and a final written decision on claims with no reasonable prospect of being invalidated is not even based on the statutory provision that applies to institutions, but rather, to final written decisions on claims actually at issue at that point. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotations omitted)). Indeed, Petitioner's interpretation of the statute would even apply to claims cancelled by the patent owner during an IPR, as those claims too would have been "challenged."

Moreover, Petitioner misconstrues the meaning of the term "challenged" in 35 U.S.C. § 318(a). This section of the AIA applies to proceedings in which an IPR has been instituted. Read in context, therefore, "challenged" necessarily means claims that were **properly** challenged in the petition, that is, claims for which a reasonable likelihood of success exists. When a petitioner cannot meet even this threshold showing, the claims have not been properly challenged and the requirements of Section 318(a) do not apply.

Even if the statute left this question open, which it did not, the Director unquestionably has the authority to promulgate regulations to fill a gap in the statute, and those regulations are entitled to deference. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.* 467 U.S. 837, 842-843 (1984); 35 U.S.C. §§ 316(a)(2), (a)(4). The regulations allow for partial institution and do not require the Board to waste time and resources addressing claims for which the Board already determined that no reasonable chance of invalidation exists. 37 C.F.R. § 42.108(a). The regulations are imminently reasonable because they streamline the issues for consideration, aid in the efficient operation of the PTO, and are more fair to patent owners by eliminating the burden of responding to baseless challenges. Changes to Implement Inter Partes Review Proceedings, 77 Fed. Reg. 48,680, 48,702-703 (Aug. 14, 2012).

## 2.    Petitioner's Policy Arguments Are Unjustified

It is Petitioner's position, not the Board's, that would have a significant impact on the just and efficient resolution of patent disputes.  Pet. Br. at 53-54.  As Petitioner acknowledges, in many instances, including this case, district courts are staying patent litigation pending the resolution of IPR proceedings.   Under Petitioner's position, an accused infringer accused only of infringing a subset of claims could delay litigation for years simply by finding a single claim for which a reasonable likelihood of success exists, even if that claim is not at issue in the litigation, and even if there is no good faith basis to seek IPR on the remaining claims.  This would only serve to delay the resolution of patent cases and allow accused infringers with deep pockets to impose wasteful costs on patent owners and the Board.

Petitioner's further contention that partial institution results in "merely adding another layer of cost and process" to patent disputes is nonsensical and reveals the extent to which IPR petitions have been nearly automatic as a tactical weapon, regardless of the likelihood of success or the circumstances of an individual case.  Pet. Br. at 54.  Petitioner's cited statistics make clear that IPRs are being sought at a staggering rate, but nothing forces an accused infringer to run to the PTO with an IPR petition every time a patent infringement suit is filed against it.  Pet. Br. at 57.  An accused infringer dissatisfied with partial institution or who

believes that there are claims for which no reasonable expectation of unpatentability exists can, and should, proceed in district court rather than create delay and complication though an IPR that will not resolve all claims.  Similarly, Petitioner's complaint that partial institution will result in only partial estoppel (which assumes that no non-statutory estoppel theories apply—an assumption Patent Owner does not concede to be true) should be directed to Congress in an effort to expand the scope of statutory estoppel to all claims in any patent in which an IPR was sought on any claims, whether instituted or not.  Pet. Br. at 54. Petitioner is certainly capable of doing so.  *See* Hearing Before the Subcommittee on Courts, Intellectual Property, and the Internet of the Committee on the Judiciary, 113th Cong. 13 (March 14, 2013) (testimony of SAS witness John Boswell).

### 3.    The IPR Process Does Not Allow Petitioner A "Do-Over"

Petitioner argues that the Board should devote scarce resources to reviewing all challenged claims, even when no reasonable likelihood of success has been shown, because a petitioner should be allowed to fix its own mistakes in its petition after institution during the IPR proceedings.  Pet. Br. at 52-53.  Consistent with its demanding mandate of promptly resolving IPR proceedings, the Board has set forth clear rules about what is required in a petition and has justifiably shown little tolerance for failures of petitioners to satisfy those requirements.  Petitioner failed

to satisfy those standards by failing to show any data flows in its discussion of Claim 2 and, for the means-plus-function limitations in claims 11-16, failing to satisfy the rule that "the construction of the claim must identify the specific portions of the specification that describe the structure, material, or acts corresponding to each function." A176. It is not the Board's partial institution practices, but rather Petitioner's own failure to abide by the Board's clear rules, that resulted in no final written decision as to Claims 2 and 11-16.

