**Nos. 2015-1346, -1347**

# United States Court of Appeals
# for the Federal Circuit

SAS INSTITUTE INC.,

*Appellant,*

v.

COMPLEMENTSOFT, LLC,

*Cross-Appellant.*

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2013-00226.

---

**RESPONSE AND REPLY BRIEF OF APPELLANT SAS INSTITUTE INC.**

---

JOHN A. MARLOTT
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
(312) 782-3939

GREGORY A. CASTANIAS
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939

DAVID B. COCHRAN
JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939

MATTHEW W. JOHNSON
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939

*Counsel for Appellant SAS Institute Inc.*

# CERTIFICATE OF INTEREST

Counsel for Appellant SAS Institute Inc. certifies the following:

1.  The full name of every party or amicus represented by me is:

    SAS Institute Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    N/A

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    None.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    JONES DAY:  John A. Marlott, David B. Cochran, John V. Biernacki, Joshua R. Nightingale, Gregory A. Castanias, Matthew W. Johnson

Dated: August 31, 2015          */s/ John A. Marlott*
                                JOHN A. MARLOTT
                                JONES DAY
                                77 West Wacker Drive
                                Chicago, IL 60601
                                Telephone:  (312) 782-3939

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ......................................................................v

TABLE OF ABBREVIATIONS .................................................................ix

STATEMENT OF RELATED CASES ....................................................... xii

I.      INTRODUCTION ........................................................................1

CROSS-APPEAL RESPONSE ...................................................................3

COUNTER-STATEMENT OF THE ISSUES .............................................3

COUNTER-STATEMENT OF THE FACTS .............................................3

     A.      The Original Patent Prosecution History Pertinent To
           ComplementSoft's Cross-Appeal................................................3

     B.      The Pertinent IPR Proceedings Regarding Independent Claim 1 ........7

STANDARDS OF REVIEW & LEGAL STANDARDS ....................................12

SUMMARY OF THE ARGUMENT ....................................................14

ARGUMENT ...........................................................................................15

I.      THE CORRECTLY CONSTRUED "DATA MANIPULATION
       LANGUAGE." ............................................................................15

     A.      The Board Properly Considered The Intrinsic Evidence
           Regarding The Meaning Of "Data Manipulation Language."...........15

     B.      The Board Also Properly Considered Extrinsic Evidence
           Regarding The Meaning Of "Data Manipulation Language."...........17

     C.      The Board's Factual Findings Regarding The Meaning Of
           "Data Manipulation Language" Are Not Clearly Erroneous .............19

     D.      The Board's Construction Of "Data Manipulation Language"
           Need Not Be Revised To Reflect Any Purported Prosecution
           "Disclaimer.".............................................................................20

          1.      No Prosecution Disclaimer Changes The Broadest
                Reasonable Claim Construction...............................................21

# TABLE OF CONTENTS

(continued)

Page

2.   The Board Relied On Coad In Combination With Other Prior Art References .................................................. 23

E.   Substantial Evidence Supports The Board's Factual Finding That Antis Discloses A "Data Manipulation Language." ................. 25

II.   THE BOARD CORRECTLY CONSTRUED "GRAPHICAL REPRESENTATIONS OF FLOWS WITHIN THE RETRIEVED SOURCE CODE." ......................................................... 26

A.   ComplementSoft Misreads The Board's Decision To Find A Purported Inconsistency Where There Is None ................. 27

B.   The Board Relied On Combinations Of References To Find Obviousness, And ComplementSoft Errs By Attacking The Coad Reference Individually .................................. 30

C.   There Is No "Practical Problem" With The Board's Construction ....................................................... 32

III.   THE BOARD CORRECTLY DETERMINED THAT CLAIMS 1, 3, AND 5-10 ARE OBVIOUS IN VIEW OF PRIOR ART ........................... 33

REPLY ARGUMENT ....................................................................... 34

I.   THE BOARD ERRED IN CONSTRUING "DATA FLOWS." ................. 34

A.   The Board's New Construction For "Data Flows" Is Not The Broadest Reasonable Construction In View Of The '936 Patent Specification ........................................................ 34

1.   The Board's Construction For "Data Flows" Improperly Imports Limitations From A Single Sentence In The Specification ............................................... 35

2.   The '936 Patent Specification Does Not Equate "Data Flows" And "Data Flow Diagrams." ....................... 36

3.   The '936 Patent Specification Does Not Limit The Display Of "Data Flows" To "Data Flow Diagrams." ........... 37

# TABLE OF CONTENTS

## (continued)

Page

4.    The Broadest Reasonable Construction Of "Data Flows" Does Not Require "Icons Depicting Data Processing Steps." ...................................................................38

B.    SAS's Proposed Modification To The Board's New Construction In The Final Written Decision Is Consistent with The Broadest Reasonable Construction Standard ..............................40

C.    SAS Did Not Waive Its Ability To Challenge The Correctness Of The Board's New Construction For "Data Flows." .....................42

D.    SAS Had No Opportunity To Present Evidence Tailored To The Board's New Construction For "Data Flows" Since That Construction Was First Adopted In The Final Written Decision ......45

II.    THE BOARD ERRED IN FAILING TO ADDRESS THE PATENTABILITY OF EACH CLAIM CHALLENGED BY SAS............47

A.    The Government And ComplementSoft Cannot Ignore Or Rewrite The Plain Language Of 35 U.S.C. § 318(a) ........................48

B.    The Government Incorrectly Equates "Grounds" With "Claims." ...............................................................................51

C.    The Government's Efficiency Arguments Cannot Trump The Statutory Command Of Section 318(a).............................................53

D.    Congress Intended More Than Just "Any Simplification" Of Parallel District Court Litigation.........................................................55

E.    Directing The Board To Comply With § 318(a) Would Not Result In Any Legitimate "Waste Of Administrative Resources." ..............................................................................56

F.    This Court Has Jurisdiction To Consider SAS's Appeal Of The Final Written Decision Under 35 U.S.C. § 319 .................................57

G.    SAS Has Alternatively Requested Mandamus Relief.......................59

CONCLUSION ...................................................................................................61

# TABLE OF AUTHORITIES

**Page**

## CASES

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) ................................................................17, 18

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*,
  216 F.3d 1042 (Fed. Cir. 2000) ...................................................................19

*Bates v. United States*,
  522 U.S. 23 (1997)........................................................................................49

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002) ...................................................................44

*City of Arlington, TX v. FCC*,
  133 S. Ct. 1863 (2013)..................................................................................55

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)......................................................................................13

*Harris Corp. v. Ericsson Inc.*,
  417 F.3d 1241 (Fed. Cir. 2005) ...................................................................45

*Heckler v. Chaney*,
  470 U.S. 821 (1985)......................................................................................54

*In re Am. Acad. of Sci. Tech Center*,
  367 F.3d 1359 (Fed. Cir. 2004) ...................................................................18

*In re Cuozzo Speed Techs., LLC*,
  793 F.3d 1268 (Fed. Cir. 2015) ........................................................12, 13, 16

*In re Cuozzo Speed Techs., LLC*,
  793 F.3d 1297 (Fed. Cir. 2015) ...........................................................passim

*In re Curtis*,
354 F.3d 1347 (Fed. Cir. 2004) ........................................................18

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ...................................................13, 14

*In re Jolley*,
308 F.3d 1317 (Fed. Cir. 2002) ........................................................13

*In re Merck & Co.*,
800 F.2d 1091 (Fed. Cir. 1986) ........................................................31

*In re Morris*,
127 F.3d 1048 (Fed. Cir. 1997) ........................................................12

*In re Schott Gemtron Corp.*,
No. 2015-133 (Fed. Cir. Aug. 11, 2015) ..........................................61

*In re Trans Texas Holdings Corp.*,
498 F.3d 1290 (Fed. Cir. 2007) .............................................19, 38, 39

*Microsoft Corp. v. i4i Ltd. P'ship*,
131 S. Ct. 2238 (2011) .....................................................................24

*Omega Eng'g, Inc., v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ........................................................22

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........................................................18

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999) ..................................................17, 19

*Rodale Press, Inc. v. FTC*,
407 F.2d 1252 (D.C. Cir. 1968) ........................................................47

*Russello v. United States*,
464 U.S. 16 (1983) ...........................................................................52

*Sciele Pharma Inc. v. Lupin Ltd.*,
    684 F.3d 1253 (Fed. Cir. 2012) ........................................................24

*Shire Dev., LLC v. Watson Pharms., Inc.*,
    787 F.3d 1359 (Fed. Cir. 2015) ........................................................21

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ...................................................48, 49

*St. Jude Medical, Cardiology Div., Inc., v. Volcano Cop.*,
    749 F.3d 1373 (Fed. Cir. 2014) ...................................................58, 59

*Sullivan v. Stroop*,
    496 U.S. 478 (1990)..........................................................................48

*Teva Pharms. U.S.A., Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015)..................................................................12, 20

*Versata Dev. Group v. SAP Am.*,
    793 F.3d 1306 (Fed. Cir. 2015) ........................................................59

## STATUTES

5 U.S.C. § 554(b)(3)...............................................................................47

35 U.S.C. § 103 .....................................................................................13

35 U.S.C. §§ 311, 312(a)(3)...................................................................50

35 U.S.C. §§ 311(b), 315(e)(2) ..............................................................55

35 U.S.C. §§ 312(a)(3), 314(a) .........................................................49, 50

35 U.S.C. § 316(b) .................................................................................53

35 U.S.C. § 318(a) ..........................................................................passim

35 U.S.C. § 319.........................................................................57, 58, 59

Administrative Procedure Act...............................................................47

America Invents Act ..................................................................................56

**OTHER AUTHORITIES**

37 C.F.R. § 42.100(b) ........................................................................16

37 C.F.R. § 42.108 ............................................................................55

37 C.F.R. § 42.108(a) ........................................................................61

154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008)...................................56

157 Cong. Rec. S1376 (daily ed. Mar. 8, 2011) .....................................56

157 Cong. Rec. S1377........................................................................54

# TABLE OF ABBREVIATIONS

***Parties***

| | |
|---|---|
| SAS | SAS Institute Inc. |
| ComplementSoft | ComplementSoft, LLC |

***Cites***

| | |
|---|---|
| A__ | Joint Appendix at page(s) __ |

***Terms***

| | |
|---|---|
| AIA | America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) |
| PTO | U.S. Patent & Trademark Office |
| Board | Patent Trial & Appeal Board |
| IPR | *Inter Partes* Review |
| CBM | Covered Business Method Review |
| the '936 patent | U.S. Patent No. 7,110,936, SAS Exhibit 1001, A449-502 |
| Petition | SAS's Petition for *Inter Partes* Review in IPR2013-00226, Paper 1, A54-121 |
| Institution Decision | Decision-Institution of *Inter Partes* Review in IPR2013-00226, Paper 9, A166-188 |
| Final Written Decision | Final Written Decision in IPR2013-00226, Paper 38, A1-43 |
| Rehearing Decision | Decision on Rehearing Request in IPR2013-00226, Paper 40, A44-49 |
| Hearing Transcript | Record of Oral Hearing held May 7, 2014 in IPR2013-00226 (entered June 4, 2014), Paper 36, A361-430 |

| | |
|---|---|
| Antis | U.S. Patent No. 5,572,650 ("Antis"), SAS Exhibit 1005, A530-548 |
| Coad | U.S. Patent No. 6,851,107 ("Coad"), SAS Exhibit 1006, A549-582 |
| Burkwald | U.S. Patent No. 6,356,285 ("Burkwald"), SAS Exhibit 1007, A583-624 |
| Eick | U.S. Patent No. 5,937,064 ("Eick"), SAS Exhibit 1008, A625-633 |
| Oracle Primer | Oracle Programming – A Primer ("Oracle Primer"), SAS Exhibit 1012, A673-773 |
| Oracle8 Primer | Oracle8 Programming: A Primer ("Oracle8 Primer"), SAS Exhibit 1013, A774-922 |
| The Oracle Primers | Collectively, the Oracle Primer and the Oracle8 Primer |
| Building Applications | "Building Applications with Microsoft Access 97," SAS Exhibit 1011, A667-672 |
| Roussopoulos Declaration | Declaration of Dr. Nick Roussopoulos Under 37 C.F.R. § 1.68 in Support of Petition for *Inter Partes* Review of U.S. Patent No. 7,110,936, SAS Exhibit 1015, A923-1017 |
| Booch UML Manual | The Unified Modeling Language Reference Manual by Grady Booch et al, SAS Exhibit 1043, A1639-1686 |
| OB___ | Opening Brief of Appellant SAS Institute Inc. at page(s) ___ |
| CB___ | Brief of Cross-Appellant ComplementSoft, LLC at page(s) ___ |
| PTOB___ | Brief of Intervenor Director of the U.S. Patent & Trademark Office at page(s) ___ |

PHOSITA                    Person having ordinary skill in the art

# STATEMENT OF RELATED CASES

SAS's original Statement of Related Cases identified two cases pending before this Court may directly affect, or be directly affected by, the Court's decision regarding one of the issues raised in SAS's appeal. OB xi-xii. SAS submits the following supplement to that Statement.