## B.    Petitioner's Purported Footnote Mandamus Petition Should Be Rejected

In a single footnote, Petitioner asks the Court to consider its brief, in the alternative, to be a petition for mandamus relief ordering the Board to waste time and resources reaching a final decision with regard to the uninstituted claims. Pet. Br. at 47 n.10. Petitioner's footnote and brief do not satisfy Federal Circuit Rule 21, and under that rule, Patent Owner is not even permitted to respond unless and until ordered by the Court. Fed. Cir. R. 21(a)(5) ("No answer may be filed by any respondent unless ordered by the court.").

## C.    The Board Did Not Manipulate Claim Construction To Hide Any Alleged Errors

Finally, Petitioner levels a very serious accusation against the Board in a last-ditch effort to force the Board to waste resources deciding an IPR on claims for which no reasonable likelihood of success has been demonstrated. Petitioner

contends that the Board realized that it erroneously failed to institute review of Claim 2 and then **deliberately** entered an "artificially-narrow and legally-erroneous construction" that would somehow obfuscate this alleged mistake. Pet. Br. at 51-53 ("Because the Institution Decision declined to review claim 2, the Board was faced with the prospect of cancelling narrower claim 4 in view of prior art, but allowing broader claim 2 to survive the IPR despite that prior art. Rather than squarely address the patentability of broader claim 2 in its Final Written Decision, however, the Board instead adopted an entirely new construction for the claim term 'data flows' as recited in both claim 2 and 4.").

Petitioner has provided not a shred of evidence to back up this outrageous accusation, and in fact, Petitioner's argument makes no sense. Petitioner contends that Claim 2 is broader than Claim 4 and that both use the term "data flows." For Petitioner's outlandish theory to work, the Board would have to have come up with a construction that somehow treated the term differently between the two claims so that both the failure to institute on Claim 2 and the resolution on Claim 4 could be reconciled. Otherwise the Board would be left to explain why it did not institute on and then invalidate Claim 2. What the Board's decision actually shows is that it never should have instituted review of Claim 4 in the first place—a prejudice suffered by Patent Owner alone.

## CONCLUSION

For these reasons, Patent Owner requests that the Court: (1) reverse the Board's decision as to Claims 1, 3, and 5-10 and find that the claims are patentable; (2) affirm the Board's decision finding Claim 4 patentable; and (3) find that the Board was not required to institute IPR on the claims for which it found no reasonable likelihood of success.

Respectfully submitted,

/s/ *Matthew V. Topic*
Matthew V. Topic
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, Illinois  60607
312-243-5900 (Telephone)
matt@loevy.com

*Counsel for Cross-Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 4th day of June, 2015, I caused this Brief of Cross-Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

John Marlott
JONES DAY
77 West Wacker Drive
Chicago, Illinois  60601
(312) 782-3939

David B. Cochran
JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, Ohio  44114
(216) 586-3939

*Counsel for Appellant*

Gregory A. Castanias
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001
(202) 879-3939

Matthew W. Johnson
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania  15219
(412) 391-3939

*Counsel for Appellant*

Nathan K. Kelley
Stacy B. Margolies
Joseph G. Piccolo
Scott Weidenfeller
U.S. PATENT AND TRADEMARK OFFICE,
   OFFICE OF THE SOLICITOR
Post Office Box 1450
Mail Stop 8
Alexandria, Virginia  22313
(571) 272-9035

*Counsel for Intervenor*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Brief of Cross-Appellant will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/ *Matthew V. Topic*
*Counsel for Cross-Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*11,888*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: June 4, 2015                              */s/ Matthew V. Topic*
                                                 *Counsel for Cross-Appellant*