(1) In *Synopsys, Inc. v. Mentor Graphics Corporation*, Appeal Nos. 14-1516, -1530 (Fed. Cir.), Synopsys raises the issue: "Did the Board err by instituting review but failing to issue a final written decision with respect to the patentability of each claim challenged by Synopsys?"

(2) In *Synopsys, Inc. v. Lee*, Appeal No. 15-1183 (Fed. Cir.), Synopsys has challenged, in part, the Board's practice of issuing "final written decisions that address fewer than all of the challenged claims in a granted petition."

SAS understands that the briefing in both these appeals has been completed, and that the two appeals will be considered companion cases and will be assigned to the same merits panel for oral argument. These appeals have not yet been set for oral argument.

## I.    INTRODUCTION

The Board got it mostly right.  It properly cancelled claims 1, 3, and 5-10 of ComplementSoft's '936 patent as unpatentable over prior art.  The Board erred, however, in two respects.

*First*, the Board declined to cancel dependent claim 4 because it erroneously concluded that the prior art failed to disclose a single claim limitation.  The Board's conclusion was premised on its error in adopting a new and overly narrow construction of "data flows" in the Final Written Decision.  The Board's new construction for "data flows" is inconsistent with the broad description of "data flows" in the '936 patent specification, and is contrary to the governing broadest reasonable interpretation standard applied during an IPR.  In particular, the Board erred by equating the claim term "data flows" with an entirely different term appearing in the specification, "data flow diagrams," and by reading into "data flows" a requirement for "icons depicting data processing steps" that is used only once in the specification to describe an exemplary embodiment.  Under the proper, broadest reasonable construction of "data flows," claim 4 is unpatentable in view of the prior art.

*Second*, the Board erred when it issued a final written decision that addressed only some of the claims challenged by SAS.  The Board's Final Written Decision in this case violated 35 U.S.C. § 318(a) because it failed to address the

patentability of claims 2 and 11-16 challenged in SAS's Petition. The Board's action is contrary to the plain terms of Section 318(a).  The government and ComplementSoft's responses largely ignore the text of § 318(a), instead inaccurately recasting SAS's arguments directed to the Final Written Decision as a challenge to the PTO's institution decision.  This Court should remand with instructions to the Board to issue a Final Written Decision in compliance with Section 318(a).

*ComplementSoft also cross-appeals*, contending that the Board erred by cancelling claims 1, 3, and 5-10.  It did not.  ComplementSoft's cross-appeal is entirely premised on claim construction, arguing that the Board erred in construing two claim terms.  Unlike the "data flows" claim term, however, the Board properly applied the broadest reasonable construction of "data manipulation language" and "graphical representations of flows within the retrieved source code."  Using the proper constructions for those terms, the Board correctly determined that claims 1, 3, and 5-10 are obvious in view of the prior art.

This Court should correct the Board's error regarding claim 4; remand for the Board to issue a final written decision in accordance with § 318(a); and affirm in all other respects.

# CROSS-APPEAL RESPONSE

## COUNTER-STATEMENT OF THE ISSUES

The sole issue raised in ComplementSoft's cross-appeal is claim construction, specifically, whether the Board correctly construed two claim terms: (1) "data manipulation language" and (2) "graphical representations of flows within the retrieved source code."  CB2 (issues 1 and 2).

ComplementSoft does not challenge the Board's legal conclusion that claims 1, 3 and 5-10 are obvious on any other basis.

ComplementSoft's cross-appeal arguments are limited to independent claim 1; ComplementSoft does not separately argue the patentability of any of dependent claims 3 or 5-10.  ComplementSoft's cross-appeal therefore stands or falls with independent claim 1.

## COUNTER-STATEMENT OF THE FACTS

### A.    The Original Patent Prosecution History Pertinent To ComplementSoft's Cross-Appeal.

As originally filed, independent claim 1 of the '936 patent was not limited to a development environment for "one of a plurality of types of data manipulation languages."  *See* A512 (reflecting amendments to original claim 1).  Claim 1, as filed, was instead directed broadly to a development environment for "source code" – any kind of source code – with the "parser layer" used to detect "the software language of the retrieved source code."  *Id.*

3

The PTO rejected original claim 1 as anticipated by Coad.  A505-506.  The PTO found that Coad disclosed "a software development tool (development environment) where a developer (user) can simultaneously view a graphical representation and a text representation of source code (Abstract, Fig. 2)," and "[t]hese graphical and textual views are synchronized (i.e., dynamically linked) such that modifications to one view are automatically reflected in the other view . . . (i.e., edits to the graphical flow are automatically reflected in the source code (text) view and visa [sic] versa)."  A506.  The PTO further expressly found that Coad teaches a "parser," an "editor," and a "visualizer."  *Id.*

Attempting to distinguish the pending claims from Coad, ComplementSoft amended independent claim 1 by limiting it to particular types of programming language—"data manipulation languages":

> 1.    (Currently Amended) An integrated development environment, comprising:
>
>       a document manager for retrieving source code <u>programmed using one of a plurality of types of data manipulation languages</u>;
>
>       an editor for displaying the retrieved source code and providing a means for a user to edit the retrieved source code;
>
>       a parser layer which detects <u>the one of the plurality of types of data manipulation languages in which</u> the ~~software language of the~~ retrieved source code <u>is programmed</u> and which activates rules and logic applicable to the detected <u>one of the plurality of types of data manipulation languages</u> ~~software language~~; and
>
>       a visualizer dynamically linked to the editor for displaying

4

graphical representations of flows within the retrieved source code using the rules and logic <u>applicable to the detected one of the plurality of types of data manipulation languages and</u> activated by the parser, wherein the editor, parser layer and visualizer cooperate such that edits made to the source code using the editor are automatically reflected in the graphical representations of flows displayed by the visualizer and edits made to the graphical representations of flows in the visualizer are automatically reflected in the source code displayed by the editor.

A512. In its remarks accompanying this claim amendment, ComplementSoft did not dispute that all four elements of the independent claim (*i.e.*, the document manager, editor, parser, and visualizer) were disclosed in Coad. A519-520. Instead, ComplementSoft argued that the "data manipulation language" limitation was the distinguishing feature of claim 1:

> Considering now Coad, Coad discloses a software development tool for use with object-oriented programming languages, such as Java or C++. More particularly, Coad discloses a system in which the object-oriented language of the source code is identified by the extension of a retrieved file to thereby identify a template which is to be used to convert the source code into a transient meta model (TMM), *i.e.*, a language-neutral representation of the source code. The system then uses the TMM to display a graphical representation of a project.

> From the foregoing it will be appreciated that Coad fails to expressly or inherently disclose the claimed system and method. More particularly, rather than disclose the claimed system and method for examining software written using one of plural data manipulation languages, *i.e.*, a language which suffers the problem of being unstructured (*see* Background section of subject application), the system and method described in Coad is limited to software written using an object oriented language, *i.e.*, a structured programming language such as Java or C++. Accordingly, rather than disclose, teach, or suggest the claimed detecting which one of the plurality of types of data manipulation languages in which software is written to thereby activate rules and logic applicable to the detected one of the plurality of types of data

> manipulation languages such that graphical representations of flows
> within the retrieved source code can be displayed by using the rules and
> logic applicable to the detected one of the plurality of types of data
> manipulation languages, the system and method of Coad leverages the
> structured nature of the programming language to merely "convert" the
> source code into a language-neutral representation and then use the
> language-neutral representation to display a graphical representation of
> the project.

A519-520 (emphasis added).  ComplementSoft thus attempted to distinguish Coad

by stressing the "data manipulation language" limitations added to the claims.

Following ComplementSoft's claim amendments and arguments, the PTO

ultimately issued independent claim 1 in the form shown above.  A501.  In a

Supplemental Notice Of Allowability (A523-529), the Examiner stated his

understanding of the differences between Coad and the '936 patent claims that

were believed to "render[] the claimed invention non-obvious over the prior art of

record":

> [Coad] teaches a software development tool where a developer
> (user) can simultaneously view a graphical representation and a text
> representation of source code which are synchronized (i.e.,
> dynamically linked) such that modifications to one view are
> automatically reflected in the other view (i.e., edits to the graphical
> flow are automatically reflected in the source code (text) view and
> visa [sic] versa).  Coad further discloses the ability to detect the
> particular language of the source code and applying rules.  However,
> Coad does not explicitly disclose the specific arrangement of elements
> including a document manager, editor, parser layer, or visulizer [sic]
> as noted above, or that the detected language is a <u>data manipulation</u>
> <u>language</u>.

A528-529 (underline in original).  The Examiner thus emphasized the "data manipulation language" limitation in issuing independent claim 1.

### B.     The Pertinent IPR Proceedings Regarding Independent Claim 1.

In the IPR, SAS challenged the Examiner's decision during original prosecution that the recitation of a "data manipulation language" in independent claim 1 was a patentable distinction over Coad and the prior art.  *See, e.g.*, A57-68.

**Coad.**  Coad does not literally use the words "data manipulation language." But Coad is specifically "designed for use with more than one programming language."  A549 (Abstract); A570 (col. 2:51-52).  In an exemplary embodiment, Coad discloses C++ and Java as potential programming languages.  A577 (col. 16:1-4).  Coad explains, however, that "[m]ethods and systems consistent with the present invention provide an improved software development tool that creates a graphical representation of source code regardless of the programming language in which the code is written."  A571 (4:38-41).  Coad does not limit the disclosed invention to any particular programming language or to any particular type of programming language.

In the Petition, SAS identified prior art references to the Board demonstrating that the "data manipulation language" limitation added during the original prosecution history did not, in fact, distinguish claim 1 from the prior art: (1) the Oracle Primers; and (2) Antis.  *See, e.g.*, A87-88. A97-99.  These references

were not considered by the PTO during the original prosecution of the application
leading to the '936 patent.

**The Oracle Primers (A673-773 & A774-922).** The Oracle Primers, both
published in 1999, are instructional books describing the Oracle database system.
The Oracle Primers are pertinent prior art because they each teach two methods for
enabling database access in the Java and C++ programming languages, which
ComplementSoft contends are object-oriented programming languages and not
data manipulation languages. (CB12).

(i) The Oracle8 Primer includes a chapter titled "Embedded SQL." A776-
834. As taught in the Oracle8 Primer, "[b]y embedding SQL statements in a
C/C++ program, one can now write application programs in C/C++ that interact
(read and write) with the database." A776. The Oracle8 Primer includes
exemplary source code for interacting with a database using SQL, including the
ability to: "select" (A779-780), "update" (A780), "insert" (A781), and "delete"
(A786) from a database.

The Oracle Primer also includes a chapter titled "Oracle JDBC" (A835-886),
which describes the JDBC ("Java Database Connectivity") application
programming interface ("API") "that enables database access in Java." A835. The
Oracle8 Primer teaches that the JDBC API "consists of a set of classes and
interfaces written in Java that allow the programmer to send SQL statements to a

database server for execution and, in the case of an SQL query, to retrieve query results." A835. The Oracle8 Primer includes, by way of example, the source code for a "simple Java program that accesses an Oracle database using JDBC." A836.

(ii) The Oracle Primer similarly includes chapters devoted to "Embedded SQL" (A675-722) and the "JDBC API" (A723-773).

**Antis (A530-548).** Antis is directed to "graphical displays for visualizing useful characteristics of large databases, in general, and graphical displays for visualizing structures and relationships within large databases, in particular." A543 (col. 1:14-17). Antis discloses graphically displaying the source code of a relational database management system (RDBMS). In the "code view" in FIG. 8 (A538), for example, Antis graphically shows RDBMS source code: "The code view displays the application source code of the RDBMS that uses the currently selected relation, in this case relation RLls_lnk." A546-547 (col. 7:32-35). In FIG. 12 (A542), Antis "shows an over view, a relations view, a path view, and an expanded code view all displayed in partially overlapping windows on a display screen." A546 (col. 8:63-66). The "expanded code view" in FIG. 12, as the Board recognized (A25), shows source code for retrieving data from a database. *See* A542 ("/HOME/PRYCE/DATA/EXTRACT/V6.0/…"); A1916-1917 at 101:4-102:19. *See* OB15-17 for additional description of Antis.

9

**The Institution Decision Regarding Claim 1.**  In instituting the IPR, the PTO found a reasonable likelihood that SAS would prevail in showing independent claim 1 is obvious based on two different combinations of Coad with the new prior art references identified in SAS's Petition.

*(1) **Coad + Oracle Primers.***  First, the Board found that SAS had "shown a reasonable likelihood of prevailing in its assertion that claim 1 is obvious over Coad combined with Oracle Primer and Oracle8 Primer."  A180.  The Board agreed with SAS that a PHOSITA would have combined the teachings of Coad and the Oracle Primers "in order to enhance the utility of the programming environment to include data manipulation."  A180.

*(2) **Antis + Coad:***  Second, the Board determined that there was "a reasonable likelihood that SAS will prevail in its challenge that [independent claim 1 was] obvious over a combination of Antis and Coad."  A183-184.  The Board found SAS's obviousness rationale to be reasonable, *i.e.*, that a PHOSITA "would have had a reason to combine Antis and Coad because they are both directed to software development tools that provide visual representations of source code," and "[t]he combination of the Coad with Antis would have allowed for easier source code debugging and a more accurate code view display."  A183.

Notably, in instituting the IPR, the Board expressly acknowledged that Coad had been before the PTO during the original prosecution.  The Board explained,

however, that the new prior art references and obviousness combinations identified by SAS had not previously been considered by the PTO.  *See* A180.

**The Final Written Decision Regarding Claim 1.**  In the Final Written Decision, the Board concluded that SAS had shown, by a preponderance of the evidence, that independent claim 1 was unpatentable in view of the prior art.  A24-28; A31-32; A41.  Specifically, the Board found independent claim 1 unpatentable based on both obviousness combinations identified in the Institution Decision:

> *(1) __Coad + Oracle Primers:__*  "[C]laim 1 would have been obvious over Coad combined with Oracle Primer and Oracle8 Primer"; and

> *(2) __Antis + Coad:__*  "[Claim 1] would have been obvious over Antis combined with Coad."

A41.  The Board determined that both of these prior art combinations render independent claim 1 unpatentable, and that the "data manipulation language" limitation does not distinguish claim 1 over the prior art.  Regarding the Coad-Oracle Primers combination, the Board found that object-oriented programming languages like Java and C++ (as taught in Coad), "when used with an embedded SQL or JDBC API" (as taught by the Oracle Primers), "can be used to access data in a database and therefore qualify as data manipulation languages as we have construed that term."  A21.  Regarding the alternative Antis-Coad combination, the Board concluded that "Antis discloses a data manipulation language."  A25.

## STANDARDS OF REVIEW & LEGAL STANDARDS

**Broadest Reasonable Claim Construction.**  ComplementSoft argues that "[t]he broadest reasonable construction standard is inappropriate in IPR proceedings" (CB17-18), referring to a March 23, 2015 petition for *en banc* rehearing on that issue in *In re Cuozzo Speed Techs., LLC,* 2014-1301.  This Court denied the petition for *en banc* rehearing in that appeal, however, on July 8, 2015. 793 F.3d 1297 (Fed. Cir. 2015).  The broadest reasonable construction standard thus remains the governing standard in this appeal.  *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1275-79 (Fed. Cir. 2015).  This Court reviews the Board's claim construction to determine whether it is reasonable.  *In re Morris*, 127 F.3d 1048, 1055 (Fed. Cir. 1997).

**Claim Construction – Standard Of Review.**  This Court reviews "the Board's claim construction according to the Supreme Court's decision in *Teva Pharms. U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015)."  *Cuozzo*, 793 F.3d 1268, 1279-80 (Fed. Cir. 2015).  Where the Board does not refer to or rely upon extrinsic evidence in construing a claim term (as with the "data flows" claim term in the '936 patent), this Court reviews the Board's construction *de novo*.  But where extrinsic evidence is consulted in construing the claims, the Court must "review for clear error those factual findings that underlie [the Board's] claim construction." *Teva,* 135 S. Ct. at 842.  Where the Board makes "underlying

factual determinations concerning extrinsic evidence" (as with the "data manipulation language" and "graphical representations of flows" claim terms in the '936 patent), those findings are reviewed for "substantial evidence and the ultimate construction of the claim *de novo*." 793 F.3d 1268, 1280 (Fed. Cir. 2015).

**Substantial Evidence.** Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "If the evidence in [the] record will support several reasonable but contradictory conclusions, [this Court] will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002). Where "two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *Id.* at 1329.

**Obviousness**. A patent is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a [PHOSITA] to which said subject matter pertains." 35 U.S.C. § 103. Whether an invention would have been obvious is a legal question reviewed *de novo*, but obviousness is based on underlying findings of fact. *In re Gartside*, 203

F.3d  1305, 1316 (Fed. Cir. 2000).  What a prior art reference teaches and the differences between the claimed invention and the prior art are questions of fact reviewed for substantial evidence.  *Id*.

## SUMMARY OF THE ARGUMENT

ComplementSoft's cross-appeal turns wholly on claim construction regarding two terms recited in independent claim 1.  ComplementSoft concedes that if the Board's construction of these two disputed limitations is upheld, claims 1, 3, and 5-10 are obvious in view of the prior art.

Specifically, ComplementSoft argues that the Board erred in construing "data manipulation language" and "graphical representations of flows within the retrieved source code."  Because the Board correctly adopted and applied the broadest reasonable construction for both of these claim terms, the Board's decision finding claims 1, 3, and 5-10 unpatentable should be affirmed.

## ARGUMENT

The Board did not err in construing either: (I) "data manipulation language"; or (II) "graphical representations of flows within the retrieved source code."

## I.    THE CORRECTLY CONSTRUED "DATA MANIPULATION LANGUAGE."

The Board construed "data manipulation language" to mean: "a programming language used to access data in a database, such as to retrieve, insert, delete, or modify data in the database." A12. ComplementSoft criticizes the Board's construction, but never explicitly explains to this Court what the proper construction should be. *See* CB22-27. ComplementSoft essentially repeats some of its arguments from the IPR, contending that the Board's construction was overly broad and that a data manipulation language must "directly" access data in a database. The Board rejected these arguments in the Final Written Decision (A7-A12), and this Court should do likewise.

### A.    The Board Properly Considered The Intrinsic Evidence Regarding The Meaning Of "Data Manipulation Language."

ComplementSoft complains that the Board "relied entirely on dictionary definitions and expert testimony" in construing the claims, and "ignored the primacy that must be placed on the specification." CB21. The Final Written Decision belies this complaint and demonstrates that the Board properly and

15

thoroughly considered the '936 specification in construing "data manipulation language."

In particular, the Board explained that it had reviewed the '936 specification and found nothing "that supports an interpretation of data manipulation language restricted to *direct* access to a database." A11 (emphasis in original); *see also* A172-173 (Institution Decision:  finding that "none of the citations to the '936 patent relied upon by ComplementSoft mandate its more narrow interpretation" of "data manipulation language").  The Board found, to the contrary, that "the '936 patent discusses, in several places, SQL and Oracle® RDBMS as examples of languages to which the invention is targeted," and "the '936 patent does not specify that these languages would be excluded if the database functionality is indirect."  A12-13 (citing A493 (col. 1:20-25); A493-494 (col. 1:64-2:3); A496 (col. 8:22-26); A497 (col. 9:47-53, col. 10:5-7); A500 (col. 16:34-49); A501 (col. 17:17-19)).  Given that the specification does not in any way limit the claimed "data manipulation language" to "direct" access to a database, the Board properly concluded the "broadest reasonable construction" of this claim term is not so limited.  37 C.F.R. § 42.100(b); *Cuozzo*, 793 F.3d 1268, 1275-79 (Fed. Cir. 2015). And contrary to ComplementSoft's assertions, the Board carefully analyzed the specification and expressly explained its findings; the Board did not "ignore" the specification.

### B. The Board Also Properly Considered Extrinsic Evidence Regarding The Meaning Of "Data Manipulation Language."

In addition to analyzing the specification, the Board also soundly considered relevant extrinsic evidence, as it is permitted to do under this Court's precedent. *See, e.g., Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999) ("[I]t is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field.").

**Expert Testimony.**  The Board considered the declarations of technical experts for both parties as to the understanding of "data manipulation language" to persons of ordinary skill in the art.  *See* A7-8, A9-10, A11 (citing testimony of ComplementSoft expert Mr. Zatkovich); A8-9, A11-12 (citing testimony of SAS's expert Dr. Roussopoulus).  This expert testimony "serve[d] the permissible purposes of aiding [the Board's] understanding of the technology and in helping [the Board] view the patent through the eyes of the skilled artisan."  *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003).  The Board weighed the testimony from both experts, and was "persuaded by the testimony of [SAS's expert] Dr. Roussopoulus that a data manipulation language does not require *direct* access to data in a database."  A11 (emphasis in original).  The Board found the contrary conclusion of ComplementSoft's expert Mr. Zatkovich to be

"unsupported," as "Mr. Zatkovich simply asserts this to be the case, without providing credible support." *Id.* "The Board has broad discretion as to the weight to give to declarations," *In re Am. Acad. of Sci. Tech Center*, 367 F.3d 1359, 1368 (Fed. Cir. 2004), and it properly exercised that broad discretion in construing "data manipulation language." *See also In re Curtis*, 354 F.3d 1347, 1354 (Fed. Cir. 2004) ("Even if we were to disagree with the way in which the Board weighed the [declaration] evidence that was before it, which we do not, our substantial evidence standard of review would require us to defer to the Board's credibility determination.").

**Inventor Testimony.** The Board also considered testimony from one of the named inventors of the '936 patent, Mr. Hiew, in determining the proper meaning of "data manipulation language." A9. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) (recognizing inventor testimony among sources of extrinsic evidence for claim construction). Mr. Hiew's testimony was consistent with the Board's broadest reasonable construction in that he agreed a "selection" (akin to a "retrieval") would be a type of manipulation performed by a data manipulation language. A9 (citing A1712 at 15-18).

**Dictionaries.** The Board further considered dictionary evidence, noting that its construction of "data manipulation language" was "consistent with dictionary

definitions from the time period of the invention." A7.[1] *See In re Trans Texas Holdings Corp.*, 498 F.3d 1290, 1299 (Fed. Cir. 2007) (in determining broadest reasonable interpretation in context of reexamination, "dictionary definitions are also pertinent"). The two technical dictionaries supported the Board's construction of "data manipulation language," without the limitations on "direct" access or "retrieval" urged by ComplementSoft. A7.

**Prior Art.** Finally, the Board considered and credited the Oracle8 Primer prior art reference, "which supports Dr. Roussopoulos's conclusion that embedded SQL accesses and manipulates data in a database." A10-11 (citing A776, A778, A786, A791, A801, A887, A890, A891, A904, A911). *See Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1044-45 (Fed. Cir. 2000) (prior art references "may assist in ascertaining the meaning of a term to a person skilled in the art").

## C. The Board's Factual Findings Regarding The Meaning Of "Data Manipulation Language" Are Not Clearly Erroneous.

The Board's consideration of the extrinsic evidence was perfectly proper and was "particularly appropriate to ensure that [its] understanding of the technical aspects of the patent [was] not entirely at variance with the understanding of one skilled in the art." *Pitney Bowes,* 182 F.3d at 1309. Moreover, this Court reviews

---

[1] Citing A2526-2528: MICROSOFT COMPUTER DICTIONARY at 125 (4th ed. 1999) ("a language that is used to insert data in, update, and query a database"); and A1595-1597: THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS (7th ed. 2000) ("A language used to retrieve, insert, delete, or modify the data in a database.").

the Board's factfinding concerning extrinsic evidence for "clear error." *Teva Pharms. USA, Inc. v. Sandoz, Inc.,* 135 S. Ct. 831, 841 (2015) (in cases where "subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence," and "this subsidiary factfinding must be reviewed for clear error on appeal").  ComplementSoft has not identified any error – let alone clear error – in the Board's factual findings regarding the expert testimony, inventor testimony, dictionary evidence, or the prior art evidence underlying its construction of "data manipulation language."  Given these factual findings, the Board's construction of "data manipulation language" is entitled to deference, and should be affirmed.

### D.    The Board's Construction Of "Data Manipulation Language" Need Not Be Revised To Reflect Any Purported Prosecution "Disclaimer."

ComplementSoft argues that the Board committed a "still greater error" in construing "data manipulation language" by failing to account for a purported prosecution disclaimer.  CB24-26.  Initially, because ComplementSoft fails to provide the Court with the explicit construction for "data manipulation language" that it claims to be correct, it is difficult to discern the precise scope of any alleged disclaimer.  As best understood, ComplementSoft contends there was "a clear disclaimer of object-oriented code from the scope of the amended claims" and "the

inventors excluded from their claim scope modules operating on code programmed in object-oriented languages, including what was taught in Coad." CB25.

### 1. No Prosecution Disclaimer Changes The Broadest Reasonable Claim Construction.

ComplementSoft's disclaimer argument is based on a single, cropped sentence from the original prosecution history. CB24-25 (citing A520: "[R]ather than disclose the claimed system and method for examining software written using one of plural data manipulation language[s], . . . the system and method described in Coad is limited to software written using an object oriented language."). Reviewed in full context, in that part of the prosecution history ComplementSoft made multiple arguments to the Examiner concerning what Coad failed to disclose. A520. ComplementSoft relies on a one-sentence argument regarding what Coad allegedly was *not*, but that single sentence was not an unmistakable statement that the alleged invention recited in the '936 patent claims could not and must not include any "software written using an object oriented language." *See Shire Dev., LLC v. Watson Pharms., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015) ("During prosecution, Shire carefully characterized the *prior art* as *not having* separate matrices but never actually stated that the *claimed invention does have* separate matrices."). ComplementSoft did not clearly and unmistakably exclude from the broadest reasonable construction of the '936 patent claims any and all uses of

object-oriented code, whether alone or in combination with "one of plural data manipulation languages."[2]

To qualify as a disclaimer, this Court has required "the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) (internal citations omitted). Here, the single sentence relied upon by ComplementSoft is not so clear and so unmistakable to meet the high standard for prosecution disclaimer, particularly given the governing broadest reasonable construction standard in an IPR.

Even if there had been some kind of prosecution disclaimer of "object-oriented code" or of "what was taught in Coad," as ComplementSoft now alleges, such a disclaimer would not mandate any change to the Board's construction of "data manipulation language." The Board's claim construction itself says nothing about "object-oriented code." A12. And nothing in the Final Written Decision suggests that the Board construed the "data manipulation language" claim term to include object-oriented programming languages alone.

---

[2] Indeed, the scope of ComplementSoft's purported disclaimer of object-oriented programming languages remains unclear, particularly since many computer languages, such as SAS, can have object-oriented aspects.

### 2.    The Board Relied On Coad In Combination With Other Prior Art References.

In finding claim 1 unpatentable, the Board did not, as ComplementSoft asserts, construe the claims "to include within their scope the very prior art reference [Coad] and object-oriented code that the inventors amended the claims specifically to disclaim." CB21. The Board did not rely on Coad standing alone or Coad's disclosure of object-oriented code standing alone. Rather, the Board relied upon Coad **in combination with other references** to find claim 1 unpatentable: Coad + Oracle Primers (A20-23) and Coad + Antis (A23-26). The Board recognized that Coad literally disclosed two exemplary object-oriented languages (Java, C++) , and the Board specifically looked to the **other prior art references** for teachings of a data manipulation language: *e.g.*, "We agree with [SAS] that when used with an embedded SQL or JDBC API [as in the Oracle Primers], Java and C++ [as in Coad] can be used to access data in a database and therefore qualify as data manipulation languages as we have construed that term" (A21); "Antis discloses a data manipulation language as we have construed the term" (A25). Therefore, ComplementSoft's disclaimer of Coad or object-oriented languages, to the extent there was any such disclaimer, has no bearing on the Board's conclusion that claim 1 is obvious over Coad **in combination with other prior art references** teaching data manipulation languages.

Boiled down, ComplementSoft's purported disclaimer argument is this: because ComplementSoft attempted to distinguish during the original prosecution history Coad and the object-oriented programming languages disclosed in Coad, the Board was necessarily precluded from relying on Coad or on prior art that similarly utilized any object-oriented source code. That is not the law. *See Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259-61 (Fed. Cir. 2012) ("[T]here is no heightened or added burden that applies to invalidity defenses that are based upon references that were before the Patent Office."); *cf. Microsoft Corp. v. i4i Ltd. P'ship,* 131 S. Ct. 2238, 2250 (2011) (same standard of proof for invalidity applies whether prior art evidence is "different" or "identical" to evidence considered by PTO during original prosecution). Indeed, ComplementSoft's prior art reference disclaimer theory would effectively preclude any post-grant validity challenge based on a reference that was allegedly distinguished during patent prosecution even where, as here, that reference renders the patent claim obvious when combined with the teachings of other prior art references. It was perfectly permissible for the Board to rely upon Coad in combination with other prior art (as the Board itself recognized, A180) in finding claim 1 unpatentable, and the Board committed no legal error with regard to any purported disclaimer by ComplementSoft.

24

### E.    Substantial Evidence Supports The Board's Factual Finding That Antis Discloses A "Data Manipulation Language."

Although included in the section of its Brief directed to its claim construction arguments regarding "data manipulation language," ComplementSoft appears to contend that the Board erred as a matter of fact in determining that Antis disclosed a "data manipulation language."[3]  CB26-27.  That is incorrect.

The Board recognized that Antis is not limited to a "data definition language," as ComplementSoft suggests.  A24.  Instead, "Antis also discusses the use of RDBMS," *i.e.*, Relational Database Management System or Software.  A24 (citing A544 at 3:30-35, A545 at 5:4-8).  *see also* A530 (Abstract); A546 (7:31-38).  The Board confirmed this teaching of Antis with expert testimony.  A24 (citing A1705-1706 at 138:19-139:12).  And, the Board found, "the '936 patent expressly mentions RDBMS several times, stating, for example, that 'a need exists for a system and method for exchanging, editing, debugging, visualizing[,] and developing . . . Oracle RDBMS®[,] and other relational database management software."  A25 (citing A493 at 1:66-2:3, 1:20-25; A496 at 8:26-30); *see also* A501 (17:17-29).  Because the '936 patent specification expressly mentions RDBMS languages or database management system languages among examples of

---

[3] It is undisputed that SQL (as disclosed in the Oracle Primers) is a data manipulation language.  *See, e.g.*, OB24 ("the inventors consistently and repeatedly described data manipulation languages using a list of languages such as SQL").

"data manipulation languages" to which the alleged invention is directed, the

Board logically and correctly determined that Antis discloses a "data manipulation

language."

The Board further confirmed this finding with inventor and expert testimony.

The inventor, Mr. Hiew, testified that "a data management system typically

includes a data manipulation language to retrieve and manipulate the data from the

storage management [ ] system" (A25 (citing A1712-1713 at 47:19-48:12)), and

consistent with this testimony, the Board found that "Antis shows some source

code that retrieves data from a database – a data manipulation language" (A25

(citing A542 at FIG. 12)).  The Board also credited Dr. Roussopoulos' testimony

that Antis' Figure 12 shows "a database query" and thereby discloses a "data

manipulation language" under the broadest reasonable construction of that term.

A25 (citing A1916-1917 at 101:4-102:19).

The Board's finding that Antis discloses a "data manipulation language" is

supported by substantial evidence, and ComplementSoft has not shown otherwise.

## II.    THE BOARD CORRECTLY CONSTRUED "GRAPHICAL REPRESENTATIONS OF FLOWS WITHIN THE RETRIEVED SOURCE CODE."

The Board construed "graphical representations of flows" to mean: "a

diagram that depicts a map of the progression (or path) through the source code."

A17.  The Board reached this construction after analyzing the claim language and

the '936 patent specification and considering the parties' arguments.  *See* A12-17.

The Board also considered dictionary evidence and rejected ComplementSoft's

contention that a "graphical representation" must be limited to "icons and arrows."

A173.  The Board's construction is correct under the governing broadest

reasonable interpretation standard.

### A.     ComplementSoft Misreads The Board's Decision To Find A Purported Inconsistency Where There Is None.

As with the "data manipulation language" term, ComplementSoft contends

that the Board's interpretation of the claim phrase "graphical representations of

flows within the retrieved source code" is flawed in some way, but never explicitly

informs this Court what the proper interpretation should be.  *See* CB27-32.

ComplementSoft does not offer a specific alternative construction, nor does

ComplementSoft explain with particularity how the wording of the Board's claim

construction should be revised.  *Id.*

ComplementSoft's primary complaint seems to be that the Board allegedly

"failed to construe the same terms consistently throughout the claims."  CB29-30.

ComplementSoft asserts that "in construing and applying [data manipulation

language], the Board found that it was met by object-oriented code **with**

**embedded SQL**."  CB29 (emphasis by ComplementSoft).  Then, according to

ComplementSoft, in construing "within the retrieved source code," which "the

claims require to have been programmed using a data manipulation language, the

27

Board concluded that merely visualizing **<u>any</u>** object-oriented code, including code

**<u>without</u>** embedded SQL, met this limitation." CB29 (emphasis by

ComplementSoft). The Board nowhere made any such finding about "merely

visualizing any object-oriented code, including code without embedded SQL."

ComplementSoft points only to the Board's statement that: "We also reject

[ComplementSoft's] assertion that the graphical representation must show flow

within source code steps that are actually performing data manipulation." CB29

(citing A22).

In order to try to manufacture "error" where there was none,

ComplementSoft misconstrues the Board's findings. ComplementSoft argues that

by stating the "graphical representations of flows" are not limited to "source code

steps that are actually performing data manipulation," the Board has read claim 1

as permitting the "retrieved source code" to be programmed in something other

than a "data manipulation language." That is **<u>not</u>** how the Board interpreted the

claims, which the Board made expressly clear: "We agree with Patent Owner that

the claim language clearly requires the graphical representations of flows to show

flows **<u>within</u>** **<u>source</u>** **<u>code</u>** **<u>created</u>** **<u>with</u>** **<u>a</u>** **<u>data</u>** **<u>manipulation</u>** **<u>language</u>**." A14

(emphasis added).

As concisely explained in the Final Written Decision, however, the Board

was "not persuaded that this requires the flows to show source code steps that are

actually performing data manipulation." A14. The Board found, correctly, that not every action of a program written in a data manipulation language must necessarily "manipulate data." The Board observed, for example, that the '936 patent shows a graphical representation of a print function with a "PRINT" icon, and that a print function may not involve "actual manipulation of data." A15 (citing A486-487 at FIGS. 20, 20a). The Board also noted that ComplementSoft and its expert Mr. Zatkovich argued that "retrieving data, as in an SQL SELECT statement, is not a manipulation of data," (A15 (citing A221-222, A1871)), but a "program written with a data manipulation language may include functions used for retrieving data" (A15 (citing A222)).

> Based on its review of the evidence, the Board concluded:

> [I]t is undisputed that a program written using a data manipulation language may contain portions of code that perform actions independent from the manipulation of data. And Patent Owner does not point to persuasive language in the '936 patent or other evidence supporting an interpretation that excludes those portions of the source code from the graphical representation. In other words, **the claims require that the "[retrieved] source code" is "programmed using one of a plurality of types of data manipulation languages,"** but nothing in the claims requires that the "retrieved source code" contain functionality that actually manipulates data.

A14-16 (emphasis added); s*ee also* A22 ("Our interpretation of the term includes, but does not require, that the flows are shown within source code that is actually performing data manipulation.").

ComplementSoft has conflated the Board's statement that the graphical representations of flows need not "show flow within source code steps that are actually **performing data manipulation**" with a purported finding (never made by the Board) that the "retrieved source code" need not be programmed using a "**data manipulation language**."  The Board affirmatively stated (at least twice, as noted above) that the claims necessarily require the "retrieved source code" to be programmed using a "data manipulation language."  But the Board correctly recognized that not all "retrieved source code" programmed using a "data manipulation language" will necessarily "manipulate data" or "actually perform data manipulation" – that "retrieved source code" is still, nevertheless, written in a "data manipulation language."  And a "graphical representation of flow" of that "retrieved source code" (whether or not it "manipulates data") would still fall within claim 1.  ComplementSoft's assertion that the Board somehow interpreted claim 1 inconsistently is therefore incorrect.

## B.    The Board Relied On Combinations Of References To Find Obviousness, And ComplementSoft Errs By Attacking The Coad Reference Individually.

ComplementSoft additionally argues that the Board's error in construing the "within the retrieved source code" portion of the "graphical representations" of "flows" claim phrase is "further apparent from its application of the construction to the prior art."  CB30.  More specifically, ComplementSoft contends that the Board

"relied solely on Coad" to show the "within the retrieved source code" limitation of claim 1. CB30-31. And, according to ComplementSoft, since Coad utilizes "object-oriented code" rather than a "data manipulation language," and since Coad was distinguished during the original prosecution history on that basis, the Board improperly applied Coad in making its unpatentability determinations. *Id.*

ComplementSoft errs by attacking the Coad reference in isolation. The Board did not find claim 1 unpatentable in view of Coad alone. Rather, the Board relied upon Coad **in combination with other prior art references**: the Coad-Oracle Primers combination (A20-23), and the Coad-Antis combination (A23-26). As the Board expressly stated, for example: "when used with an embedded SQL or JDBC API, Java and C++ can be used to access data in a database and therefore qualify as data manipulation languages." A21. It is true that the Board pointed to the disclosure in Coad for the "graphical representations of flows within the retrieved source code" limitation. *See* A22; A25. But that does not mean, as ComplementSoft avers, that the Board "relied solely on Coad" in finding claim 1 obvious. To the contrary, the Board relied upon a combination of Coad with other prior art references teaching the "data manipulation language" limitation: the Oracle Primers (A21) and Antis (A25). ComplementSoft's attack on the Coad reference in isolation is therefore misplaced. *See In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Non-obviousness cannot be established by attacking

31

references individually where the rejection is based upon the teachings of a combination of references.").

## C.    There Is No "Practical Problem" With The Board's Construction.

ComplementSoft's final argument is that "[a]ccording to the Board's construction, the code whose flow is graphically represented need not actually contain any data access or manipulation code (or steps, as the Board called it), and includes object-oriented code in which there is no embedded SQL." CB31. ComplementSoft appears to argue that the Coad-Oracle Primers and Coad-Antis combinations would result in a programming language written partially in object-oriented source code (the Coad portion) and partially in data manipulation language source code (the Oracle Primers / Antis portion). ComplementSoft splits the hair far too finely.

The Board determined that the Coad-Oracle Primers combination would result in a "data manipulation language": "[W]hen used with an embedded SQL or JDBC API, Java and C++ can be used to access data in a database **and therefore qualify as data manipulation languages**." A21 (emphasis added). In other words, when object-oriented code written in "Java and C++" is used with "an embedded SQL or JDBC API," that Java and C++ code with that functionality qualifies as a "data manipulation language" – the result of the obviousness combination is not a programming language that can be broken into separate

32

"object-oriented" source code pieces and separate "data manipulation language" source code pieces.  Likewise, the Board combined the teachings of Coad and Antis to result in an object-oriented language that also qualifies as a data manipulation language, not a partial object-oriented language / partial data manipulation language.  The Board did not rely, as ComplementSoft asserts, on prior art combinations entirely lacking data manipulation language source code.

## III.    THE BOARD CORRECTLY DETERMINED THAT CLAIMS 1, 3, AND 5-10 ARE OBVIOUS IN VIEW OF PRIOR ART.

As noted above, ComplementSoft's entire cross-appeal is premised on claim construction.  CB2.  Other than challenging the Board's construction of two claim terms, ComplementSoft makes no patentability arguments to overcome the Board's obviousness determination regarding claims 1, 3, and 5-10.  ComplementSoft does not dispute what the prior art references teach, does not dispute the combinability of the references, does not dispute the motivation to combine the references, and argues no secondary considerations or objective evidence of nonobviousness.  Because the Board properly construed "data manipulation language" and "graphical representations of flows within the retrieved source code" in accordance with the governing broadest reasonable construction standard, the Board's decision finding claims 1, 3, and 5-10 unpatentable should be affirmed.

## REPLY ARGUMENT

The Board's claim construction for "data flows," reviewed *de novo* by this Court, was in error, and the Board's patentability finding regarding claim 4 should be reversed or, alternatively remanded for the Board to apply the proper construction.  Also, the Board's Final Written Decision violated 35 U.S.C. § 318(a) because it failed to include any decision regarding the patentability of claims 2 and 11-16, which SAS challenged in the Petition.  This Court should remand for the Board to issue a final written decision in accordance with § 318(a).

## I.    THE BOARD ERRED IN CONSTRUING "DATA FLOWS."

The Board's new and overly narrow construction for "data flows" adopted in the Final Written Decision is not the broadest reasonable construction in view of the specification, and that flawed construction led the Board to err in confirming the patentability of claim 4.  ComplementSoft argues waiver, but the Board *sua sponte* adopted a new construction for "data flows" in the Final Written Decision, and there was no waiver by SAS.

### A.    The Board's New Construction For "Data Flows" Is Not The Broadest Reasonable Construction In View Of The '936 Patent Specification.

The Board's new construction for "data flows" requires: "a graphical representation comprised of icons depicting data processing steps and arrows to depict the movement of data through source code."  A18-19.  As demonstrated in

SAS's Opening Brief, that construction is not the broadest reasonable interpretation because it:  improperly equates "data flows" (as recited in claim 4) with "data flow diagrams" (**not** recited in claim 4); is inconsistent with the broad description of "data flows" in the '936 patent specification; and impermissibly reads into claim 4 a requirement for "icons depicting data processing steps."  *See* OB28-41.  ComplementSoft attempts to defend the Board's new construction on several grounds, none of which establishes the Board's narrow definition as the broadest reasonable construction in view of the specification.

> **1.    The Board's Construction For "Data Flows" Improperly Imports Limitations From A Single Sentence In The Specification.**

The Board's new construction for "data flows" is based on a single sentence in the SUMMARY OF THE INVENTION portion of the '936 patent specification describing "data flow diagrams."  A18 (citing A493 col. 2:40-42: "Data flow diagrams are comprised of icons depicting data processing steps and arrows to depict the flow of the data through the program.").  ComplementSoft argues that the Board properly relied upon this sentence "in context" because that portion of the SUMMARY OF THE INVENTION describes the "visualizer," and the claims recite that the "visualizer" is what is used to display the "graphical representations of data flows."  CB34-35.  But other portions of the specification describe the "visualizer" as merely showing "data flows" (the actual term recited in claim 4) –

not limited or restricted to "data flow diagrams" (a term <u>not</u> recited in claim 4).

For example, in the DETAILED DESCRIPTION, the '936 patent specification states:

"As shown in FIGS. 9 and 17, the **visualizer** 120 may be used to show the program

flow 122 or the **data flow** 124 of the selected code on the visualizer window 121."

A500 (col. 15:50-52) (emphasis added).  Thus, in full context, the entirety of

the '936 patent specification does not limit the "visualizer" to the display of "data

flow diagrams," as ComplementSoft suggests.

## 2.    The '936 Patent Specification Does Not Equate "Data Flows" And "Data Flow Diagrams."

ComplementSoft repeats the Board's mistaken conclusion that "the

inventors used 'data flows' and various terms indicating the visualization of those

flows interchangeably" (CB34-35), so "data flows" and "data flow diagrams" must

be the same.  That is not correct.  As SAS explained in its Opening Brief, the '936

specification does not use the terms "data flows" and "data flow diagrams"

interchangeably, OB34, and, indeed, it would defy ordinary usage and common

sense for a "diagram" of a thing to be the same as the thing itself.  Neither of the

two exemplary citations to the '936 specification relied upon by the Board for this

conclusion actually uses the term "data flow diagram."  A18-19 (citing A494 col.

4:12-13 & A500 col. 16:3-5).  And the term "data flow diagram" does not appear

anywhere in the DETAILED DESCRIPTION portion of the specification, even though

36

the purportedly "interchangeable" term "data flow" is used extensively in that part of the specification (*e.g.*, A496 col. 8:8-14; A500 col. 16:6-30, 16:47-59).

### 3.    The '936 Patent Specification Does Not Limit The Display Of "Data Flows" To "Data Flow Diagrams."

In the '936 patent specification, "data flows" are not exclusively displayed in "data flow diagrams."  *See* OB32-33.  SAS readily agrees with ComplementSoft that "data flows" are shown in FIG. 17.  *See* OB8-9.  SAS does not agree, however, that "data flows" are shown **only** in FIG. 17.  CB33-36.  "Data flows" **also** are shown in FIG. 9.  Indeed, the '936 patent specification states multiple times that FIG. 9 shows "the flow of data":

- "**FIG. 9** is an exemplary screen shot depicting a program flow for a selected file, along with arrows that **indicate the flow of data** within the program flow"  A494 (col. 3:49-51) (emphasis added);

- "As illustrated in **FIG. 9**, arrows connect these program flow icons 126 to generally **illustrate the flow of data**" A496 (col. 8:12-14) (emphasis added).

ComplementSoft concedes that FIG. 9 "shows program flow."  A128.  Because the '936 specification discloses that "data flows" are also illustrated in diagrams showing "program flow" (like FIG. 9), the Board erred by construing "data flows" to be necessarily, and in all cases, coextensive solely with "data flow diagrams."

### 4.     The Broadest Reasonable Construction Of "Data Flows" Does Not Require "Icons Depicting Data Processing Steps."

As SAS explained in its Opening Brief (OB35-38), the '936 specification discloses in multiple places "data flows" being illustrated with more general "program flow icons"—not necessarily "icons depicting data processing steps" and arrows:  *see, e.g.*, A496 (col. 8:8-14: "As illustrated in FIG. 9, arrows connect these **program flow icons 126 to generally illustrate the flow of data**"); A500 (col. 16:15-16-20: "the visualizer 120 and the document view engine 200 may re-generate the data flow 124a on the visualizer window 121 and collapse the number of **program flow icons 126 that comprise the data flow 124**"); A500 (col. 16:27-30: "thereby expanding the number of **program flow icons 126 that comprise the data flow** 124 and showing the data flow 124 for individual sections or blocks of code") (emphasis added to each).  In view of these broader disclosures, the Board erred by limiting "data flows" to a single, specific embodiment described in the specification as using "icons depicting data processing steps," particularly since the '936 patent specification explains that the disclosed embodiments should be considered exemplary, illustrative, and non-limiting.  *See* A501 (col. 18:13-17); A501 (col. 17:62-66); A494 (col. 3:15-20; col. 3:24-26).  SAS has not "warp[ed] the specification" as ComplementSoft alleges (CB 36-37), but rather has urged a construction that is based on the entirety of the specification, as required.  *In re Trans Tex. Holdings Corp.*, 498 F.3d 1290, 1299 (Fed. Cir. 2007) (it is improper

for PTO Board in reexamination to confine claims to specific embodiments found in the specification).

ComplementSoft (CB37) fails to identify any specification passage cited by SAS that actually recites or refers to the "icons depicting data processing steps" language improperly imported into the claims by the Board. *See* A500 (col. 16:19-22); A496 (col. 8:8-14). That language appears once—and only once—in the entire '936 specification, describing an exemplary embodiment of a "data flow diagram" that uses "icons depicting data processing steps," not a "data flow" as broadly claimed. *See* A493 (col. 2:40-42). Because the '936 specification describes "data flows" that are depicted, for example, with general "program flow icons," the Board's construction requiring "icons depicting data processing steps" was not the broadest reasonable construction in view of the specification.

Indeed, the Board itself in the Institution Decision correctly determined that the '936 patent specification does not limit the claimed "graphical representations" (as in the "graphical representations of data flows" recited in claim 4) to "icons and arrows" generally, let alone to "icons depicting data processing steps and arrows." As the Board found:

> We are not persuaded that the term "graphical representation" is limited to "icons and arrows" as proposed by ComplementSoft. *See id.* The plain and ordinary meaning of the word "graphical representation" is using a picture or graph to depict something else. *See, e.g.,* AMERICAN HERITAGE DICTIONARY at 573, 1049 (2nd College Ed. 1982) (defining "graphical" as "of or pertaining to pictorial

representation"). Thus, the plain and ordinary meaning of "graphical representation of flows" is a picture or graph that depicts flows. Although the '936 patent describes the use of icons and arrows in diagrams (*see, e.g.*, col. 2, ll. 38-42), ComplementSoft does not point to language in the patent that limits the diagrams to those particular symbols.

A173. The Board was correct in the Institution Decision that nothing in the '936 patent limits the "graphical representation" of the flows to particular symbols, like "icons and arrows." So in claim 1, according to the Board, a "graphical representation of flows" is just "a picture or graph that depicts flows," with no icons or arrows of any kind necessarily required. But then in the Final Written Decision, the Board inexplicably interpreted the claim 4 phrase "graphical representations of **data** flows" (differing only by the addition of the word "data") to be narrowly limited to very specific kinds of symbols: "icons depicting data processing steps and arrows." This further demonstrates the Board's error in reading in a requirement that "data flows" must include particular kinds of icons and arrows.

### B.    SAS's Proposed Modification To The Board's New Construction In The Final Written Decision Is Consistent with The Broadest Reasonable Construction Standard.

SAS showed in its Opening Brief that the broadest reasonable construction of "data flow" in view of the '936 specification is just the final portion of the Board's construction: "the movement of data through source code." OB28-41. "Data flows" are generally used to illustrate the movement (the flow and the

direction) of the data through the source code.  A500 (col. 16:7-12: "The data flow 124 is generated by parsing the code, tracing the flow of the data through the code and displaying individual processes and data blocks in separate columns with arrows that connect the program flow icons 126 and indicate the direction of the data flow.").  As broadly described in the '936 specification, "data flows" do not necessarily require, *inter alia*, "icons depicting data processing steps," as the Board held.

ComplementSoft argues that the construction for "data flows" urged by SAS in its opening brief is "wrong on the merits."  CB42-44.  ComplementSoft points to certain excerpts from the specification cited in SAS's Opening Brief, again arguing that SAS ignores "its own allegedly supporting passages."  CB42 (citing OB41, OB36).  None of those passages, however, includes the language that the Board imported into the construction of "data flows" from the specification: "icons depicting data processing steps."  *See id*.  Moreover, those particular passages from the '936 specification describe FIGS. 17 and 18, each of which is described as an "exemplary" – *i.e.*, non-limiting – screen shot: A494 ("FIG. 17 is an exemplary screen shot depicting a data flow for a selected file; FIG. 18a-c are a series of exemplary screen shots depicting operation of a step-wise function and various data flows as the data flows are being collapsed").

ComplementSoft further argues that SAS's invalidity position is "meritless," even if its modification to the Board's new construction is adopted. OB42-44. ComplementSoft argues that there is no testimony or evidence that a PHOSITA would consider "message flows" as shown, *e.g.*, in Coad's FIG. 15 to be "data flows." *Id.* Although ComplementSoft's own expert testified that "messages" can be "data" (*see* OB44, citing A1844 (p. 71:19-23)), ComplementSoft quibbles that Mr. Zatkovich did not expressly equate "message flows" and "data flows." OB43-44. And ComplementSoft overlooks similar testimony from Dr. Roussopoulus that a PHOSITA would understand that "messages" can be used for delivering data. *See* A2192 at 39:3-8 ("Q. And messages – what's the understanding of one skilled in the art as to what messages are? A. A message is – it could be a control message or it could be data delivering message."). Under a proper, broadest reasonable interpretation of claim 4, the evidence supports a finding that Coad does indeed show "data flows."

### C.    SAS Did Not Waive Its Ability To Challenge The Correctness Of The Board's New Construction For "Data Flows."

ComplementSoft argues that SAS "did not pursue its proposed construction [for data flows] before the Board," and cannot "introduce a new construction on appeal." *See* CB39-41. But this is not a situation where the parties offered competing constructions for a particular claim term, and the tribunal chose one construction over another. Here, in its own words, the Board in the Final Written

Decision construed a term "not addressed explicitly by either party." A6-7.

Indeed, when ComplementSoft's counsel was asked during the oral hearing if he

had "a specific interpretation for data flow" to propose, he responded: "Not at this

time. It's not a question we briefed or really considered." A401. The Board then

*sua sponte* adopted a completely new construction for "data flows" in the Final

Written Decision. A6-7. SAS challenged this new construction at its very first

opportunity, in its Request For Rehearing, explaining why the new construction

was overly narrow and inconsistent with the governing broadest reasonable

interpretation standard. A437-443. SAS is therefore not precluded from

challenging the correctness of the Board's construction on appeal to this Court.

Nor is SAS precluded from proposing modifications to the Board's

construction adopted in the Final Written Decision. Upon this Court's *de novo*

review, SAS maintains that the Board's construction for "data flows" should be

modified to remove certain portions as follows: "~~a graphical representation~~

~~comprised of icons depicting data processing steps and arrows to depict~~ the

movement of data through source code." OB40-41. SAS previously argued to the

Board in its Request For Rehearing that these same portions of the Board's new

construction were improper and were contrary to the broadest reasonable

interpretation standard. *See* A443 (regarding "graphical representation" language);

A441-443 (regarding "icons depicting data processing steps"); A439-441

43

(regarding "data flows" and "data flow diagrams" not being coextensive).  The Board had an opportunity to address SAS's arguments and, incorrectly, declined to modify its construction in its Rehearing Decision.  A46-48.  There was no waiver. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1371 (Fed. Cir. 2002) (in evaluating waiver, "we look to see whether the trial court and the party claiming waiver had fair notice and an opportunity to address the issue concerning the scope of a claim limitation").

Furthermore, during the earlier stages of the IPR, SAS argued that ComplementSoft was interpreting "data flows" too narrowly.  SAS maintained that FIGS. 14 and 15 of the prior art Coad reference disclosed "data flows" under a broadest reasonable interpretation of that term:  "These figures thus depict a map of the path of data through the source code, *i.e.*, data flow."  A290-291.  SAS's interpretation of "data flows" at that time ("a map of the path of data through the source code") is fully consistent with its current position regarding how the Board's new construction should be modified to comply with the controlling broadest reasonable interpretation standard ("the movement of data through source code").

As explained in its Opening Brief, SAS argued in its Request For Rehearing that the Board should have applied the interpretation of "data flows" from the

Institution Decision.  *See* OB41 n. 8.  That interpretation[4] was generally consistent with the broadest reasonable construction standard and did not impermissibly require, *inter alia*, "icons depicting data processing steps" and other unnecessary limitations that SAS now proposes should be removed from the construction newly adopted in the Final Written Decision.  SAS urges this Court, upon *de novo* review, to modify the Board's construction to remove the unnecessary limitations imported from the specification description of a "data flow diagram."  While ComplementSoft argues that SAS should have proposed this specific modification in its Request For Rehearing, there is no authority requiring that an issue must be raised in a rehearing request to avoid waiver.  Particularly given the circumstances here, where the Board admittedly injected the issue into the case *sua sponte*, it would be inappropriate for this Court to find waiver.  *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1251 (Fed. Cir. 2005) ("An appellate court retains case-by-case discretion over whether to apply waiver").

### D.    SAS Had No Opportunity To Present Evidence Tailored To The Board's New Construction For "Data Flows" Since That Construction Was First Adopted In The Final Written Decision.

The "icons depicting data processing steps" portion of the Board's new "data flow" claim construction was the only basis for finding claim 4 patentable.  *See*

---

[4] The Board generally discussed "data flows" in the Institution Decision, but did not expressly construe that claim term.  *See* A184.  As the Board explained in the Final Written Decision: "In the Decision to Institute, we did not explicitly interpret ['data flows'] as part of the claim construction section."  A18.

OB38-39.  ComplementSoft criticizes SAS for claiming "without citation" that "[t]he only thing the Board identified as missing in SAS's unpatentability arguments was prior art evidence corresponding to the new requirement for 'icons depicting data processing steps.'"  CB38 n. 6.  But the Board expressly acknowledged just that fact – that SAS had already presented evidence during the IPR regarding the other portion of the new "data flow" construction adopted in the Final Written Decision, just not the "icons depicting data processing steps":

"[A]lthough [Dr. Roussopoulos's] testimony addresses part of our interpretation of the term 'data flows'—'arrows to depict the movement of data through source code,' his testimony does not explain how Coad depicts 'icons depicting data processing steps.'"  A29.  Of course, since the Board did not adopt its new construction for "data flows" until over 14 months *after* Dr. Roussopoulos submitted his declaration, and over 9 months *after* he gave deposition testimony, it is unsurprising that Dr. Roussopoulus did not specifically tailor his testimony to the particular requirements of the Board's new claim construction.

Because the Board adopted an entirely new and unforeseen claim construction for "data flows" in the Final Written Decision, SAS should have been afforded an opportunity to address the new "icons depicting data processing steps"

requirement, via supplemental testimony from Dr. Roussopoulus or otherwise.[5]

The Board, however, improperly denied SAS's rehearing request seeking that

opportunity.  A46-48. Should this Court affirm the Board's construction of "data

flows" as newly-adopted in the Final Written Decision, SAS requests that the

Court remand to the Board so that SAS is given a proper opportunity to present

evidence of the unpatentability of claim 4 under this new claim construction.[6]

## II.  THE BOARD ERRED IN FAILING TO ADDRESS THE PATENTABILITY OF EACH CLAIM CHALLENGED BY SAS.

The text of 35 U.S.C. § 318(a) is clear:  If the Board decides to institute

review, then it "shall" (i.e., must) "issue a final written decision with respect to the

patentability of **any** patent claim **challenged by the petitioner**."  *Id.* (emphases

added); *see* OB45-51.  Because the Final Written Decision here indisputably did

---

[5] ComplementSoft contends that SAS argued to the Board at the Oral Hearing "that it would be perfectly appropriate to construe terms for the first time in the Final Written Decision." CB39 (citing A380-381).  But SAS never argued that the Board could, as it did here, adopt a new and dispositive claim construction in its final written decision without at least giving the parties some opportunity to address that new claim construction.

[6] The Administrative Procedure Act imposes certain minimum obligations on Board actions.  For example, 5 U.S.C. § 554(b)(3) requires that "[p]ersons entitled to notice of an agency hearing shall be timely informed of . . . the matters of fact and law asserted"; § 554(c) requires that agencies give "all interested parties opportunity for . . . the submission and consideration of facts [and] arguments . . . [and] hearing and decision on notice"; and § 556(d) "entitle[s]" a party "to submit rebuttal evidence."  Section 554(b)(3) has been applied to mean that "an agency may not change theories in midstream without giving respondents reasonable notice of the change" and "the opportunity to present argument under the new theory."  *Rodale Press, Inc. v. FTC*, 407 F.2d 1252, 1256-57 (D.C. Cir. 1968).

not address the patentability of every claim challenged by SAS, *see* A41, the Board did not satisfy the statute's clear command. The arguments by the government and ComplementSoft cannot overcome the statutory text, and they wrongly assert that review by this Court is foreclosed. The Final Written Decision should be vacated in pertinent part and the matter remanded for proceedings consistent with § 318(a).

## A.    The Government And ComplementSoft Cannot Ignore Or Rewrite The Plain Language Of 35 U.S.C. § 318(a).

The government and ComplementSoft do not dispute that the unambiguous meaning of "shall" is "must," and that "any" means "all." OB48-49. And, notwithstanding the primacy of statutory text, the government avoids discussing the language of § 318(a) until 13 pages into its argument (PTOB13-19), and the government does not even include § 318(a) in its "Relevant Statutory Provisions" reproduced at the start of its brief. The reason for downplaying § 318(a) is simple: The statutory command that the final written decision shall address "the patentability of any patent claim challenged by the petitioner" is plain. It requires the Board to address, in the final written decision, the patentability of each challenged claim.

As SAS explained (OB49-50), "the normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("We therefore presume that

48

Congress intended that the term have the same meaning in each of the pertinent sections or subsections of the statute, and we presume that Congress intended that [the agency], in defining the term, would define it consistently."). Congress repeatedly used the phrase "claim(s) challenged" to refer to "claims" that the petitioner "challenged" in its petition. 35 U.S.C. §§ 312(a)(3), 314(a). The petition is the mechanism by which the petitioner challenges claims. *Id*.

Both the government and ComplementSoft urge alternative interpretations of § 318(a) by improperly reading language into the statute. The government argues that "the plain meaning of section 318(a) is that the Board's final written decision should address the patentability of any claims remaining in dispute once the IPR has reached the final decision stage – any *remaining* 'challenged' claims and any *new* claims added by amendment." PTOB15 (emphases by PTO). But that interpretation violates the very rule that the government (in its very next paragraph) wrongly accuses SAS of violating: "The Supreme Court has instructed that 'we ordinarily resist reading words or elements into a statute that do not appear on its face.'" PTOB15-16 (citing *Bates v. United States*, 522 U.S. 23, 29 (1997)). The statute on its face does not literally refer to "any *remaining* patent claim challenged"—it recites only "any patent claim challenged."

For its part, ComplementSoft reads different language into § 318(a): "Read in context, therefore, 'challenged' necessarily means claims that were **properly**

challenged in the petition, that is, claims for which a reasonable likelihood of success exists." CB46 (emphasis by ComplementSoft). Here again, § 318(a) on its face does not literally refer to "any patent claim *properly* challenged" – it recites only "any patent claim challenged."

SAS's statutory interpretation, by contrast, does not read words into § 318(a). SAS merely interprets the literal language "any patent claim challenged" in § 318(a) by considering other parts of the statute that similarly refer to "claim(s) challenged," 35 U.S.C. §§ 312(a)(3), 314(a), and these provisions refer to "claims" that the petitioner "challenged" in its petition. The government argues that "claim challenged by the petitioner" in § 318(a) means something different than "claims challenged in the petition" in § 314(a). PTOB16 (Congress used "the words 'challenged' and 'petition' in other sections where Congress intended 'challenged' to be limited in this manner"). But there is little reason to think that "claim challenged by the petitioner" means something different from "claims challenged in the petition" since it is the petitioner who challenges claims in the petition. *See* 35 U.S.C. §§ 311, 312(a)(3). Giving these words their plain meaning does not "essentially add[] extra words to section 318(a)." PTOB15.

The government argues that Section 318(a) cannot mean what it says because it does not appear in the portion of the statute dealing with the institution of an IPR, and that SAS's interpretation fails "to consider the statutory framework

as a whole." PTOB14.  SAS's interpretation, to the contrary, is fully consistent with the overall IPR framework.  Under § 314(a), the PTO has the authority to institute an IPR if there is a reasonable likelihood that the petitioner will prevail "with respect to at least 1 of the claims challenged in the petition."  If the threshold is met as to at least 1 claim and the PTO does institute the IPR of the patent, then the Board is required to issue a final written decision under § 318(a) "with respect to the patentability of any patent claim challenged by the petitioner."  So an IPR may be instituted if the threshold showing is met as to "at least 1 of the claims challenged," but once the IPR is instituted, the Board must then issue a final written decision not just as to that "at least 1 claim" or some other subset of the claims—the statute mandates that the final written decision must address "any patent claim challenged by the petitioner."  And the "any patent claim challenged" requirement is right where it belongs in the statute, in the final written decision provision in § 318(a), because it is the final written decision that creates estoppel under § 315(e) and is appealable under § 329.

## B.    The Government Incorrectly Equates "Grounds" With "Claims."

Throughout its brief, the government repeatedly emphasizes its discretion to deny certain "grounds" when instituting an IPR.  And the government strains to equate "grounds" of unpatentability with patent "claims."  *See, e.g.*, PTOB12 ("Since the non-instituted grounds (concerning claims 2 and 11-16) were never

part of the IPR, they were never part of the Board's final decision."). But § 318(a) does not refer to "any **grounds** raised by the petitioner" – the statute instead clearly requires a final written decision as to "any patent **claim** challenged by the petitioner." In other parts of the statute, Congress does expressly refer to "ground(s)." *See, e.g.*, § 312(a)(3) (referring to "the grounds on which the challenged to each claim is based"); § 315(e)(1) (referring to "any ground that the petitioner raised or reasonably could have raised"); § 315(e)(2) (same); § 316(a)(2) (referring to "sufficient grounds to institute a review under 314(a)"). And as the government itself argues (PTOB16), "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotations omitted).

Moreover, Congress even used both "grounds" and "claims" multiple times in the same section of the statute, regarding the estoppel provisions: "with respect to that **claim** on any **ground** that the petitioner raised or reasonably could have raised during the [IPR]" (§ 315(e)(1), emphasis added); "that the **claim** is invalid on any **ground** that the petitioner raised or reasonably could have raised during that [IPR]" (§ 315(e)(2), emphasis added). This demonstrates that Congress knew well the difference between "grounds" and "claims," and purposefully chose to

require in § 318(a) that the final written decision address the patentability of "any patent **claim** challenged by the petitioner." Congress did not require in § 318(a) the PTO to address all "grounds" raised by a petitioner, but if an IPR is instituted, Congress did expressly require the PTO to issue a final written decision addressing all "claims" challenged by the petitioner.

### C.    The Government's Efficiency Arguments Cannot Trump The Statutory Command Of Section 318(a).

The government also stresses that Congress intended to achieve "efficiency by giving the USPTO discretion in determining whether to deny institution, even for otherwise meritorious petitions." PTOB5-6. The government cites legislative history characterizing 35 U.S.C. § 316(b) as "reflect[ing] a legislative judgment that it is better that the [USPTO] turn away some petitions that otherwise satisfy the threshold for instituting an inter partes or post-grant review than it is to allow the [USPTO] to develop a backlog of instituted reviews that preclude the [USPTO] from timely completing all proceedings." PTOB5-6, PTOB17-18 (citing 157 Cong. Rec. S1377 (daily ed. Mar. 8, 2011) (Senator Kyl statement)).

This legislative history says nothing about the PTO having discretion to conduct an IPR on only certain claims challenged in a petition, or discretion to issue a final written decision on less than all the challenged claims in a petition. Instead, this legislative history confirms that Congress only intended to give the PTO discretion to deny "some **petitions**"—meaning **petitions in full and in their**

**entirety**—even if those petitions "otherwise satisf[ied]" the statutory threshold for instituting an IPR, because of concerns that the PTO needed a "safety valve" in case it ever became overburdened by too many filings.  In the sentence immediately preceding the one quoted three times in the PTO's Brief (PTOB5-6, 21-22), Senator Kyl explained: "It is expected that the Office will include in the threshold regulations a safety valve that allows the Office to decline to institute further proceedings if a high volume of pending proceedings threatens the Office's ability to timely complete all proceedings."  *See* 157 Cong. Rec. S1377.  The government mentions that important context only in a footnote.  PTOB22 n. 5.

The Board's discretion whether to institute review at all does not answer the very different question of what the Board must do once it does institute review. There may be good reasons to give the Board discretion when deciding whether to institute an IPR.  But § 318(a), as well as § 316, make clear that, once the Board institutes review, its discretion is **not** unfettered.  *Cf. Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (even when an agency has unreviewable discretion to institute proceedings, "when an agency *does* act…[t]he action at least can be reviewed to determine whether the agency exceeded its statutory powers").  Once the Board institutes an IPR, its discretion is limited by § 318(a), which requires a final written decision with respect to the patentability of all claims challenged in the petition.

The government is similarly mistaken to rely on a regulation that purports to authorize partial institution. PTOB4-5, 22-25 (discussing 37 C.F.R. § 42.108). That regulation is contrary to law, to the extent it conflicts with 35 U.S.C. § 318(a). *See* OB46 n. 9. In addition, the regulation does not answer the question of what the Board must address in its final written decision. The PTO has promulgated no rule interpreting "claims challenged by the petitioner," so the Board merits no deference as to the scope of final written decisions under § 318(a), which is the question presented here. *See City of Arlington, TX v. FCC*, 133 S. Ct. 1863, 1874 (2013) ("[F]or *Chevron* deference to apply, the agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted.").

### D.    Congress Intended More Than Just "Any Simplification" Of Parallel District Court Litigation.

By resolving all claims challenged in an IPR petition, a proper Board ruling under § 318(a) estops further litigation over the patentability of the challenged claims based on Section 102 or 103 grounds that the petitioner raised or reasonably could have raised. 35 U.S.C. §§ 311(b), 315(e)(2). A partial final written decision, however, leaves the patentability of any non-addressed claims to be resolved in litigation, defeating Congress's purpose in enacting the IPR statute. *See* OB53-57.

The government argues that even if the PTO fails to address all "claims challenged" by an IPR petitioner, and the estoppel effect is therefore necessarily

limited, "any simplification helps a district court which is also entertaining the subject patent." PTOB18. But "any simplification" was not Congress's intent. Congress designed the estoppel provisions "to force a party to bring all of [its] claims in one forum … and therefore to eliminate the need to press any claims in other fora." 154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl); *see also* OB53-54 n. 12. Congress specifically intended for IPRs to "completely substitute for at least the patents-and-printed publications portion of the civil litigation," 157 Cong. Rec. S1376 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl); *see also Cuozzo*, 793 F.3d 1297 at 1300 ("The post-grant proceedings established by the America Invents Act were intended as a far-reaching surrogate for district court validity determinations.") (Newman, J., dissenting). The PTO's practice of issuing final written decisions that address only some claims challenged by an IPR petitioner is contrary to Congress's intent.

### E.    Directing The Board To Comply With § 318(a) Would Not Result In Any Legitimate "Waste Of Administrative Resources."

The government and ComplementSoft (correctly) observe that a patent owner may disclaim or cancel claims during the course of an IPR, from which the government (incorrectly) infers that SAS's interpretation "would have the Board ignore these developments and issue a final written decision on claims that have been dedicated to the public—a clear waste of administrative resources." PTOB15; *see also* CB45. SAS in no way suggests that the Board would ignore such

developments.  If a patent owner disclaims one or more of the claims challenged in an IPR petition, there is nothing burdensome or wasteful about the Board briefly memorializing in its final written decision that the patent owner canceled one or more claims; this easy task would satisfy the Board's § 318(a) obligation to issue a final written decision with respect to the patentability of any claim challenged by the petitioner.

Nor is there any practical impediment to the Board following the clear statutory command of § 318(a).  The Board already addresses each "challenged claim" when it decides whether to grant a petition.  Here, the Board issued a 20+ page decision doing just that.  *See generally* A166-188.  At a minimum, therefore, it could incorporate that reasoning into the final written decision (making it subject to appeal under 318(a)).  If the PTO determines that its current procedures create a "waste of administrative resources" in view of the requirements of § 318(a), then rather than frontload the analysis prior to institution, the Board could (as the statute provides) grant review upon determining that "at least 1 claim" meets the threshold requirement, and then conduct the IPR in total as to all the challenged claims.

### F.    This Court Has Jurisdiction To Consider SAS's Appeal Of The Final Written Decision Under 35 U.S.C. § 319.

The government argues that SAS's appeal is barred by existing case law concerning the appealability of an IPR institution decision.  PTOB9-11.  But SAS is not seeking "review of the decision to institute IPR."  This IPR was instituted

after the PTO determined that SAS had met the statutory threshold of showing "a reasonable likelihood that [it] would prevail with respect to at least 1 of the claims challenged in the petition" (A167), and SAS does not challenge that finding here. In this appeal, SAS is challenging a PTAB final written decision, which is expressly authorized by statute.  35 U.S.C. § 319.

The government argues that SAS "crafts its challenge as one to the Board's final written decision," but asserts that "SAS *is* challenging the Board's decision at the institution stage."  PTOB11 (emphasis by government).  This argument disregards the plain language of the relevant jurisdictional provision.  The AIA provides, simply and clearly, that a "party dissatisfied with the final written decision of the [Board] under § 318(a) may appeal" that decision to this Court.  35 U.S.C. § 319; *id*. § 141(c).  That describes this case exactly:  SAS is "dissatisfied with the final written decision of the [Board] under § 318(a)" because the Board failed to issue a final written decision that addressed "the patentability of any patent claim challenged by" SAS, as § 318(a) requires.  OB68-72, 75-76.  That is why *Cuozzo* and *St. Jude* do not decide the question in this appeal; those decisions concerned appeals of the decision to institute, not the final written decision. *Cuozzo*, 793 F.3d at 1272 ("Cuozzo argues that the PTO improperly instituted IPR . . . "); *St. Jude Medical, Cardiology Div., Inc., v. Volcano Cop.*, 749 F.3d

1373, 1374 (Fed. Cir. 2014) ("St. Jude appealed the noninstitution decision to this court.").

The government reads too much into § 314(d), which only bars review of a "determination…*whether* to institute" an IPR. *Id.* (emphasis added). Section 314(d) does not bar review of every decision that might "*affect* whether to institute" review, which is how the government re-writes the provision. Such an interpretation would be limitless. Permitting the Board to apply the "broadest reasonable interpretation" of claims, for instance, surely affects determinations whether to institute. *See Cuozzo*, 793 F.3d at 1275-79. So too if a patent qualifies as a covered business method patent under § 18 and whether § 101 challenges are cognizable in post-grant reviews. *Versata Dev. Group v. SAP Am.*, 793 F.3d 1306, 1329-30 (Fed. Cir. 2015).

At issue here is the very thing over which § 319 expressly grants jurisdiction: whether, under § 318(a), the Board "issue[d] a final written decision with respect to the patentability of any patent claim challenged by the petitioner." Nothing in § 314(d) limits that express grant of jurisdiction.

### G.    SAS Has Alternatively Requested Mandamus Relief.

As explained in SAS's Opening Brief, SAS appeals under 35 U.S.C. § 319 the Board's failure to issue its <u>Final</u> <u>Written</u> <u>Decision</u> in compliance with § 318(a). OB47 n.10. But to the extent the Court considers any part of SAS's appeal to be a

challenge to the Board's Institution Decision declining to review challenged claims 2 and 11-16, then SAS requests that this appeal be considered a mandamus petition. *Id*. *See Cuozzo*, 793 F.3d at 1274 ("mandamus may be available to challenge the PTO's decision to grant a petition to institute IPR after the Board's final decision in situations where the PTO has clearly and indisputably exceeded its authority").

All of the requirements for mandamus relief exist here. First, to the extent the Court concludes it is precluded from reviewing on appeal the Board's failure to issue its Final Written Decision regarding all claims challenged by SAS, there is no other means for SAS to obtain adequate relief given that the Court held in *Cuozzo* that mandamus offered the sole possibility to challenge a PTO decision to institute after issuance of a final written decision. *Cuozzo*, 793 F.3d at 1273-74. Second, unlike in *Cuozzo*, SAS has a clear and indisputable right to relief. As described above and in SAS's Opening Brief, the Board erred as a matter of law in the Final Written Decision by failing to address the patentability of claims 2 and 11-16 challenged in SAS's Petition. In so doing, the Board "clearly and indisputably exceeded its authority" under the IPR statute. The "nondiscretionary duty that the Board failed to carry out" (PTOB33) was the issuance of a final written decision in compliance with § 318(a). Third, issuance of the writ is appropriate under the circumstances of this case. The Board's erroneous Final Written Decision was

contrary to law, caused clear prejudice to SAS, and lacked any cognizable administrative justification.

This Court's recent nonprecedential decision in *In re Schott Gemtron Corp.*, No. 2015-133 (Fed. Cir. Aug. 11, 2015) does not squarely address the issue raised here. Here, SAS appeals a final written decision and the Board's failure to address the patentability of all the claims challenged in SAS's petition as required by § 318(a). In *Schott*, by contrast, the Court denied a mandamus petition seeking to force the PTO to address certain grounds of unpatentability that had been denied in the Board's institution decision. The Court cited to PTO Rule 37 C.F.R. § 42.108(a) that purports to permit the Board to "elect to review 'all or some of the challenged claims' and proceed 'on all or some of the grounds of unpatentability asserted for each claim,'" and acknowledged that the PTO has discretion in deciding whether to institute an IPR. Because *Schott* only sought relief regarding the Board's denial of certain allegedly redundant grounds, rather than the Board's failure to address all the challenged patent claims in the final written decision, the Court's statements regarding "challenged claims" is dicta.

## CONCLUSION

The Court should affirm the Board's decision finding claims 1, 3, and 5-10 unpatentable.

The Court should reverse the Board's construction of the claim term "data flows" and its decision confirming the patentability of claim 4 of the '936 patent. The Court should declare claim 4 to be unpatentable or, in the alternative, remand to the Board for a determination of patentability of claim 4 applying the proper construction of "data flows."

Additionally, the Court should reverse and vacate the Board's decision in relevant part regarding claims 2 and 11-16 and remand with instructions to comply with § 318(a).

Dated:  August 31, 2015

Respectfully submitted,

*/s/ John A. Marlott*
JOHN A. MARLOTT
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
jamarlott@jonesday.com

GREGORY A. CASTANIAS
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
gcastanias@jonesday.com

DAVID B. COCHRAN
JONES DAY
North Point

901 Lakeside Avenue
Cleveland, OH 44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dcochran@jonesday.com

MATTHEW W. JOHNSON
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone:  (412) 391-3939
Facsimile:  (412) 394-7959
mwjohnson@jonesday.com

*Counsel for Appellant,
SAS Institute Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2015, I served a copy of the foregoing on all counsel of record by CM/ECF.

Dated:  August 31, 2015

*/s/ John A. Marlott*

JOHN A. MARLOTT
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

*Counsel for Appellant,*
*SAS Institute Inc.*

# CERTIFICATION OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,827 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface using Microsoft Office 2007 in Times New Roman 14 point.

Dated:  August 31, 2015

*/s/ John A. Marlott*

JOHN A. MARLOTT
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
jamarlott@jonesday.com

GREGORY A. CASTANIAS
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
gcastanias@jonesday.com

DAVID B. COCHRAN
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dcochran@jonesday.com

MATTHEW W. JOHNSON
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone:  (412) 391-3939
Facsimile:  (412) 394-7959
mwjohnson@jonesday.com

*Counsel for Appellant,*
*SAS Institute Inc.*

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

## IN RE: SCHOTT GEMTRON CORPORATION,
*Petitioner*

---

2015-133

---

On Petition for Writ of Mandamus to the United States Patent and Trademark Office in No. IPR2013-00358.

---

## ON PETITION

---

Before LOURIE, WALLACH, and HUGHES, *Circuit Judges*.

PER CURIAM.

## O R D E R

Schott Gemtron Corporation ("Schott") petitioned the Director of the United States Patent & Trademark Office ("PTO") to institute *inter partes* review of U.S. Patent 8,286,561 ("the '561 patent"), assigned to SSW Holding Company, Inc. The Director granted the petition in part, instituting *inter partes* review on two of the nine grounds asserted in the petition. The remaining seven grounds were accordingly denied.

Subsequently, on May 26, 2015, the PTO Patent Trial and Appeal Board ("the Board") issued its final decision,

which held that Schott did not prove by a preponderance of the evidence that claims 1, 13, and 25 of the '561 patent are unpatentable under 35 U.S.C. § 103. *Schott Gemtron Corp. v. SSW Holding Co.*, IPR2014-00367, 2015 WL 3430088 (P.T.A.B. May 26, 2015). Schott appealed from that decision to this court. In a decision issued today, *Schott Gemtron Corp. v. SSW Holding Co.*, No. 2015-1073, we summarily affirmed the Board's decision.

Schott now petitions this court to issue a writ of mandamus that would direct the PTO to grant *inter partes* review on two of the seven denied grounds. We hereby deny that petition.

Our opinions in *St. Jude Medical, Cardiology Division, Inc. v. Volcano Corp.*, 749 F.3d 1373 (Fed. Cir. 2014) and *In re Dominion Dealer Solutions, LLC*, 749 F.3d 1379 (Fed. Cir. 2014) are determinative. In *St. Jude*, we concluded that 35 U.S.C. § 314(d) prohibits interlocutory review of the PTO's denial of a petition for *inter partes* review. 749 F.3d at 1375–76. In *Dominion Dealer*, we further held that a non-institution decision could not be alternatively challenged via the extraordinary relief of mandamus. 749 F.3d at 1381. Those decisions artfully illuminate that the denial of a petition cannot be reviewed under any circumstances. This case is no different. 37 C.F.R. § 42.108(b) ("Denial of a ground is a Board decision not to institute *inter partes* review on that ground."). Indeed, we would undermine the statutory regime if we were to find mandamus unavailable when a petition is denied in its entirety, yet available when a petition is denied only in part. *In re Cuozzo Speed Technologies, LLC*, No. 2014-1301, 2015 WL 4097949 (Fed. Cir. July 8, 2015) is not to the contrary.

Even if mandamus were available here, Schott fails to satisfy its exacting standard. *See Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 402 (1976) ("The remedy of mandamus is a drastic one, to be invoked only in ex-

traordinary situations."). In particular, Schott fails to establish a clear and indisputable right to relief because it seeks review of a discretionary decision. *See Heckler v. Ringer*, 466 U.S. 602, 616 (1984) ("The common-law writ of mandamus . . . is intended to provide a remedy for a plaintiff . . . only if the defendant owes him a clear non-discretionary duty."). Here, the decision to institute an *inter partes* review is left to the PTO's discretion. And pursuant to that discretion, the Board may elect to review "all or some of the challenged claims" and proceed "on all or some of the grounds of unpatentability asserted for each claim." 37 C.F.R. § 42.108(a). The extraordinary relief of mandamus is thus not warranted here.

Accordingly,

IT IS ORDERED THAT:

Schott's petition for a writ of mandamus is denied.

FOR THE COURT

August 11, 2015                    /s/ Daniel E. O'Toole
        Date                       Daniel E. O'Toole
                                   Clerk of Court